UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
AYAKO HOYAMA, TAKASHI HOYAMA, HIDEKI
KATAYAMA, TAKAKO KATAYAMA, HITOSHI          Case No. 1:10-civ-06465 BSG-GWG
KAWAMOTO, SUGURU KAWAMOTO, COACH
MANAGEMENT, LLC, YASUSHI MOCHIZUKI,
YUKO MOCHIZUKI, ATSUSHI MORI, HIROKO
NAKAMURA, KAYOKO ORITA, YOKO OGURA,
NORMAN SANDLER, MEGUMI SETO, ATSUSHI
SETO, KAZUOMI SHIBATA, TOSHIMI SHIBATA,
MASAOMI SHIBATA, MICHIKO TAKEMATSU,
and YUKA TSUNODA,

                                  Plaintiffs,


                    -against-



MAMORU SAITO, TAKAHITO SAKAGAMI,
TETSUYA HASHIKURA, HIROMI HASHIKURA,
RUMIKO TERMYNA, AMIWORLD, INC., JASB OF
NEW YORK CORPORATION, EBOA LTD, ODIN
ENERGY NY CORPORATION, ODIN PETROLEUM
CORPORATION, ODIN ENERGY CORPORATION,
ODIN PETROIL S.A., ODIN ENERGY SANTA MARTA
CORPORATION S.A., C.I. ODIN PETROLUEM
COLOMBIA, S.A.S., GREAT VOYAGES, CO., LTD.,
GREAT VOYAGES, CO. CORPORATION, BANK OF
THE ATLANTC, LTD., EUBK HOLDINGS, INC.,
EUROPEAN BO ATLANTIC TRUST, EK FOR, EUBK
TRUST EK FOR, EUROPEAN COMMERCIAL BANK,
 EUBK STOCK HOUSE, TSUKUYOMI CORPORATION,
and JOHN DOES 1-20,

                                  Defendants.
------------------------------------------------------------------X

## FIRST AMENDED COMPLAINT

Plaintiffs, Ayako Hoyama ("Mrs. Hoyama"), Takashi Hoyama ("Mr. Hoyama"), Hideki

Katayama ("Mr. Katayama") ,Takako Katayama ("Mrs. Katayama"), Hitoshi Kawamoto ("Mr.

Kawamoto"), Suguru Kawamoto ("Suguru"), Coach Management, LLC ("Coach Management")

1

Yasushi Mochizuki ("Mr. Mochizuki"), Yuko Mochizuki ("Mrs. Mochizuki"), Atsushi Mori ("Mr. Mori"), Hiroko Nakamura ("Mrs. Nakamura"), Yoko Ogura ("Mrs. Ogura"), Kayoko Orita (Mrs. "Orita"), Norman Sandler ("Mr. Sandler"), Atsushi Seto ("Mr. Seto"), Megumi Seto ("Mrs. Seto"), Kazuomi Shibata ("Mr. Shibata"), Toshimi Shibata ("Mrs. Shibata"), Masaomi Shibata ("Masaomi") , Michiko Takematsu ("Ms. Takematsu") and Yuka Tsunoda ("Mrs. Tsunoda") (collectively, "Plaintiffs") by their attorney, Florence Rostami Law, LLC, as and for their first amended complaint (the "Amended Complaint") against defendants Mamoru Saito ("Saito"), Takahito Sakagami ("Sakagami"), Tetsuya Hashikura ("Mr. Hashikura"),  Hiromi Hashikura ("Mrs. Hashikura"), Rumiko Termyna ("Termyna"),  Amiworld, Inc. ("Amiworld"), EBOA , Ltd. ("EBOA"), JASB of New York Corporation ("JASB"), ODIN Energy NY Corporation ("ODIN NY"), ODIN Petroleum Corporation ("ODIN Petroleum"), Great Voyages, Co., Ltd. ("Great Voyages NY"), ODIN Energy Corporation ("ODIN Energy"), ODIN Petroil S.A. ("ODIN Petroil"), ODIN Energy Santa Marta Corporation S.A. ("ODIN Santa Marta"), C.I. ODIN Petroleum Colombia, S.A.S. ("ODIN CI"), Great Voyages, Co. Corporation ("Great Voyages"), Bank of the Atlantic, Ltd. ("BOA"), EUBK Holdings, Inc. ("EUBK Holdings"), European Bo Atlantic Trust, Ek For ("EBOA Trust"), EUBK Trust Ek For ("EUBK Trust"), European Commercial Bank, EUBK Stock House, Tsukuyomi Corporation ("Tsukuyomi") and John Does 1-20 (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action to recover for a massive, Ponzi-like fraud. Since 2006, Saito, Sakagami, their accomplices and their agents including Mr. and Mrs. Hashikura and Termyna have created and maintained a fraudulent investment scheme, preying upon mostly Japanese residents of the U.S. with minimal investment experience. Saito and Sakagami created two

clusters of entities – one purportedly involved with oil and the other with financial services. They offered securities of these entities and investments in funds operated by these entities to Plaintiffs and many other investors. Through verbal and written communications, Defendants offered Plaintiffs stellar returns such as 35% to 50% for one year investments, often with principal guaranteed.

2.      Defendants attracted investors through continuous advertising in local Japanese newspapers and magazines and by holding seminars in various Japanese communities in New Jersey, New York, Texas and perhaps in other states as well. Saito and Sakagami hired agents, such as Defendants Mr. and Mrs. Hashikura and Termyna, from within the Japanese community to promote the investment to their neighbors and colleagues through word of mouth. The promotions were extremely successful, luring large numbers of investors into the scheme. In many cases, the word-of-mouth promotion lured in relatives residing in Japan to invest in the scheme as well.

3.      To carry out their scheme, Saito and Sakagami organized numerous companies, including Amiworld, ODIN Energy NY, ODIN Energy, Great Voyages, offshore banks, including BOA, and other financial institutions, including EBOA and EUBK Trust, all wholly owned and controlled by them. They sold securities of Amiworld, ODIN Energy and Great Voyages. They deceived Plaintiffs into believing that these securities would be listed on the NASDAQ and appreciate 5 to 10 times when in fact they knew this would be impossible.

4.      In one particularly egregious example of fraud, Saito and Sakagami solicited Plaintiffs to invest in funds operated by ODIN NY. Saito and Sakagami issued worthless letters to Plaintiffs, purportedly guaranteeing their invested principal by Defendants EBOA Trust and

EUBK Trust – entities which were purportedly licensed to provide financial services in Sweden, but, in fact, were nothing but insolvent paper institutions.

5.      Pursuant to Defendants' various investment agreements, Plaintiffs were required to deposit $1,000 and open an account with BOA – a bank purportedly licensed in the Republic of Anjouan, Africa.  This BOA account would supposedly hold the purported returns on the investments when they arrived and principals at maturity. BOA is not recognized as a licensed bank by the U.S. authorities. The U.S. Department of State has issued a report stating that all banks licensed by the Republic of Anjouan – a jurisdiction with extremely loose banking regulations – are of dubious legality and may be involved with drug trafficking, money laundering and other financial crimes.  BOA is nothing but a paper company with an elaborate website and, on information and belief, it has never taken custody of Plaintiffs' money. Saito and Sakagami took Plaintiffs' money for their personal use and benefit.

6.      To the outside investor – and certainly to Plaintiffs – Defendants successfully created the impression that investment returns would be certain.  In several instances, the invested money was guaranteed by "independent credit unions", EBOA Trust and EUBK Trust. These credit unions of course were not independent at all, but were, in fact, sham institutions – all under the same umbrella of ownership by Defendants Saito and Sakagami.

7.      Plaintiffs and other investors were directed to pay *all* monies for the purchase of securities or investments in various funds over to EBOA.  On information and belief, not one cent of either these invested monies, or the purported returns on the monies, was ever actually transferred to BOA.  This despite the fact that BOA had elaborate webpages for each of the investors purporting to show an account holding these returns.

4

8.      Following the Ponzi-like pattern, Defendants used the moneys obtained from early investors to pay some initial returns to the investors, which, in turn, lured more investors into the scheme. In the beginning, investors were permitted to transfer money from their BOA accounts into their local bank-accounts in the U.S. and in Japan, from which they could withdraw the funds.  Hence, the reputation of the Defendants grew enough not only to lure in more investors, but also to convince prior investors, including Plaintiffs, to invest more in the schemes and to roll over their investments from year to year.

9.      As with every Ponzi-like scheme, after a certain period of time, the Defendants stopped paying returns. Although their bank accounts at BOA showed monthly deposits of purported returns, after about a year the Plaintiffs and other investors could not withdraw any of the funds. When Plaintiffs expressed their concern with the inaccessibility of their accounts, Sakagami would call them with one of a variety of manufactured excuses for the delay.  Among the excuses was the claim that President Obama's newly-enacted financial regulations had prevented an easy flow of money from off-shore banks to fulfill Plaintiffs' transfer orders.

10.     To further give themselves an appearance of legitimacy, the Defendants registered Amiworld with the U.S. Securities and Exchange Commission ("SEC") for the purported purpose of trading over-the-counter shares. On information and belief, no shares have been traded by parties not related to the Defendants.

11.     By the time this scheme began, in or about 2006, Saito and Sakagami were already highly skilled, highly sophisticated swindlers, having had extensive prior experience running successful frauds in Japan and in the U.S. They engineered an aura of legitimacy around their scheme by associating – and engaging directly with –publicly trusted institutions like the SEC; by developing a convincing internet presence for each of their entities; by drawing on the

5

built-in trust of well-connected third-party sales agents – like the Hashikuras and Termyna –

from within the target community; and by touting their own past business successes, while

leaving out the unseemly details.

12.      Saito and Sakagami generated community "buzz" and excitement about the

investment by, among other things, selecting a purported business platform that was widely

touted in the news as "up and coming"– alternative fuels; by playing off unsophisticated, middle-

class investors' desire for an "inside track" on stocks purportedly about to blow up and go

public; and by skillfully deploying coordinated claims about the investments' promise – e.g.,

plans to be listed on the NASDAQ – directly and through their agents.

13.      Saito and Sakagami also structured their purported businesses and related entities

in a confusing and opaque way that would still appear legitimate to the unsophisticated investor

by, among other things, creating numerous shell and/or sham corporations with similar names

and unclear functions; by constantly altering and revising the overall corporate structure of the

web of companies; by drafting all corporate statements in language that was vague and

confusing, while still appearing to disclose actual information; and, by establishing their physical

base of operations in Colombia, where meaningful investor inquiry would be next to impossible.

14.      Most importantly, Saito and Sakagami and their agents induced and prolonged

reliance on their representations: by preying upon financially modest, unsophisticated Japanese-

American communities, known culturally for their tight-knit, trusting dynamic; by giving

investors the false impression of control over their investment accounts, through the issuance of

phony online (BOA) bank accounts; by skillfully placating investors – angry over payment

delays – with excuses that were plausible, yet technocratic and industry-specific and, therefore,

impossible for the average unsophisticated investor to evaluate.

15.     To date, Defendants have refused Plaintiffs' requests to return the invested moneys.  Instead, they have resorted to various threats and fear tactics – through repeated calls to the investors' homes at all hours of day and night – in order to pressure the investors not to seek legal relief.

16.     As result of this conduct, the Defendants violated the federal securities laws (the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act")) (counts I-III); multiple sections under 18 U.S.C. § 1961 *et seq.* (the Racketeer Influenced and Corrupt Organizations Act ("RICO")) (counts IV-VII); they have engaged in common law fraud; they have engaged in aiding and abetting civil conspiracy to commit fraud; negligent misrepresentation; and breach of fiduciary duty; they have been unjustly enriched (counts VIII-XV).

17.     As a result of Defendants' fraud, Plaintiffs have been injured in an amount to be established at trial, but substantially in excess of $11.4 million.

## THE PARTIES

18.     Plaintiff Ayako Hoyama is a permanent resident of United States. She is a resident of New York State.

19.     Plaintiff Takashi Hoyama is a permanent resident of United States. He is a resident of New York State.

20.     Plaintiff Hideki Katayama is a permanent resident of United States. He is a resident of New Jersey.

21.     Plaintiff Takako Katayama is a permanent resident of United States. She is a resident of New Jersey.

22.     Plaintiff Hitoshi Kawamoto is a permanent resident of United States. He is a resident of California.

23.     Plaintiff Suguru Kawamoto is a U.S. citizen and a resident of Japan.

24.     Plaintiff Coach Management is a California limited liability company with an office in California.

25.     Plaintiff Yasushi Mochizuki is a Japanese citizen and resident of Japan.

26.     Plaintiff Yuko Mochizuki is a Japanese citizen and resident of Japan.

27.     Plaintiff Atsushi Mori is a permanent resident of United States. He is a resident of New Jersey.

28.     Plaintiff Hiroko Nakamura is a Japanese citizen and resident of Japan.

29.     Plaintiff Yoko Ogura is a Japanese citizen and resident of Japan.

30.     Plaintiff Kayoko Orita is a Japanese citizen and resident of Japan.

31.     Plaintiff Atsushi Seto is a United States citizen. He is a resident of New York.

32.     Plaintiff Megumi Seto is a permanent resident of United States. She is a resident of New Jersey.

33.     Plaintiff Norman Sandler is a U.S. Citizen and resident of New York.

34.     Plaintiff Kazuomi Shibata is a Japanese citizen and resident of England.

35.     Plaintiff Toshimi Shibata is a Japanese citizen and resident of England.

36.     Plaintiff Masaomi Shibata is an America citizen and resident of Japan.

37.     Plaintiff Michiko Takematsu is a permanent resident of the United States and resident of New Jersey.

38.     Plaintiff Yuka Tsunoda is a citizen and resident of Japan.

39.     On information and belief, Defendant Mamoru Saito is a Japanese citizen and resident of New York. He resides at 240 East 47th Street, Apartment 10E, New York, New York 10017.

40.     On information and belief, Defendant Takahito Sakagami is a Japanese citizen and resident of New York State. He resides at 255 East 49th Street, New York, New York 10017.

41.     Defendants Tetsuya and Hiromi Hashikura are residents of Leonia, New Jersey and reside at 402 Highwood Avenue, Leonia, New Jersey 07605. On information and belief, Mrs. Hashikura is a United States citizen.

42.     Defendant Rumiko Termyna resides at 220 Demott Avenue, Clifton New Jersey, 07011.

43.     At all relevant times, Defendant Amiworld has been a foreign corporation registered to do business in the State of New York with an office at 60 East 42nd Street, Suite 1225, New York, New York 10165. Defendants Saito and Sakagami are its principal shareholders. Saito is the CEO and Sakagami is the president of Amiworld.

44.     Defendant JASB is a New York domestic corporation with its principal office at 60 East 42nd Street, Suite 1225, New York, New York 10165. Saito is its chairman and/or CEO. Upon information and belief, Saito and Sakagami are its principal shareholders.

45.     Defendant EBOA is a Canadian corporation registered to do business in New York as a foreign corporation with an office at 60 East 42nd Street, Suite 1225, New York, New York 10165. Saito is listed as its chairman and/or CEO. In Amiworld's 2009 financial statements, filed with SEC, EBOA is listed as an affiliate engaged in financial services with access to significant resources from which Amiworld had an ongoing ability to borrow short term loans with no interest or repayment terms from EBOA on an ad hoc as-needed basis.

9

46.     Defendant ODIN NY is a New York domestic corporation with its principal office at 60 East 42nd Street, Suite 1225, New York, New York 10165. Saito is its chairman and/or CEO. On information and belief, directly or indirectly Saito and Sakagami own a majority interest in ODIN NY.

47.     Defendant ODIN Petroleum is a New York domestic corporation with its principal office at 60 East 42nd Street, Suite 1225, New York, New York 10165. Saito is its chairman and/or CEO. On information and belief, directly or indirectly Saito and Sakagami own a majority interest in ODIN Petroleum.

48.     Defendant ODIN Energy is a Panamanian corporation with its office at Torre de las Americas, Torre B Piso 7, Oficina 703, Panama, Panama Punta Pacífica. On information and belief, directly or indirectly Saito and Sakagami own a majority interest in ODIN Energy.

49.     On information and belief ODIN Petroil is a Colombian corporation with an office at Kml Via San Francisco Troncal Del Caribe, Sanata Marta, Colombia, and is a wholly owned subsidiary of Amiworld.

50.     Defendant BOA is licensed in The Republic of Anjouan. It conducts business from an office located at 60 East 42nd Street, Suite 1225, New York, New York. On information and belief, Defendants Saito and Sakagami are its principal shareholders.

51.     On information and belief ODIN Energy Santa Marta Corporation S.A. is a wholly owned subsidiary of Amiworld and a Colombian corporation with an address at Km1 Vía San Francisco Troncal del Caribe Santa Marta, Colombia, and indirectly wholly owned by Amiworld, Saito and Sakagami.

52.     On information and belief C.I. ODIN Petroleum Colombia, S.A.S. is a corporation organized under Colombian law and indirectly wholly owned by Amiworld, Saito and Sakagami.

53.     Defendant Great Voyages NY is a New York corporation with an address at 60 East 42nd Street, Suite 1225, New York, New York. On information and belief, directly or indirectly Saito and Sakagami own a majority interest in Great Voyages NY.

54.     Defendant Great Voyages is a Panamanian corporation with no known address. Its website just lists info@greatvoyagescorp.com email address for contacting the corporation, and indirectly wholly owned by Amiworld, Saito and Sakagami.

55.     Defendant EUBK Holdings is a New York domestic corporation with an address at 60 East 42nd Street, Suite 1225, New York, New York. On information and belief, Saito and Sakagami are its principal shareholders.

56.     Defendant EBOA Trust is an entity registered with Swedish authorities and on information and belief conducts its operations from 60 East 42nd Street, Suite 1225, New York, New York. EBOA Trust is wholly owned by EUBK Holdings.

57.     Defendant EUBK Trust is an entity registered with Swedish authorities and on information and belief conducts its operations from 60 East 42nd Street, Suite 1225, New York, New York. EUBK Trust is wholly owned by EUBK Holdings.

58.     Defendant European Commercial Bank is licensed in the Republic of Anjouan and doing business from its address at 60 East 42nd Street, Suite 1225, New York, New York. European Commercial Bank is wholly owned by EUBK Holdings.

11

59.     On information and belief, Defendant EUBK Stock House is a corporation that conducts business at 60 East 42nd Street, Suite 1225, New York, New York. EUBK Stock House is wholly owned by EUBK Holdings.

60.     Defendant Tsukuyomi is a Panamanian corporation. Tsukuyomi's sole office where its operation is managed and its executives are located at 402 Highwood Avenue, Leonia, New Jersey 07605. On Information and belief Defendants Mr. and Mrs. Hashikura are Tsukuyomi's president and vice president and own the majority of the shares of Tsukuyomi.

61.     Plaintiffs allege on information and belief that at all relevant times, Defendants John Does Nos. 1-20, inclusive, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein.  Plaintiffs are presently unaware of the true names and identities of those Defendants sued herein as John Does Nos. 1-20.  Any reference made to such Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John Does Nos. 1-20, inclusive.

## DEFENDANT ALTER EGOS

62.     JASB, Amiworld, EBOA, ODIN NY, ODIN Petroleum, Great Voyages NY, ODIN Energy, ODIN Petroil, ODIN Santa Marta, ODIN CI , Great Voyages, BOA, EUBK Holdings, EBOA Trust, EUBK Trust, European Commercial Bank and EUBK Stock House (collectively, "Corporate Defendants") are alter egos of Defendants Saito and Sakagami. For the reasons stated herein, there is such a unity of interest and ownership between Saito and Sakagami and Corporate Defendants that the separate personalities of the corporations no longer exist.

63.     At all relevant times hereto, Corporate Defendants were inadequately capitalized, and Saito and Sakagami diverted funds from the Corporate Defendants to themselves through

misappropriating investors' funds, ownership transfers without proper shareholder action and dissolution of corporate entities.

64.      At all relevant times hereto, Corporate Defendants failed to observe corporate formalities, and were instead solely controlled and directed by Saito and Sakagami on a unilateral, *ad hoc* basis, with no other functioning officers or directors. Defendants routinely failed to observe corporate formalities in connection with Amiworld, ODIN Energy and Great Voyages. For example, in September 2010, they dissolved Amiworld without holding a shareholder meeting.

65.      At all relevant times, Saito and Sakagami closely controlled the operations of the Corporate Defendants.

66.      At all relevant times, Saito and Sakagami financed the operations of the Corporate Defendants through sham loans from EBOA which directly collected funds from Plaintiffs.

67.      Amiworld, ODIN Energy and Great Voyages and other Corporate Defendants have not paid dividends to their non-insider shareholders.

68.      On information and belief, at all relevant times hereto, Corporate Defendants did not keep or maintain proper corporate records for the Corporate Defendants, but instead falsified such records when records have been kept at all.

69.      At all relevant times hereto, Saito and Sakagami commingled the funds of Corporate Defendants with their own funds and with funds that they misappropriated from the Corporate Defendants, and treated the Corporate Defendants' funds as their own personal funds.

70.      As described below, Saito and Sakagami diverted assets of the Corporate Defendants to themselves and to their agents and accomplices including, without limitation, Mr. and Mrs. Hashikura, Termyna to the detriment of Plaintiffs.

71.     Defendants failed to maintain an arm's-length relationship between Saito and Sakagami and Corporate Defendants.

72.     Corporate Defendants are mere façades for the personal benefit of Saito and Sakagami.

73.     Saito and Sakagami conceived, orchestrated, and carried out the fraudulent scheme to deprive Plaintiffs of their money by creating the Ponzi-like schemes described below, cultivating the deception that Amiworld, ODIN NY, ODIN Energy and Great Voyages and other Corporate Defendants were viable companies with substantial operations whose listing on the NASDAQ was imminent. Defendants Saito and Sakagami used Corporate Defendants as a means to carry out their fraud, and personally benefited from their unlawful and fraudulent activities to Plaintiffs' detriment.

74.     To allow Saito and Sakagami to hide behind the shield of corporate separateness, where they have employed corporate alter egos as their wholly controlled instruments to benefit themselves through a pattern of misappropriation and fraud, would sanction their fraud, would be manifestly unjust, and would promote inequitable consequences by allowing two of the principal wrongdoers to hide behind a corporate shield to protect themselves. Under these circumstances, the illusion of corporate separateness cannot stand, and, in addition to direct claims against them, Plaintiffs must be permitted to pierce the corporate veil to obtain jurisdiction over and sue Saito and Sakagami directly for the wrongs they committed through Corporate Defendants.

## JURISDICTION AND VENUE

75.     This Court has subject matter jurisdiction of Counts I through III of the Amended Complaint, pursuant to 28 U.S.C. § 1331, because those counts arise under the federal securities laws.

14

76.     This Court has subject matter jurisdiction over Counts IV through VII of the

Amended Complaint, pursuant to 28 U.S.C. § 1331, because those counts arise under the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

77.     This Court has subject matter jurisdiction over Counts VIII through XV of the

Amended Complaint, pursuant to 28 U.S.C. § 1367, as pendent claims because those counts are

so related to Counts I through VIII that they form part of the same case or controversy.

78.     This Court has personal jurisdiction over Defendants Saito and Sakagami:

(i)   pursuant to New York Civil Practice Law and Rules ("CPLR") Section 301,

because (1) Saito and Sakagami, on information and belief, are domiciliaries of the state of New

York, (2) Saito and Sakagami transact business in New York by establishing and managing

various New York domestic corporations in New York, and (3) Saito and Sakagami vicariously

transact business through their alter egos JASB, Amiworld, ODIN Energy NY, BOA and EBOA

in New York.

(ii) pursuant to CPLR Section 302(a)(1) because Saito and Sakami, directly or

through their agents, transact extensive business in New York (1) by establishing JASB, the

predecessor of Amiworld, ODIN NY, ODIN Petroleum, Great Voyages and EUBK Holdings as

New York domestic corporations, (2) by causing EBOA and Amiworld to register as  authorized

foreign entities in New York, and (3) by causing ODIN Energy, Great Voyages, BOA, EBOA

Trust, EUBK Trust, European Commercial Bank to conduct business including soliciting funds

in and from New York;

(iii) pursuant to CPLR Section 302(a)(2) because Saito and Sakagami committed the

tortious acts alleged in this Amended Complaint within the State of New York including without

15

limitation making, and causing their agents to make, fraudulent representations to Plaintiffs regarding the status of Corporate Defendants;

(iv) pursuant to CPLR Section 302(a)(3) because Saito and Sakagami (1) committed the tortious acts alleged in this Amended Complaint outside of the State of New York causing injury and harm to Plaintiffs in New York and (2) regularly conduct business in the State of New York including soliciting funds from Plaintiffs and other investors;

(v) pursuant to CPLR Section 302(a)(4) because Saito and Sakagami, on information and belief, own, possess and use real property in the State of New York; and

(vi) pursuant to 18 U.S.C. § 1965(a), because (1) Saito and Sakagami and their agents, the Hashikuras and Termyna, are present in New York, and (2) Saito and Sakagami are participants in a pattern of racketeering activity and a racketeering conspiracy that has an impact on commerce in New York, and at least one of whose participants is subject to personal jurisdiction in New York.

79.    This Court has personal jurisdiction over Defendants Mr. and Mrs. Hashikura and Termyna:

(i) pursuant to CPLR Section 302(a)(1) because each of them transacts business in the State of New York including entering into agreements with Saito, Sakagami and Corporate Defendants to solicit, and soliciting funds from New York residents and entering into agreements with Plaintiffs;

(ii) pursuant to CPLR Section 302(a)(2) because each of them committed tortious acts alleged in this Amended Complaint within the State of New York including without limitation making fraudulent misrepresentations to Plaintiffs in furtherance of the Defendants' schemes;

(iii) pursuant to CPLR Section 302(a)(3) because each of them committed tortious acts alleged in this Amended Complaint outside of the State of New York causing injury and harm to Plaintiffs in New York and regularly conducts business in the State of New York including soliciting funds from Plaintiffs and other investors; and

(iv) pursuant to 18 U.S.C. § 1965(a), because the Hashikuras and Termyna are participants in a pattern of racketeering activity and a racketeering conspiracy that has an impact on commerce in New York, and at least one of whose participants is subject to personal jurisdiction in New York.

80. Pursuant to CPLR Section 301, this Court has personal jurisdiction over Defendants Amiworld, JASB, ODIN NY, ODIN Petroleum, Great Voyages NY, EUBK Holdings and EBOA because these entities are registered either as domestic corporations or as foreign corporations with the New York Secretary of State to do business in this State.

81. This Court has personal jurisdiction over Defendant BOA:

(i) pursuant to CPLR Section 301 because BOA transacts business from an office located at 60 East 42nd Street, New York, New York;

(ii) pursuant to CPLR Section 302(a)(1) because BOA transacts business in the State of New York including entering into agreements with Defendants Saito, Sakagami and Corporate Defendants to solicit and soliciting funds from Plaintiffs in New York, and offering banking services to Plaintiffs and other investors in New York;

(iii) pursuant to CPLR Section 302(a)(2) because BOA committed tortious acts alleged in this Amended Complaint within the State of New York by making fraudulent misrepresentations to Plaintiffs in furtherance of the Defendants' schemes;

17

(iv) pursuant to CPLR Section 302(a)(3) because BOA (1) committed tortious acts alleged in this Amended Complaint outside of the State of New York causing injury and harm to Plaintiffs in New York and (2) regularly conducts business in the State of New York including providing banking services to Plaintiffs and other investors; and

(v) pursuant to 18 U.S.C. § 1965(a), because (1) BOA's agents, Saito and Sakagami, the Hashikuras and Termyna are present in New York, (2) BOA transacted business in New York, and (iii) BOA is a participant in a pattern of racketeering activity and a racketeering conspiracy that has an impact on commerce in New York, and at least one of whose participants is subject to personal jurisdiction in New York.

82.     This Court has personal jurisdiction over Defendants EBOA Trust and EUBK Trust:

(i) pursuant to CPLR Section 302(a)(1) because each of these entities transacts business in the State of New York including entering into agreements with Defendants Saito, Sakagami and Corporate Defendants to solicit funds and soliciting funds from Plaintiffs in New York;

(ii) pursuant to CPLR Section 302(a)(2) because each of these entities committed tortious acts alleged in this Amended Complaint within the State of New York including without limitation by making fraudulent misrepresentations to Plaintiffs in furtherance of the Defendants' schemes;

(iii) pursuant to CPLR Section 302(a)(3) because each of these corporations (1) committed tortious acts alleged in this Amended Complaint outside of the State of New York causing injury and harm to Plaintiffs in New York and (2) regularly conducts business in the State of New York including soliciting funds from Plaintiffs and other investors; and

18

(iv) pursuant to 18 U.S.C. § 1965(a), because (1) EBOA Trust's and EBUK Trust's agents, Saito and Sakagami, the Hashikuras and Termyna are present in New York, (2) EBOA Trust and EBUK Trust transacted business in New York, and (3) EBOA Trust and EBUK Trust are participants in a pattern of racketeering activity and a racketeering conspiracy that has an impact on commerce in New York, and at least one of whose participants is subject to personal jurisdiction in New York.

83.    Pursuant to CPLR Section 302(a)(1), this Court has personal jurisdiction over Defendant European Commercial Bank because it transacts business in the State of New York including entering into agreements with Defendants Saito, Sakagami and Corporate Defendants to solicit funds from Plaintiffs in New York.

84.    Pursuant to CPLR Section 302(a)(1), this Court has personal jurisdiction over Defendant EUBK Stock House because it transacts business in the State of New York including entering into agreements with Defendants Saito, Sakagami and Corporate Defendants to solicit funds and entering into agreements with Plaintiffs in New York.

85.    Pursuant to CPLR Section 302(a)(1), this Court has personal jurisdiction over Defendant Tsukuyomi because it transacts business in the State of New York including entering into agreements with Defendants Saito, Sakagami and Corporate Defendants to solicit funds and entering into agreements with Plaintiffs in New York, and pursuant to 18 U.S.C. § 1965(a), because (1) Tsukuyomi's agents, the Hashikuras, Saito, Sakagami, Amiworld, JASB and ODIN Energy NY are present in New York, (2) Tsukuyomi transacts business in New York, and (3) Tsukuyomi is a participant in a pattern of racketeering activity and a racketeering conspiracy that has an impact on commerce in New York, and at least one of whose participants is subject to personal jurisdiction in New York.

19

86.     This Court has personal jurisdiction over Defendant Great Voyages:

(i) pursuant to CPLR Section 302(a)(1) because it transacts business in the State of New York including entering into agreements with Defendants Saito, Sakagami and Corporate Defendants to solicit and soliciting funds from Plaintiffs in New York;

(ii) pursuant to CPLR Section 302(a)(2) because it committed tortious acts alleged in this Amended Complaint within the State of New York including without limitation making fraudulent misrepresentations to Plaintiffs in furtherance of the Defendants schemes;

(iii) pursuant to CPLR Section 302(a)(3) because it (1) committed tortious acts alleged in this Amended Complaint outside of the State of New York causing injury and harm to Plaintiffs in New York and (2) regularly conducts business in the State of New York including soliciting funds from Plaintiffs and other investors; and

(iv) pursuant to 18 U.S.C. § 1965(a), because (1) Great Voyages' agents, the Saito and Sakagami, the Hashikuras and Termyna are present in New York, (2) Great Voyages transacts business in New York, and (3) Great Voyages is a participant in a pattern of racketeering activity and a racketeering conspiracy that has an impact on commerce in New York, and at least one of whose participants is subject to personal jurisdiction in New York.

87.     Pursuant to CPLR Section 302, ODIN Energy, ODIN Petroil, ODIN Energy Santa Marta, and ODIN C.I. because these entities transact business through their parent company and its other subsidiaries in the State of New York and because pursuant to 18 U.S.C. § 1965(a), these entities are participants in a pattern of racketeering activity and a racketeering conspiracy that has an impact on commerce in New York, and at least one of whose participants is subject to personal jurisdiction in New York.

88.     Venue is proper in the Southern District of New York because many of Defendants reside in, and many of Defendants' acts and transactions constituting the violations of the Securities Act and the Exchange Act occurred in the Southern District of New York.

89.     Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Amended Complaint.

## FACTS

### I.   THE FRAUDULENT INVESTMENTS

90.     As discussed more fully below, Saito and Sakagami solicited, directly and through agents, investments from Plaintiffs for the following investment projects (the "Projects"): (1) Venezuelan Bolivar Currency Exchange project ("VEB") where Saito and Sakagami sold U.S. dollars to Venezuelan nationals who could not otherwise exchange Venezuelan currency for U.S. dollars through authorized government agencies; (2) ODIN Oil Fund ("Oil Fund") a fund offered by ODIN NY and used by Saito and Sakagami for the trading of petroleum as a commodity; (3) Palm Oil Fund ("Palm Fund") a fund used by Saito and Sakagami for the trading of palm oil  as a commodity; (4) equity securities of (a) Amiworld, (b) ODIN Energy Corporation, and (c) Great Voyages.

91.     As a result of their fraudulent efforts, Saito and Sakagami actually received at least $40 million in aggregate principal investment amounts from Plaintiffs and other investors for these projects.

92.     In all of these investments schemes, the manner by which Saito and Sakagami obtained the money was the same. They required investors and Plaintiffs to open an account with BOA for receiving the return on their investments, and pay the invested sums to EBOA.

## II.  INVESTMENT PROJECTS

### A.  Venezuelan Bolivar Currency Investment

93.     Between 2006 and 2008, Saito and Sakagami initiated a venture, through BOA, in which they solicited investments in a currency exchange project designed to exploit the scarcity of official channels through which Venezuelan nationals were practically able to purchase U.S. dollars at any time and in any quantity.

94.     As it was represented to Plaintiffs, the VEB venture was designed to provide U.S. currency to the many Venezuelans studying or doing business in the U.S. who needed the difficult-to-obtain dollars. On information and belief, the scarcity of access to U.S. currency enabled Saito and Sakagami to sell dollars – funded through investments in this venture at a 100% markup over the official exchange rate.

95.     Mr. and Mrs. Hashikura told the Hoyamas, the Shibatas and Mrs. Takematsu that JASB was behind the VEB project and had already made substantial profits selling U.S. dollars to Venezuelan nationals. In addition, Mr. and Mrs. Hashikura told Plaintiffs that they had invested $300,000 in VEB and were satisfied with the returns.

96.     Termyna – on numerous occasions – also represented to the Katayamas, the Mochizukis and the Setos that she had invested in VBE and was satisfied.

97.     Saito and Sakagami promoted the currency exchange venture in two separate offering memoranda one in 2005 ("2005 VBE Offering Memo") written in Japanese and a second one in 2007 ("2007 VEB Offering Memo") written in English.  Both documents were

22

written in an extremely vague and convoluted manner, almost certainly designed to prevent the intended audience of unsophisticated investor/readers from comprehending precisely what was being represented therein, while, at the same time, not dissuading them from investing.

98.     The 2007 VEB Offering Memo misled Plaintiffs by representing that the returns on the VEB investment would be tax-free – implying it would be tax free in the U.S. and in Japan in accordance with offshore regulations, without identifying the regulations or providing the jurisdictional basis for their applicability.

99.     BOA operated VEB from 60 East 42nd, New York, New York, with telephone contact at: (212) 557-1012.

100.    Plaintiffs' BOA account statements – both paper and online – displayed returns on Plaintiffs' investments as increases in the value of the accounts.

101.    In or about 2008, Sakagami, the Hashikuras and Termyna advised Plaintiffs and other investors that the VEB investment was ending. Sakagami, the Hashikura and Termyna, aggressively advised those Plaintiffs who had invested in VEB to roll over their investment in VEB to the Oil Fund and/or to the other projects. They offered to guarantee the principals invested in the Oil Fund and the Palm Oil Fund.

102.    VEB was the initial snare with which Saito and Sakagami entrapped Plaintiffs.

**B.  ODIN Oil Fund**

103.    In or about fall of 2006 and continuing through 2008, Saito and Sakagami solicited Plaintiffs to invest in a joint venture with their wholly owned and controlled entity ODIN NY, a New York domestic corporation, to purchase crude oil for resale and for refining. In a seven page offering memorandum (the "Oil Fund Memo"), they explained to potential

23

investors, among them Plaintiffs,  that ODIN NY would use the money raised to purchase crude

oil in an operation conducted by international petroleum majors jointly with refineries owned by

public companies or oil investment organizations.

104.    The Oil Fund Memo made representations that JASB's local representative

company had obtained the right to purchase oil directly from Ecopetrol, S.A., Colombia's

national oil company, a venture for which $3,000,000 was being solicited in six separate units of

$500,000 each. On information and belief, Saito and Sakagami solicited at the minimum $11.4

million from Plaintiffs and other investors for this Project.

105.    The Oil Fund Memo promised returns of 33% to 48% for investments between

$10,000 to $500,000 and 48% for investments of $500,000 or more for one-year term, with no

cancellation right. The Oil Fund Memo also claimed that shareholders of Amiworld and Great

Voyages were being advantageously treated, although it did not specify in what way. EBOA

Trust was named the administrator of the Project, and BOA was named the recipient of the

returns. The principal was guarantee by EBOA Trust and EUBK Trust. Both of these entities

were insolvent.

106.    The crude oil supply would purportedly be refined and the products sold. The

profits would purportedly be shared on a 50/50 basis (50% of profits were to be paid to Saito and

Sakagami, and 50% divided between Plaintiffs and other investors in proportion to their

investments) with all the investors in the joint venture. ODIN NY claimed that it would store

crude oil in tankers until it refined the oil, at which time the refined products would be sold to the

market. However, on June 6, 2007, in the prospectus (the "Prospectus") filed with the SEC, Saito

and Sakagami represented that Amiworld (including its subsidiaries) was only involved with a

biodiesel processing plant and that they intended to have a crude oil refinery.

107.    To fund this project, Saito and Sakagami solicited one year term investments of $100,000 or more from its investors. For individual investors who could not meet the $100,000 threshold, with Saito's and Sakagami's help, Mr. and Mrs. Hashikura created defendant Tsukuyomi to pool smaller individual investment amounts and then invest it on behalf of the investors in the oil project collectively.

108.    To capture smaller investors, Saito and Sakagami also created the Palm Oil Fund which required a minimum of only $20,000 investment. EBOA Trust and EUBK Trust supposedly guaranteed the principal investment.  Otherwise, the Palm Oil Fund claimed to provide the same returns as with the Oil Fund. This project promised investments in palm oil the raw material used by the JASB Group's biodiesel fuel plant.

109.    Sakagami, Mr. and Mrs. Hashikura and Termyna continuously told Plaintiffs and investors that their principal were guaranteed by big Swedish banks, owned and operated by Saito and Sakagami and that, therefore, Plaintiffs would bear no risk by investing in the Oil Fund. Among the specifically known representations, Sakagami told Mrs. Shibata and Mr. Katayama, on separate occasions, that the Oil Fund was a safe investment, and that Amiworld owned a large bank in Sweden that was guaranteeing the principal on all investments in Amiworld ventures. Sakagami told Mr. Kawamoto that because of the tight control by the European Union, EBOA Trust's and EUBK Trust's guarantees were reliable.

110.    Plaintiffs trusted and relied on the representations made by Sakagami, Mr. and Mrs. Hashikura and Termyna and invested in the Oil Fund.

111.    With every deposit, Sakagami signed a one page guarantee – first by EBOA Trust, and once EBOA Trust was declared bankrupt for failure to pay its corporate taxes, by

EUBK Trust – which supposedly guaranteed the funds being invested. However, both of these entities were paper companies and functionally insolvent.

112.    Plaintiffs and other investors were required to open an account with BOA, but, were instructed to wire the deposit and the investment monies to EBOA. Plaintiffs were able to see regular deposits of their returns registering in their individual online BOA accounts. Plaintiffs were told that they would be able to withdraw, at their individual discretion, the monies in their accounts through wire transfer to their bank accounts in the United States and in Japan. In reality, only a small number of the investors who attempted to make withdrawals actually succeeded in doing so and, even then, only a handful of times and in small increments.

113.    The typical pattern for withdrawal was that the first transfer request would take four business days to be processed and transferred, while the second and third requests would take several weeks or months to be processed. As of mid 2009, except for a handful of transfers, Defendants no longer allow even these transfers, leaving Plaintiffs with no ability to withdraw money from their accounts.

114.    In conversations and by email, Sakagami, the Hashikuras and Termyna gave Plaintiffs several excuses for the delays, among them that, due to President Obama's money laundering policies, it was very difficult to transfer monies from offshore banks to banks in the United States. They told some inquiring Plaintiffs that their correspondent bank had gone bankrupt and others that the delay was due to embezzlement at the correspondent bank, without disclosing the name of the purported correspondent bank to Plaintiffs.

115.    On numerous occasions, including without limitation in or around summer of 2007, and in September 2009, on November 23, 2010, Sakagami, the Hashikuras and Termyna

told Plaintiffs that JASB Group has sufficient funds to cover any loss suffered by their investors due to the embezzlement and or bankruptcy of their correspondent bank.

116.    In or about February and summer of 2007, on January 24, 2008, Saito and Sakagami - directly and through Mr. Hashikura and Termyna - advised Plaintiffs that their off-shore returns did not have to be reported to the I.R.S.

117.    In addition, on or about summer of 2009, Saito and Sakagami – directly and through Mr. Hashikura and Termyna – advised Plaintiffs not to transfer more than $9,999 from their BOA accounts at any given time, in order to avoid triggering provisions of the money laundering regulations.

118.    As Plaintiffs' annual terms expired, they were aggressively pushed to roll their principal investments over into a new annual term.

## C. Amiworld's Securities

119.    Saito and Sakagami solicited Plaintiffs and other investors to invest in Amiworld and its subsidiaries in several unregistered private offerings. Sakagami, the Hashikuras and Termyna told Plaintiffs that this was a rare opportunity for outsiders to have the privilege of being offered securities of a company that was about to be listed on the NASDAQ and appreciate 10 to 30 times in its value and that it was offered to Plaintiffs because they were BOA account holders.

120.    Amiworld's predecessor, Amiworld, Inc. ("Amiworld NY") was incorporated in the State of New York on October 30, 1998 as Amuru International, Inc., by its appointed CEO and President, Saito, and its appointed COO, Sakagami. On April 28, 1999, Amuru International Inc.'s name was changed to Amiworld, Inc. and on May 12, 1999, the corporation was listed on

the Bermuda Stock Exchange (BSX) under the listing: AMI-BH. In January of 2004, Amiworld

NY failed to meet the BSX registration requirements and, as a result, was de-listed from the

BSX.  Saito and Sakagami did not disclose this fact to Plaintiffs.

121.     On February 6, 2007, a separate new sibling entity, Amiworld (defendant in this

action) was created and registered in Nevada. By merger (the "Merger") of the two entities in

May 2007, Amiworld NY disappeared. Subsequently, Amiworld registered to do business in

New York as a foreign corporation.

122.     Amiworld's articles of incorporation entitle the common shareholders of record to

one vote per share, with equal voting rights – including for the election of directors – to all

shareholders. Amiworld's By-Laws provide for an annual meeting on the third Friday of

November of each year at 10:00 a.m., as well as special meetings at the designation of officers or

directors, for which notice of annual and special meeting shall be sent to all shareholders. The

By-Laws required a 60 days prior written notice stating the place, day and hour of the meeting of

shareholders be delivered personally or by mail to each shareholder of record entitled to vote. All

of the Plaintiffs who invested in Amiworld's securities had the right to vote, but were not given

the opportunity to exercise this right.

123.     The corporation is subject to statutory dissolution rules of the State of Nevada, as

the By-Laws are silent on dissolution. On September 9, 2010, ten days after the original

Amended Complaint in this action was filed, without notifying Plaintiffs of the dissolution,

holding a shareholder meeting for a vote on the dissolution, or providing an opportunity for an

accounting to minority shareholders, Saito and Sakagami dissolved Amiworld to remove it from

the jurisdiction of the courts in the United States. The dissolution of Amiworld violated the

corporate dissolution laws of the State of Nevada.

124.     In November of 2006 but continuing at least through 2010, Saito and Sakagami began setting in motion a plan to develop some business to give themselves the appearance of legitimacy to defraud Plaintiffs and other investors. They developed a small biodiesel fuel plant in Colombia through ODIN Energy Santa Marta S.A., a Colombian entity, by acquiring, on November 30, 2006, 9.9 acres of land in Magdaleno Colombia for $452,902; and purchased from C.M. Bernardini of Italy a biodiesel decalcification plant for which they paid $2,947,382.

125.     In November 2006, Saito and Sakagami solicited investments in an oil refinery plant purportedly existing on the same property in Magdaleno, Colombia. On information and belief, Amiworld did not have or operate a crude oil refinery at that time. Further, on information and belief, no such refinery exists and even if it exists, its operations are marginal.

126.     In or about November - December 2006, Saito and Sakagami caused Amiworld NY to issue a private stock offering of 346,190 shares, at $10 per share, to U.S. residents, thereby raising $3,461,900, purportedly for the oil refinery, but in reality for the biodiesel plant. Then in May 2007, Amiworld NY merged into Amiworld.  Saito and Sakagami did not issue Plaintiffs stock certificates in Amiworld NY or in the successor entity. In some instances, after constant pressuring by some of the Plaintiffs, Saito and Sakagami sent them copies of stock certificates in Amiworld.

## 1.  2006 Amiworld Securities Offering

127.     Saito, Sakagami and their agents, the Hashikuras and Termyna aggressively solicited Plaintiffs to purchase Amiworld's securities.

128.     In an offering memorandum ("Amiworld Offering Memo") – dated sometime near, but prior to, November 19, 2006 – Saito and Sakagami, as CEO and COO of Amiworld

NY, respectively, outlined Amiworld NY's purported ongoing 2006 initiative to prepare Amiworld NY to be listed on the NASDAQ stock exchange. In addition to Saito's and Sakagami's titles, the Amiworld Offering Memo represented that David Garin was the Financial Administrator of Amiworld NY. The Amiworld Offering Memo, which was made available exclusively in the Japanese-language, was approved by Amiworld NY's board of directors (which was controlled by Saito and Sakagami).

129.    Saito and Sakagami claimed that this offering was exempt from registration under Regulation S of the Securities Act of 1933, because it was not being offered to any residents of the United States. This claim was false. In reality, the Amiworld Offering Memo had been circulated amongst investors who were either permanent or non-permanent residents of the U.S., residing in New York, New Jersey, Texas and California. Sakagami, Termyna, and Mr. and Mrs. Hashikura knew that the offering memorandum had been circulated among U.S. residents; therefore, they repeatedly directed Plaintiffs to use an address in Japan on the stock applications and purchase agreements (the "SPAs"). They claimed that this measure was being taken in order to avoid making the offering to Americans who were considered litigious and difficult to control. Sakagami, Termyna, Mr. and Mrs. Hashikura failed to explain to Plaintiffs that the sale of securities exempt from registration pursuant to Regulation S to U.S. residents would violate the law.

130.    At the time that the Amiworld Offering Memo was circulated, no other equally pertinent document – such as the articles of incorporation or By-Laws of Amiworld New York and/or Amiworld Nevada or the merger plan – had been provided to the Plaintiffs, with the exception of a brochure on biodiesel production of ODIN Energy of Santa Marta, Amiworld NY's subsidiary. To relieve themselves of any liability for this failure, Defendants included a

false representation in the stock purchase agreement that all pertinent and relevant documents had been provided to the investors.

131.  The language of Amiworld Offering Memo was convoluted and at times difficult for any Japanese native speaker, even those experienced in securities offerings to understand.

132.  In the Amiworld Offering Memo, a broad set of fraudulent and misleading representations were made regarding Amiworld in connection with the issuance of 780,000 shares of class A common voting stock with an application period between November 11, 2006 and December 15, 2006 at $10 a share.

133.  The Amiworld Offering Memo misled Plaintiffs that the company had already taken several steps necessary to be listed and thereafter was going to be listed on the NASDAQ in about 180 days. Plaintiffs reasonably relied on this statement and invested in Amiworld NY securities.

134.  The Amiworld Offering Memo made a host of false and/or misleading representations regarding Amiworld NY's background and purported experience and ongoing activities in the oil resale business that were designed to induce unsuspecting investors, among them Plaintiffs, to invest in Amiworld NY – among them were the statements that Amiworld NY:

   a.  "was soliciting capital for its crude oil refinery" when in fact it was building a biodiesel plant;

   b.  "had 220,000 shares outstanding"  when in fact in 2005-2006 period, Amiworld NY issued 1,825,000 shares to JASB and 100,000 shares to EBOA;

   c.  "was previously involved with resort development in the U.S., but liquidated its assets in 2005" while failing to disclose that in 1995, Saito and Sakagami's Japanese

entities, Amuru Japan, Ltd., Fox Pines Condominium Associations, Inc., and JASB Company, filed a petition for involuntary bankruptcy of Rabex North Carolina, a wholly owned subsidiary of JASB Company, to defraud about 900 Japanese investors;

d.   "had acquired 45% of a shipping company called Great Voyages [NY], for the shipment of its oil products that would acquire a 1,000 ton class tanker in November 2006" when in fact Great Voyages [NY] never acquired any vessels; and

e.   "was running a virtual offshore bank – BOA – to support the finances of the venture, and was in the process of obtaining various bank licenses from the U.S. federal and state banking agencies which would take twelve (12) months" when in fact the U.S. Department of State reported that any bank who was licensed by the Republic of Anjuoan – such as BOA – was a dubious institution and possibly involved with drug trafficking, money laundering and other financial crimes.

135.   Notably, omitted from the Amiworld Offering Memo were representations about the risks of operations, Saito's and Sakagami's intent to list Amiworld with the over-the-counter securities' market, the Over the Counter Bulletin Board ("OTCBB"), the associated risk of price decreases as the result of listing on this market, and the outstanding Japanese judgments against Saito and Sakagami and Amiworld NY's affiliates Amuru Japan, and Amuru USA (as discussed more fully below).

136.   Plaintiffs were asked to send their subscription price to EBOA. Supposedly, Saito and Sakagami would then transfer the money to the BOA account of the payor and, thereafter, withdraw it from BOA to acquire the securities. On information and belief, none of the monies paid for securities were ever deposited with BOA by EBOA. On information and belief, most of

the funds paid for the securities of Amiworld NY or its successor in interest Amiworld, were pocketed by Saito and Sakagami.

137.    In order to give the illusion that the investors in Amiworld NY were not U.S. residents, Sakagami, the Hashikuras and Termyna told Plaintiffs to use an address in Japan on the agreements they signed.

138.    And, thereafter, in the Prospectus, Saito and Sakagami represented that: "In December 2006, we commenced a private offering of our Common Stock, whereby we sold an aggregate of 346,190 shares of our Common Stock to 307 investors, *none of whom are residents of the United States*, at a price of $10.00 per share, for aggregate proceeds of $3,461,900." (emphasis added).  Plaintiffs Mr. and Mrs. Katayama, Mr. and Mrs. Mochizuki, Mr. Seto and Mrs. Seto, Mr. and Mrs. Shibata and Mrs. Takematsu who purchased the stocks in December 2006 were U.S. residents.

139.    After the 2006 Amiworld Offering and the Merger of Amiworld NY with Amiworld, Saito and Sakagami, caused a one-to-ten stock split without notifying Plaintiffs or providing the stock certificates.

## 2.   2007 Amiworld Securities Offering

140.    In or about October of 2007, Amiworld issued a two page offering memorandum dated October 26, 2007 ("2007 Amiworld Offering Memo"), for 5 million restricted common stock at $2.00 per share (price of shares after a one-to-ten stock split), to be open from October 28, 2007 through November 30, 2007.

141.    The 2007 Amiworld Offering Memo, which was signed by Sakagami as Shares Manager, COO/CEO of Amiworld, made numerous material representations regarding

Amiworld's positive business outlook, its approval by the SEC as a publicly traded company and its purportedly positive prospects for the listing of Amiworld stock on the NASDAQ, including that on October 5, 2007, Amiworld, Inc. was approved by the SEC as a publicly traded company (File number 333-143566).  The 2007 Amiworld Offering Memo misleadingly stated that (a) Amiworld would undergo the NASDAQ stock market listing procedures within 60 days of [this] approval; and (b) that after regulatory approval and during the NASDAQ listing process period, the stock would be offered publicly at $3 per share within the United States.

142.    The 2007 Amiworld Offering Memo also contained two separate representations of Amiworld's stated policy of excluding U.S. residents from eligibility for the purchase of Amiworld's securities. But, in the 10KSB document (the annual and transition report for the small issuer) filed with the SEC on March 28, 2008, Saito and Sakagami represented to have issued 3.1 million shares of Amiworld's securities at $2 per share to 47 investors, none of whom were U.S. residents. However, Mr. and Mrs. Katayama, Mr. and Mrs. Hoyama, Mr. Kawamoto, all U.S. permanent residents, and Mr. Sandler, a U.S. citizen purchased shares from this offering.

143.    The two page 2007 Amiworld Offering Memo did not include any representations on operation risks, the fact that the securities were being traded over-the-counter, and the risk of downward price fluctuations because of being traded on the OTCBB.

144.    Plaintiffs were required to pay for the shares prior to receiving the subscription application or the investment agreements.

### 3.  Stock Purchase Agreements

145.    On March 12, 2007, Sakagami issued a statement to Plaintiffs, together with a Stock Purchase Agreement (the "SPA"), both in Japanese, for the purchase of Amiworld's

securities. Sakagami stated that Amiworld's business plans had been successfully implemented and were running on schedule.

146.    The SPA contained, among other things, boilerplate terms requiring investors, among them Plaintiffs, to (falsely) attest to their individual investment sophistication and to their direct access to company information, as well as to acknowledge the un-registered status of the shares, thereby implicitly disclaiming any right to re-sale of the stock. Plaintiffs signed the SPA without understanding the meaning of the representations they were attesting to and the consequences of these terms. Not once were Plaintiffs directed to seek professional advice regarding the investment or the SPA. Indeed, Saito, Sakagami, Mr. and Mrs. Hashikura and Termyna pressured Plaintiffs to rely on their repeated representation that everything "was above board and alright."  However, these offerings were not exempt from the registration requirements of the U.S. securities laws.

147.    In 2008, Sakagami issued another SPA (the "2008 SPA"), in Japanese and in English, to potential investors, which was closely based upon – and repeated many of the same fraudulent terms as – the 2006 SPA. Plaintiffs were asked to sign this SPA as well.

148.    The representations that Defendants required under the 2006 and 2008 SPAs, knowing that they knew were false, included that:

a.  The investors understand the offering memo provided.

b.  The investors (with no experience in trading securities) had sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment in the shares and bear the economic risk of the investment.

c. The investors were in a position with regard to [Amiworld] and its officers and directors which has enabled them to obtain information from [Amiworld] and its affairs in order to evaluate the merits and risks of this investment in the shares.

d. That [Amiworld] had made available the opportunity to ask questions of and receive answers from the directors and executive officers of [Amiworld] and to obtain any additional information concerning [Amiworld].

149. Defendants knew that Plaintiffs did not have sufficient knowledge or experience in financial business matters to evaluate the merits and risks of investments in Amiworld's securities or in any other projects offered by Saito and Sakagami. Plaintiffs had not invested in securities of any other entity – whether public or private. Plaintiffs did not understand the implications of the subscriber representations in the SPAs. If any Plaintiff asked a question, they were told to rely on the representations of Saito, Sakagami, the Hashikuras and Termyna, who were sophisticated and experienced business people.

150. The 2006 SPA contained clauses regarding the subscribers' right to sell Amiworld's securities: (i) "I understand the shares are not registered with the SEC or any state securities commission, and that any benefit which may accrue to me will not materialize at this point;" and (ii) "I understand that I cannot sell the shares unless such sale is registered under the 1933 Act and exemptions from such registration become available." Plaintiffs did not understand the implications of these statements; rather they believed the representations by Sakagami, Termyna and the Hashikuras that Plaintiffs could sell the securities 4-6 months after they purchased them.

### 4.   **NASDAQ Listing**

151.   Knowing that being registered as a public entity would give them an appearance of legitimacy, Saito and Sakagami filed to register Amiworld with the SEC for being listed on the OTCBB.

152.   On June 7, 2007, Saito and Sakagami caused to be filed the Prospectus with the SEC, relating to the 2006 offering to enable all Amiworld stockholders (represented therein as constituting a total of 335 shareholders holding a total of 3,573,900 common shares outstanding) to re-sell their shares at an initial price of $3.00 per share, with the stated goal of developing a market for the shares on the OTCBB. This was explained to investors and to Plaintiffs as the process to obtain approval for being listed on the NASDAQ market despite the fact that the NASDAQ is quite distinct from the OTCBB market, which is run by Financial Industry Regulatory Authority, Inc. Stocks listed on the OTCBB have small market capitalization, minimum share price, no corporate governance or other requirements, and thereby susceptible to manipulation and fraud.

153.   From June 2007 to September 2010, Saito and Sakagami filed about 63 documents with the SEC making numerous misrepresentations including the following:

a.   None of the subscribers who purchased shares at private offerings were U.S. residents;

b.   Amiworld owned several subsidiaries involved with processing palm oil into biodiesel fuel, refining crude oil, mixing biodiesel fuel and crude oil – when, on information and belief, there is only one plant located in Magdalena, Colombia, using the biodiesel decalcification plant equipment purchased from C.M. Bernardini; on the

websites created to legitimize these subsidiaries, Saito and Sakagami used photos of the same plant to give the impression of multiple operations; and

c.   Saito and Sakagami each had substantial business experience and success in previous ventures they were involved with – failing to disclose their involvement with two other Ponzi-like schemes for one of which there were two outstanding judgments against them.

154.   Saito and Sakagami *repeatedly* told Plaintiffs – directly and through Mr. and Mrs. Hashikura and Termyna, in writing and verbally – that, within a matter of days, Amiworld was to be listed on the NASDAQ and, thereafter, Amiworld's stock price would increase at a minimum 500%, if not 3000%, in value.

155.   In numerous emails and direct communications with Plaintiffs, Sakagami, Mr. and Mrs. Hashikura, and Termyna continuously informed and reassured Plaintiffs that an investment in Amiworld, immediately prior to its imminent listing on the NASDAQ, was a golden investment opportunity ordinarily reserved only for insiders and higher-ups.  Each and every time that Sakagami, the Hashikuras or Termyna met, spoke with or wrote to one or all of Plaintiffs, they repeatedly stated that Amiworld's listing on the NASDAQ was imminent. Indeed, when gathering at community functions or for coffee in neighborhood cafes, Mr. and Mrs. Hashikura would always discuss how the stocks would appreciate after the process for NASDAQ listing of Amiworld was completed. They represented that this would be the last opportunity for non-insiders to, in effect, become insiders and buy Amiworld stock at $10 per share as it was expected to increase at least 5 times – but more likely up to 30 times – once the NASDAQ listing was effectuated.

156.    Plaintiffs believed in these representations and relied on their truth in making the decision to purchase Amiworld's securities, as well as in making their decisions to continue investing in Amiworld and/or other Saito and Sakagami ventures, such as Great Voyages and ODIN Energy – entities that, they were told, would be merged with Amiworld in order to boost its stock value after the NASDAQ listing.

157.    Indeed, to encourage further investments in their schemes, Saito and Sakagami continuously represented to Plaintiffs, verbally and in writing, that ODIN Energy and Great Voyages would be merged into Amiworld once it was listed on NASDAQ, implying that Amiworld was going to be a substantial company of great value.

158.    In a letter dated November 19, 2006, Mr. Hashikura reported to targeted investors, Plaintiffs among them, that Sakagami had told him: "Some of you may want to ask: 'Can the stock be enlisted in NASDAQ?', but this issue is already cleared up. When this company listed its stock in Bermuda Stock Exchange, all audit was done, so on top of this track record of listing, the result of transparent audit of the management is also provided. Top notch pro of the pros are handling the stock listing matter with absolutely seamless environment, so there is no problem." He further wrote that Sakagami told him that Amiworld was already engaged in the oil resale business – the implication being that "oil" means crude oil. Also: "in connection with the state of the bio diesel business, a tanker will be purchased. Also, new tankers will be added every year." The implication being that Great Voyages will buy a tanker very soon as promised and add other tankers. All of these statements were false. However, Sakagami and Mr. Hashikura knew that the promise of investing in a company listed on the NASDAQ would attract – as it did – many investors, including Plaintiffs.

39

159.    On December 21, 2006, Mr. Hashikura emailed Plaintiffs and other investors to relay Sakagami's representations to Mr. Hashikura including: (a) that Amiworld had met the criteria for being listed on the NASDAQ – having 300 shareholders and $5 million assets – and the registration work had commenced; (b) that the IPO was to be the next step; (c) that outside auditors had valued Amiworld's shares at $18 per share or $8 more than the price offered to Plaintiffs; (d) that Amiworld would violate the law if its price fell below the price offered at private offerings and would have to pay a penalty; and (e) that, if investors promote Amiworld to their family and friends, they will help themselves by increasing Amiworld's value.

160.    On October 26, 2007, Saito and Sakagami wrote to the shareholders, Plaintiffs among them, that Amiworld would be listed on the NASDAQ within 60 days and that an IPO would be effectuated, starting at $3 per share, even though Amiworld's financials allowed for the shares to be traded at more than $4 per share. After May 2007 one to ten stock split, Saito and Sakagami sold Amiworld's stocks at $2 per share.

161.    On November 16, 2007, prior to Mrs. Orita purchasing 50,000 shares of Amiworld, Mr. Hashikura emailed Mrs. Orita stating that on October 5, 2007, the SEC approved Amiworld as a public company and that within 60 days, by or before December 25, 2007, Amiworld was going to be listed on the NASDAQ.

162.    On January 1, 2008, Mr. Hashikura forwarded to Plaintiffs Sakagami's email, stating that Amiworld would be listed on the NASDAQ in January 2008 at a starting price of $4 per share. In the same email, Mr. Hashikura stated that all specialists agree that the per-share price would quickly reach $10.

163.     On March 17, 2008, Mr. Hashikura emailed to Plaintiffs posting on his Blog at www.adventurenewyork.com/amiworld/news-mar-17-08/nasdaq-info-mar17 that: "We got a NASDAQ listing schedule from Amiworld." Plaintiffs received and viewed this posting.

164.     On April 4, 2008, Mr. Hashikura, via email, forwarded to Plaintiffs an email, dated April 3, 2008, from Sakagami to Mr. and Mrs. Hashikura and Termyna stating that, according to *insider* information he received on that day, NASDAQ was going to accept Amiworld's stock listing application on April 4, 2008; that the company was going to be listed 60 days later; and, that the shares Plaintiffs owned would be sold on or about August 19, 2008. In a letter dated April 7, 2008, Saito and Sakagami, as representatives of Amiworld, gave the same news directly to the shareholders.

165.     In numerous emails and direct communications with Plaintiffs and potential investors, representatives of Amiworld – including, among others, Saito, Sakagami, Mr. and Mrs. Hashikura and Termyna – continuously informed and/or reassured Plaintiffs that the listing of Amiworld shares on the NASDAQ was imminent.

166.     Saito further promised Plaintiffs that Amiworld was very close to being listed on the NASDAQ, which would have automatically qualified Amiworld to be listed on the Tokyo AIM and on a London Stock Exchange market for emerging companies.

167.     However, Amiworld was never listed on the NASDAQ.  Defendants did not even attempt to be listed on the NASDAQ. Given its weak financial operations, Saito and Sakagami knew that they would not succeed in listing Amiworld on the NASDAQ.

168.     When they could no longer credibly claim further delays on the NASDAQ listing, Saito and Sakagami turned to accusing the NASDAQ officials of racism for failure to list

Amiworld.  When neither the Plaintiffs nor other investors believed this claim, Saito and

Sakagami blamed the U.S. economic crisis for Amiworld's failure to be listed on the NASDAQ.

### 5. After NASDAQ

169.    In the financial statements filed with the SEC, Amiworld reported an investment

of $4 million in land and in equipment. Later, Saito and Sakagami borrowed $4 million from

legitimate local banks. On information and belief, Saito and Sakagami paid themselves the

proceeds of the loan to replace the initial funds they used to create the operations giving them the

appearance of legitimacy. In effect, Saito and Sakagami recovered the part of the funds they used

to purchase hard assets. Except for the portion that they paid to Plaintiffs to placate them, Saito

and Sakagami have paid themselves all the monies they solicited from Plaintiffs and other

investors, aside from the incentive compensation provided to agents such as Termyna and the

Hashikuras.

170.    Further, Saito and Sakagami knew that none of the Plaintiffs acquiring

Amiworld's securities qualified as accredited investors, and that some of Plaintiffs had borrowed

home equity loans or money from their credit card to purchase the securities – Saito and

Sakagami encouraged such borrowings.

171.    When the original complaint in the instant case was filed, on September 9, 2010,

on information and belief, Saito and Sakagami delisted from the OTCBB in order to avoid the

consequences of the discovery of the fraud.  In or about September 2010, Saito and Sakagami

transferred JASB's Amiworld shares to ODIN Energy, a Panamanian corporation, so that they

could claim that Amiworld was more than 50% foreign owned and thus not within the

jurisdiction of the SEC. Saito and Sakagami intended to remove Amiworld from the jurisdiction

of the SEC and from the reach of Plaintiffs – a fraudulent conveyance.

### D. **ODIN Energy Securities.**

172.     Another fraudulent venture that Saito and Sakagami used to take money from Plaintiffs and investors was the sale of preferred stocks of ODIN Energy. Saito and Sakagami registered the shares of ODIN Energy on the Panama Stock Exchange and issued a prospectus and a five year business plan for 2008-2013 to attract investors ("ODIN Energy Offering Memo"). The prospectus offered 4 million preferred shares of ODIN Energy stock, to be offered between February 20, 2009 and March 20, 2009, complete with conversion rights in ODIN. Saito is the CEO of ODIN and Sakagami is a Director. The company claims to be financially serviced through BOA. The prospectus and the business plan were circulated among the Plaintiffs, who are residents of New York and New Jersey, and other potential investors throughout the United States.

173.     Saito and Sakagami – who have been doing business in South America for many years – knew or had reason to know that the Panama Stock Exchange has only about 115 members and very little trade and, therefore, being listed on Panama Stock Exchange would not result in any meaningful financing. Saito and Sakagami listed ODIN Energy to further give themselves the appearance of legitimacy and to induce investors to buy shares of this entity as well. In fact, Saito and Sakagami were successful: they sold ODIN Energy's preferred stock at $10,000 per share.

174.     In or about September 9, 2010, ODIN Energy was finally listed on the Panama Exchange. Since being listed, it has had only one trade for 1,000 shares at $0.80 per share – a price just a fraction of the initial $10,000 investment price.

43

175.     The ODIN Energy Offering Memo stated that financing was needed for a merger between ODIN Energy and another unnamed company listed on the NASDAQ. Defendants claimed that the merger would be with Amiworld so that ODIN Energy itself could be listed and publicly traded on the NASDAQ.

176.     The ODIN Energy Offering Memo guaranteed an annual dividend of 9.6% of the stock price, to be paid to the investor up until the conversion of the stock that would follow the merger. This interest was not paid to Plaintiffs who invested in these securities.

177.     As with the other schemes, Saito and Sakagami asked investors to wire the money to EBOA. The contract provided that the returns would be deposited with investors' BOA accounts. These securities were not registered with the SEC.

178.     Saito and Sakagami kept creating new stories about getting their companies listed on the NASDAQ. In or about spring of 2009, they told investors about an upcoming merger that will get ODIN Energy on the NASDAQ.

179.     Specifically, on May 25, 2009, via a letter to Plaintiffs, Sakagami – as COO of ODIN Energy – wrote that they had identified a crude oil company to merge with, where ODIN Energy would be the surviving company, and that they had received advice from the NASDAQ management as to the form of the merger.

180.     On July 2009, Sakagami promised in a letter that ODIN Energy's merger with the NASDAQ listed company was going forward. This deal never materialized.

181.     On May 31, 2010, in a letter, Sakagami as the COO of ODIN Energy, told shareholders that although their original plan was to merge ODIN Energy with their public company in the U.S. – i.e. Amiworld – because of the depressed U.S. market, they had decided

to seek financing on the Panama Exchange. Since they were registered on this exchange, $800 worth of Odin Energy shares have traded.

182.     As of October 2010, according to its filing with the Panama Stock Exchange, ODIN Energy owns Amiworld; Great Voyages; ODIN Petroleum and its subsidiary, C.I. ODIN Petroleum (a Colombian entity); ODIN Petroil; and ODIN Energy of Santa Marta.

183.     In the financial statements filed with the Panama Stock Exchange, ODIN Energy reported $4 million of assets. On information and belief, this number represents the entire assets of ODIN Energy, Amiworld and their subsidiaries, which is the value of the plant in Santa Marta Colombia. On information and belief, out of the estimated $40 million they received from Plaintiffs and other investors, Saito and Sakagami invested approximately $4 million in operations to establish an appearance of legitimacy for the Projects and to induce further investments from Plaintiffs with which to line their own pockets. But, as stated above, they recovered even this amount through debt financing.

### E.  Great Voyages' Securities

184.     Saito and Sakagami own – through JASB and Amiworld – Great Voyages, which is incorporated in Panama supposedly for the purpose of becoming a shipping company with its own fleet.  Saito and Sakagami then actively solicited investments in the preferred stocks of Great Voyages, which were priced at $50,000 per one preferred share with a 9.5% yield.

185.     In an offering memorandum ("G.V. Offering Memo") disseminated to Plaintiffs and other investors, Saito and Sakagami made confusing representations about the entity and the investment including the following: (a) that Great Voyages was an affiliate of Great Voyages of New York without defining the affiliation; (b) that JASB was the principal shareholder of Great

45

Voyages and Amiworld owned 55% of the shares of Great Voyages; (c) that the preferred stock was convertible to a publicly listed affiliate's common shares without giving the name of the company; and (d) that Great Voyages was to own several vessels, one of which was purportedly already under construction and was to be called ODIN III.

186.    The G.V. Offering Memo represented that the company was primarily engaged in the construction and/or purchase of oil tankers to meet the shipping demands of Amiworld and the ODIN oil entities. Accordingly, the memorandum included drawings and pictures of a ship apparently under construction. Further, the G.V. Offering Memo stated that Amiworld will pass the SEC's regulatory requirements over the course of August to Sept 2007 and will then be listed on the NASDAQ – the indication being that Great Voyages will be listed on the NASDAQ once it merges with Amiworld.

187.    In the Amiworld Offering Memo, given to Plaintiffs and many other investors during November and December of 2006, Saito and Sakagami represented that Great Voyages was going to purchase the following vessels: in the first year, a 1,000 ton class oil tanker - to be purchased by November 2006; in the second year, a 2,000 ton class oil tanker - to be purchased in January 2007; in 2009, a 5,000 ton class oil tanker. If these statements were true, the purchase of the first and second tanker had to have taken place simultaneously with circulation of the Amiworld Offering Memo.  But, in fact, Saito and Sakagami had no plans to purchase any vessels.

188.    On websites for ODIN Energy and Great Voyages, last accessed on February 1, 2011, Saito and Sakagami still claim that Great Voyages is involved with shipping their diesel products with shipping routes in the U.S. and Europe as well as on the coast of Central and South America, and that it would have about 10 tankers by 2010.

46

189.    Saito and Sakagami represented that Great Voyages had a stated capital of $3.5 million.

190.    On information and belief, Great Voyages – on the contrary, and like many other entities in the group – is, in fact, a paper company.

191.    Conspicuously missing from the G.V. Offering Memo was information on the entity into whose shares the Great Voyages stocks were to be converted; information on shareholder's rights in the event that the conversion did not turn out to be on terms acceptable to them; and information on risks that the investors were taking in investing $50,000 on one preferred stock which could be – and indeed was – converted into worthless common stocks of ODIN Energy.

192.    Plaintiffs were not provided with any other pertinent information regarding Great Voyages.

193.    The one page contract required investors to acknowledge that they understood that the stock they were purchasing would be converted to the stock of a predetermined entity, whose name was not disclosed to the purchaser.

194.    Sakagami, Mr. Hashikura and Termyna represented to Plaintiffs – verbally and in writing – that purchasing Great Voyages securities would be a sound investment.

195.    Mr. Hashikura told Mrs. Shibata, and Sakagami and Termyna told Mr. Katayama, that owning a share of Great Voyages would be the same thing as owning shares of Amiworld, since they had planned to merge Great Voyages into Amiworld and – once Amiworld was listed on the NASDAQ – the Great Voyages stock was expected to increase in value at least 5 times and more likely 15 ($750,000) and even 30 ($1.5 million) times, together with Amiworld's – a very attractive prospect.

196.     On or about April 19, 2007, at a restaurant in New York City, Sakagami and Termyna told Mr. Katayama that a tanker ship was being built for Great Voyages. According to the Amiworld Offering Memo, purchase of a 1,000 ton tanker was imminent in November 2006. According to the Great Voyages website accessed on July 19, 2010, ODIN III was being built and was supposed to have been in operation in 2007. In fact no such ship was being built.

197.     On June 28, 2010,  Sakagami, as COO, advised shareholders of Great Voyages that, to enable them to trade the securities in the market, the current holders' preferred stocks would be swapped for ODIN Energy's common stock, which was already listed on the Panama Exchange. One preferred share of Great Voyages was exchanged for one and a half shares of ODIN Energy's common stock. However, like the other statements made by Sakagami, this was not true – ODIN Energy's common stocks were not traded on the Panama Exchange at that time or since. ODIN Energy has only listed its preferred stock and not its common stock for trading on the Panama Exchange.

198.     As part of consenting to stock swap, Saito and Sakagami instructed Plaintiffs to send their share certificates to JASB at 60 East 42nd Street, Suite 1225, New York, New York 10165, send a related facsimile to (914) 462-3631 (a New York area number), and call (212) 557-0223 with any questions.

**III. AGENTS**

199.     Saito and Sakagami retained agents who had influence in their communities to solicit investors on their behalf. In New York and New Jersey, they hired Defendants Termyna and Mr. and Mrs. Hashikura – a husband and wife team.

200.     Saito and Sakagami also offered incentive programs to a number of individuals, wherein they would be paid a commission in exchange for introducing investors to them. Among

these programs was an $80 credit to a person's BOA account if they introduced a client who opened a bank account with BOA and one to five percent (1%-5%) commission on any new investment resulting from an introduction.

### A. **Termyna**

201.    Termyna is a licensed life-insurance broker who works with MetLife, Inc. For about 30 years, she worked closely with members of the Japanese community in New Jersey and assisted them in obtaining life insurance and mortgages, and facilitated other transactions for those who had difficulty with the English language. Through these activities, she built up a foundation of trust with Plaintiffs in managing their affairs.

202.    Since 2005, Termyna also worked as an agent of Saito and Sakagami and disseminated offering memorandums to Plaintiffs and solicited their investments in the VEB, Oil Fund, Palm Oil Fund and the securities of Amiworld, ODIN Energy Corporation and Great Voyages.

203.    On information and belief, Termyna is not licensed to trade in securities, further, Saito and Sakagami knew that Termyna was not a licensed securities broker.  Nevertheless, Termyna has acted as an investment advisor to Plaintiffs.

204.    Termyna told investors that she herself had invested in these offerings and had, in fact, made money from the investments. She represented to Plaintiffs that the investments were safe, sound and risk-free. She made these statements knowing that Plaintiffs would rely on them to their detriment.  Plaintiffs did, in fact, rely on Termyna's representations and proceeded to invest much, and in some cases all, of their life savings in the Projects, in addition to funds obtained through loans.

205.    In furtherance of her soliciting activities, Termyna continuously called investors at all hours of the day and night, badgering them into investing in the various Saito and Sakagami Projects.

206.    Termyna regularly encouraged Plaintiffs to consider the merits of home-equity and/or mortgage refinancing and borrowing from their insurance policies, in order to raise investment funds – and maximize their earnings margins in – these purportedly high return projects. In some cases, Termyna facilitated the borrowing by referring loan brokers to Plaintiffs or even making appointments with brokers on their behalf.  For instance, she personally made an appointment with a home equity loan broker for Mrs. Seto.

207.    Termyna encouraged Plaintiffs to borrow money from their credit cards to use as investments in the Projects. For instance, Termyna advised Mr. and Mrs. Katayama to borrow funds from their credit cards – which they did – to buy securities of Amiworld.

208.    Termyna also regularly solicited and communicated with potential investors and Plaintiffs via email, wherein, Termyna identified herself as the agent of JASB Group companies. Termyna distributed the offering memorandums for VEB, the Oil Fund, the Palm Oil Fund, securities of Amiworld, ODIN Energy and Great Voyages to Plaintiffs and other investors, which outlined and touted these Projects

209.    On information and belief, Saito and Sakagami not only knew about Termyna's practice of pressuring and facilitating investors – including Plaintiffs – to finance investments in their Projects through borrowing, but, in fact, also counseled and encouraged Termyna to engage in such practices.

210.    Termyna repeatedly told Plaintiffs to trust Saito and Sakagami and to invest in their Projects. Termyna knew or had reason to know that Saito and Sakagami were not

trustworthy. She knew or had reason to know that the investment Projects offered to Plaintiffs were not legitimate opportunities and that Plaintiffs would ultimately lose their money.

211.     Since the filing of the original compliant in the instant matter, Termyna has made a regular practice of repeatedly calling members of the Plaintiff group – on their cell phones and/or home phones – in order to harass them for pursuing their claims against the Defendants and to stop them from continuing. On or about December 17, 2010, she left a voice message on Mrs. Mochizuki's home telephone number, stating that Sakagami has some funds to distribute to investors, but he will not distribute anything to members of the Plaintiff group.

212.     On information and belief, Termyna successfully solicited investments from at least 30 investors including Plaintiffs.

### B.  The Hashikuras

213.     Tetsuya and Hiromi Hashikura – who are husband and wife – have resided in the Leonia, New Jersey area for about ten years.  Since 2006, they have both acted as agents, soliciting investments on behalf of various Saito and Sakagami-backed ventures, including the VEB, Oil Fund, Palm Oil Fund, and securities of Amiworld, ODIN Energy and Great Voyages.

214.     For some time until leaving in or about 2001, Mr. Hashikura taught Japanese and Mrs. Hashikura taught English in a Japanese school in New Jersey. Because of the respect teachers have in Japanese communities, the Hashikuras were well respected.

215.     On information and belief, neither Mr. nor Mrs. Hashikura is a licensed securities broker or otherwise licensed to trade in securities – a fact of which both Saito and Sakagami knew. Nevertheless, the Hashikuras have acted as an investment advisor to Plaintiffs. In or about fall of 2007, Mr. Hashikura represented to Mr. Sandler that he was a licensed broker.

216.    In furtherance of their solicitation activities, the Hashikuras employed a variety of means, one of which was the maintenance of an internet web-blog (the "Blog"), targeting potential investors in the various Saito and Sakagami ventures.

217.    Mr. and Mrs. Hashikura posted many blogs on their on his website, www.adventurenewyork.com ("Blog") promoting the Projects. These Blog pages were taken down soon after Plaintiffs retained legal advice to recover their funds.

218.    From December 2006, Mr. Hashikura used a business card naming him as the agent for investments in the ODIN Oil Fund. Further, a May 23, 2007 Blog entry advertised him as the contact person for any individuals desiring a 42% return on investments in the Oil Fund.

219.    The Hashikuras' Blog entries regularly encouraged potential investors to consider the merits of home-equity and/or mortgage refinancing and/or other types of low-interest loan borrowing to raise funds to invest in – and maximize their earnings margins in – the purportedly high return projects.  On January 24, 2007 and February 20, 2009, Mr. Hashikura published Blog entries, which specifically discussed the merits of this type of leveraging to raise investment funds, introducing himself as a professional, knowledgeable investment advisor with connections to brokers, to whom he could refer potential investors for the securing of such loans.

220.    The Hashikuras told Plaintiffs that they had facilitated many investors in the various offerings, who were indeed very satisfied with the returns they had received, including to the extent that their investments had been financed through home equity loans.

221.    The Hashikuras encouraged investments in the Projects by representing themselves as highly satisfied investors. On January 4, 2007, via mass email, Mr. Hashikura wrote that he had used his business line of credit, together with a loan on the equity in his home,

in order to raise the capital for a $300,000 investment of his own in VEB. Plaintiffs received and read this email.

222.    In or about the fall of 2007, Mr. and Mrs. Hashikura told Mr. Hoyama that they had invested $500,000 in the Oil Fund, in Amiworld securities, as well as in other of the Projects, all of which was financed through a loan on the equity in Mr. and Mrs. Hashikura's home. On information and belief, this was a false representation.

223.    In or about the fall of 2007, the Hashikuras told Mr. and Mrs. Hoyama that they had obtained two loans based on their home equity by signing two commitment letters from two different banks on the same date. Mr. Hashikura encouraged Mr. Hoyama and other Plaintiffs to follow his example to increase the amount of money to be invested in Saito and Sakagami ventures.

224.    In or about winter of 2008-2009, Mr. Hashikura held a seminar in Kyoto Japan hosted by the branch manager of the Kyoto Branch of the Bank of the Tokyo-Mitsubishi UFJ, Ltd. in which substantial sums were solicited. On information and belief, one of Sakagami's sons and Saito were present at this seminar.

225.    The Hashikuras also regularly solicited and communicated with potential investors and Plaintiffs via email, wherein, Mr. Hashikura identified himself as the agent of JASB Group companies. The Hashikuras distributed the offering memorandums for VEB, Oil Fund, Palm Oil Fund, securities of Amiworld, ODIN Energy and Great Voyages to Plaintiffs and other investors, which outlined and touted these Projects of Saito's and Sakagami's.

226.    To encourage further investments in Amiworld's securities, the Hashikuras misrepresented Amiworld's financial performance. Shortly after April 20, 2009, Saito and Mr. Hashikura reported on the 2008 financial performance of Amiworld to the shareholders so that

53

they could further promote Amiworld as a very successful company and also to explain the net

loss in a convoluted manner to minimize the effect on the investors. Saito and Mr. Hashikura

knew that very few, if any, of the investors would read the financials filed with the SEC – given

that they were in English – and, especially so after they issued their reports. Mr. Hashikura wrote

that on April 20, 2009 Amiworld's public relations company released a quick report on its

financial performance and that: "[T]he most remarkable point is the following two lines: The

Revenue increased for 964%, marking a record high of $19,395,820. The gross profit increased

for 510.10%, recording $3,767,777. … This should be the result of the team effort under the

guidance of the management. I believe this would be further accelerated in 2009." Mr. Hashikura

added the report from Saito to the investors where Saito stated: "In fiscal 2008, a net profit and

loss of $360,939 ($0.02/share) was made, as compared with a net profit and loss of $113,100

($0.01/share) in 2007. The profit and loss in 2008 is coming from the increase of the

administrative expense by the start of full scale activity and large scale capital investment." Saito

and Mr. Hashikura used the words "profit and loss" together intentionally to direct Plaintiffs'

attention away from the loss and towards the gross profit. Their strategy worked: Plaintiffs relied

on the summary of the operations – given that it was written in Japanese and in a positive light

which was calculated to lull Plaintiffs to believe there was nothing to be concerned about – and,

therefore, came away believing that Amiworld had made a profit in 2008.

227.    The Hashikuras' Blog entries also made numerous promotional references to the

Tsukuyomi. Tsukuyomi was created with Saito's and Sakagami's support for facilitating smaller

investments. On information and belief, Saito and Sakagami had set minimum threshold

investment amounts for the projects – $100,000 for the Oil Fund and the same for Amiworld – to

delude Plaintiffs into believing that Saito and Sakagami were operating highly attractive

investment opportunities. Tsukuyomi was the vehicle through which they captured smaller investment amounts without appearing to be willing to accept smaller investments.

228.    The stated address of Tsukuyomi's U.S. operational office is 402 Highwood Avenue, Leonia, New Jersey 07605 and the phone number is 917-428-4255.

229.    Mr. Hashikura would solicit investments and, purportedly, once he received $100,000 in the aggregate, would then invest the amount in the Oil Fund or in Amiworld's securities, through Tsukuyomi. For investments between $20,000 and $99,999, he would invest it in the Palm Oil Fund.

230.    The Hashikuras told Plaintiffs to trust Saito and Sakagami, that the investment Projects were safe. On information and belief, the Hashikuras knew or had reason to know that Saito and Sakagami were not trustworthy, that the Projects offered to Plaintiffs were not legitimate opportunities, and that Plaintiffs would lose their money. Regardless, they made these representations intending for Plaintiffs to rely on them and to invest in the Projects – and in fact Plaintiffs did rely on Mr. and Mrs. Hashikura's representations and invested their life's savings and funds obtained through loans in the Projects.

231.    On information and belief, the Hashikuras have successfully solicited funds from at least 60 investors including Plaintiffs.

### C.  **Financial Institutions**

232.    Saito and Sakagami used the following financial institutions to commit fraud on Plaintiffs.

1. **EBOA**

233.    Saito and Sakagami indirectly own and control EBOA, a corporation registered (originally as BOA Financial Group, Inc.) in Canada on March 22, 2001, and as a foreign corporation to do business in New York. In public records, JASB is listed as the majority shareholder of EBOA and its directors are: Yuji Adachi, Sakagami, and Saito. Saito is also listed as the president of EBOA. In public records, EBOA declared, at least in 2001, that Amiworld held over 50% of EBOA's outstanding voting shares. EBOA does not have a website.

234.    Plaintiffs were directed to pay all monies they invested in various Projects to EBOA, which then turned over the monies to Saito and Sakagami. Plaintiffs sent EBOA all monies invested in VEB, Oil Fund and Palm Oil Fund, as well as amounts paid for the purchase of securities of Amiworld, ODIN Energy and Great Voyages. These funds were transferred to EBOA via check or wire transfer into its legitimate bank accounts, including to an account in JP Morgan Chase (U.S.) and in the Bank of Tokyo-Mitsubishi UFJ, Ltd.(Japan).

235.    In Amiworld's 2009 financial statements, which it filed with the SEC, EBOA is listed as an affiliate engaged in financial services with access to *significant resources* from which Amiworld had an ongoing ability to borrow, without entering into any written agreements, and with no interest or repayment terms from EBOA, on an as-needed basis.  EBOA's significant resources referenced in the filings are monies fraudulently obtained from Plaintiffs.

236.    Although defendants claim that EBOA was registered to offer financial services, a search of its public records does not turn up any of the requisite licenses.

## 2.   **Bank of the Atlantic**

237.     Saito and Sakagami own and control BOA, a virtual off-shore bank that is purportedly organized and licensed pursuant to laws of the Republic of Anjouan. BOA is operated from 60 East 42nd Street, New York, New York.

238.     Saito and Sakagami promoted BOA as a reliable and safe bank that transacts business with financial institutions in Sweden, Switzerland and the United States, insures depositors' funds, and provides various banking services to investors – including online banking and savings account services – as well as offering annual tax-free interest of 4.19% on savings. The implication of this last representation being that money transfers through BOA would be tax-free to residents of the U.S. and Japan. Until recently, BOA was advertized on Japanese cable television programs – reaching a substantial number of Japanese households in the United States and in Canada – and Japanese newspapers published in the New York area and widely available in the U.S. Saito and Sakagami are BOA's top executives.

239.     On BOA's website, which has been available in Japanese and in English to Plaintiffs, Saito and Sakagami have made a number of false representations to lure the Plaintiffs and other investors. On July 19, 2010, BOA's website contained the following representations:

   a.   "Our safe and reliable banking system is based on the concept of worldwide customer support …";

   b.   "[A] pioneer in 21st century financial business licensed in the Republic of Anjouan, offers global banking services by the business cooperation with Sweden [sic] company …";

    c.   "Worldwide banking institutions with reliable financial affairs and information support the private banking system of Bank of the Atlantic …";

    d.   "These information networks enable BOA to ensure the safest and stable utilization of funds and profit maximization and minimization of risk…";

    e.   "Bank of the Atlantic collaborates with banking institutions of Switzerland, U.S.A and EU accession states to provide a safe and secure utilization of funds through a refined banking system";

    f.   ***"Private funds invested in the Bank of the Atlantic will be backed by secure collateral*** and will not be invested in an enterprise project that is not reliable and promising";

    g.   "BOA has a very sophisticated concept of private banking. Based on the bank license, its high quality operation method ensures optimum fund utilization and its investment center in Switzerland, the United States and EU France. This has made BOA a trustworthy and proud institution;

    h.   "There will be no tax on interest in accordance with offshore tax haven";

    i.   "Bank of the Atlantic (BOA) Saving Account offers you the access to secured online banking system …";

    j.   EBOA is BOA's credit union subsidiary;

3.   "Office hours for [funds transfer requests] order us from 9AM to 13PM based on Eastern Time Zone …"; "Transfer from or to external banks [are allowed]"; and

4.   "Please allow approximately four to five business days to transfer the fund."

(emphasis added). Saito and Sakagami intended Plaintiffs and other investors to read and rely on their representations. And in fact, Plaintiffs read and believed in Saito's and Sakagami's representations.

240.    Saito and Sakagami promised that depositors would have access and control over their BOA accounts and be able to transfer their funds to other banks.

241.    Plaintiffs and other investors were required to open an account with BOA for the deposit of monies that would, in turn, be invested in the various Projects and securities offered by Saito and Sakagami. Payouts of all investment returns on any of these Projects and/or securities would be exclusively through deposits in each individual investor's BOA account. At maturity, when an investor decided not to enroll in another term, the principals invested in various project would be deposited in his/her bank account.

242.    Contrary to all representations regarding BOA, on information and belief, BOA, in fact, never had the capacity to receive or hold money and, as such, never received any actual deposits of money on behalf of Plaintiffs. In reality, BOA was merely a front operation, which created the false impression of the conduct of actual banking services in order to reassure investors, including Plaintiffs, of the legitimacy of the Projects. This impression was created through the provision, by Saito and Sakagami, of apparently bona fide account information on BOA's website – to which Plaintiffs were granted password-protected access – as well as through monthly statements that were mailed to Plaintiffs. Saito, Sakagami and their Agents instructed Plaintiffs to send their payments for various investments to EBOA, which would then, purportedly, deposit the money into their BOA accounts.  On information and belief, EBOA never deposited any money with BOA.

243.   Sakagami informed Mrs. Shibata – both verbally, and through an employee of BOA (via email) – that EBOA does not transfer the deposits it receives from Plaintiffs directly into their respective BOA accounts, but, rather, the equivalent amount of a given investor's payment into EBOA is deposited into the appropriate BOA accounts by an offshore affiliate of the group. In fact, this representation was false. All funds invested in the Projects were held with EBOA until such time as they were transferred, undetected, through the web of companies to Saito and Sakagami themselves.

244.   In November 2006, Saito and Sakagami represented, falsely, that they were in the process of obtaining licenses for BOA from the Federal and relevant state governments.

245.   On information and belief, BOA is not a legitimate bank and it is not licensed to conduct banking operations in the U.S..

246.   In the summer of 2006, via email, Saito and Sakagami sent a picture of one of their employees, Terry Snyder, taken with New Jersey Senator Robert Menendez with a message that read: "Mr. Robert Menendez is one of those who understand[s]… our banking business establishment... [and] is a member on the United States Banking Committee. This is to show you the picture I took with him after our meeting. The meeting went well." Senator Menendez's office has confirmed, via telephone, that neither they, nor the Senator, know Terry Snyder. The photo was apparently taken during a fund raising campaign sometime prior to November 2006 elections. This photograph was a misleading attempt to add credibility to BOA.

247.   In a report dated May 4, 2010, the Bureau of International Narcotics and Law Enforcement Affairs of the United States Department of State reported that any bank license obtained from the Republic of Anjouan could be evidence of money laundering and financial crimes, including drug trafficking given the lax regulations of that jurisdiction. 2010

International Narcotics Control Strategy Report (INCSR)--Volume II: Money Laundering and Financial Crimes Country Database--Comoros through India, located at www.state.gov/p/inl/rls/nrcrpt/2010/database/141516.htm.

### 3. EBOA Trust and EUBK Trust

248.    To further promote the illusion of legitimacy and build investor trust in the Projects, Saito and Sakagami used EBOA Trust and EUBK Trust as purported guarantors of the principal amounts invested in the Oil Fund and Palm Fund. Sakagami signed all of the guarantee agreements with Plaintiffs as the COO of EBOA Trust and EUBK Trust.

249.    Saito and Sakagami – directly to investors, through a website for EBOA Trust, and through their Agents – represented EBOA Trust as a bank that was authorized to provide limited financial services, including saving account services and the issuance of loans to its members. Further, they represented to Plaintiffs that all funds guaranteed by EBOA Trust were insured by the Swedish government.

250.    In fact, EBOA Trust never received a license to offer any such financial services, nor did it carry on any legitimate operations of any kind anywhere, nor was it in possession of any actual capital, with which to guarantee any other funds.

251.    In July of 2009, the Swedish tax authorities filed a petition for the involuntary bankruptcy of EBOA Trust for failure to pay approximately $9,000 in corporate taxes. Saito and Sakagami repeatedly ignored requests for information from the attorneys representing the Swedish tax authorities. No operations or assets were ever located for EBOA Trust. Like BOA, EBOA Trust exists only on paper.

252.    On EBOA Trust's website available on September 9, 2010, which is no longer available, Saito and Sakagami made the following representations:

    a.   EBOA *has been providing services* based not only in Europe, where it is expected a great prospectus [sic] in economy with monetary unification, <u>but also in the U.S.</u> …;

    b.   The main businesses of EBOA, which has its HQ in Sweden, Stockholm, are savings, cards issuance and lending services;

    c.   Our fund management is conducted by the best banks, which are members of SWIFT and FDIC.; and

    d.   [EBOA] is providing major card systems to major countries all over the world;

(emphasis added). Saito and Sakagami intended Plaintiffs and other investors to read and rely on their representations. And in fact, Plaintiffs read and relied in Saito's and Sakagami's representations.

253.    However, EBOA Trust's website did not contain any information on its bankruptcy. Rather, to anyone accessing this website, EBOA Trust appeared as a sophisticated and operational financial institution.

254.    After EBOA Trust was declared bankrupt in July 2009, Saito and Sakagami used EUBK Trust to "guarantee" Plaintiffs' investments in the Oil Fund and the Palm Oil Fund.

255.    Yet, in its financial statements, which it is required to file with the Swedish authorities; EBUK Trust has reported negative net worth for 2008 and 2009.

256.    While EUBK Trust is licensed as a credit union, it has reported negative net worth to the Swedish Authorities. On information and belief, EUBK Trust is another paper company. EUBK has purported to guarantee millions of dollars in funds invested in the Oil Fund and the

Palm Oil Fund. Such guarantees are worthless and did not disclose that EUBK Trust had a negative net worth.

257.   Sakagami signed all of the purported guarantee agreements as the COO of EUBK Trust.

## IV. FAILURE TO DISCLOSE SIMILAR PAST MISCONDUCT

258.   Saito and Sakagami have a history of promoting Ponzi-like schemes to individuals with little or no investment experience and disappearing with a substantial part of the solicited investments. Other than the scheme in the instant case, they have been involved with at least two other schemes.

259.   To Plaintiffs, Saito and Sakagami represented themselves as businessmen who owned and operated a group of interrelated companies – the "JASB Group" – with substantial business experience in the golf and resort industry, the hospitality industry, energy production, the maritime business, and in banking.

260.   However, Saito and Sakagami failed to inform Plaintiffs that investors had lost nearly $100 million in Saito and Sakagami's golf course and resort business. On information and belief, in the early 1990s, Saito and Sakagami sold, to about 900 Japanese investors, golf memberships at approximately $100,000 per membership. The golf course was located in North Carolina and was owned and operated by Rabex of N. C., Inc., a wholly owned subsidiary of Rabex Japan.  These companies were owned and controlled by Saito and Sakagami. Saito and Sakagami used part of the proceeds of the membership drive to acquire a small golf course in North Carolina. Then, in 1995, they rolled up the scheme by filing an involuntary bankruptcy petition against Rabex N.C. – a petition, which was effectuated through Rabex Japan, Ltd., Amuru Japan, Co., Ltd. ("Amuru Japan") and JASB Corporation, a Japanese entity, all of which

63

were corporations owned and controlled by Saito and Sakagami themselves. On information and belief, none of the investors ever received a penny of their initial investments, because Saito and Sakagami had taken them.

261.    Also, Saito and Sakagami deliberately hid from Plaintiffs the fact that, in the late 1990s and early 2000s, investors in Saito and Sakagami's online gambling business had lost approximately $20 million. Prior to 2002, Saito and Sakagami established a cluster of entities, which, on information and belief, included: The Amuru Casino Corporation, a New York domestic entity, with Saito as its chairman and CEO, and 60 East 42nd Street, Suite 1225, New York, New York as the address for receiving service of process; Amuru USA, Inc. ("Amuru USA) and Amuru Casino Corporation ("Amuru Casino") (annulled by proclamation), both Delaware domestic corporations, which are, on information and belief, wholly owned subsidiaries of Amuru Japan.

262.    In the 2009 annual filing of Amuru USA with the Delaware Secretary of State, Saito is listed as the CEO, Sakagami is listed as the president and both individuals are listed as directors of the company. On information and belief, Saito and Sakagami solicited about $20 million in investments in their gambling business from a large number of investors – possibly as many as 700.  While some returns were paid out to investors, these payouts eventually ceased. In at least two lawsuits filed by 30 investors against Amuru Japan, Co., Ltd., Amuru USA, Saito, Sakagami, and several of third-party agents to the scheme, courts in Shizuoka and Tokyo, Japan held that Saito and Sakagami had committed fraud upon investors and entered judgments against the Defendants for approximately $1.6 million. Ultimately, the defrauded investors were only able to locate about ¥12,072 (approximately $120) of Saito's and Sakagami's funds, with which

to enforce the judgment. On information and belief, these judgments are still outstanding in Japan.

263.     Had all of the facts of Saito's and Sakagami's prior fraud – as outlined above – been properly disclosed to Plaintiffs, they would never have entrusted Saito and Sakagami with a penny of their modest assets. Defendants did not disclose this information to Plaintiffs in order to maintain their aura of trustworthiness.

## V.  VICTIMS

### A.  **Hoyamas**

264.     Mr. and Mrs. Hoyama and Mr. and Mrs. Hashikura have known each other for over ten years and used to meet regularly. Mr. Hoyama considered Mr. Hashikura a trusted friend.

265.     In or about fall of 2006, in a meeting, Mr. Hashikura introduced the VEB program and gave the VEB Offering Memo to Mr. and Mrs. Hoyama. Mr. Hashikura told Mr. and Mrs. Hoyama that Saito and Sakagami were sophisticated, successful and trustworthy businessmen and that any investments introduced by them were safe and sound.

266.     Mr. Hoyama told Mr. Hashikura that he did not have any money to invest. Mr. Hashikura advised him to borrow about $50,000, use $10,000 to pay interest on the loan, and invest the rest. Mr. Hashikura explained that a 24% return on the investment is several times higher than the interest due on any loan.

267.     Mr. Hashikura referred Mr. Hoyama to a broker, who assisted him in obtaining a loan of $50,000.

268.     In or about October 2006, Mr. Hoyama also met with Sakagami, who assured him that VEB. Further, Sakagami told Mr. Hoyama that Saito and Sakagami were sophisticated and successful businessmen and that Amiworld would be listed on the NASDAQ and appreciate in value.

269.     Mr. and Mrs. Hoyama followed Mr. Hashikura's advice and invested $40,000 from the $50,000 loan proceeds in VEB. They were directed to pay the funds to EBOA. The Hoyamas wired the funds to EBOA.

270.     Mr. and Mrs. Hoyama were instructed to open accounts with BOA, which they did, where their purported returns were to be deposited.

271.     Mr. Hoyama opened an account with BOA. Mrs. Hoyama's purported returns were  deposited in the same account. Mr. Hoyama received monthly statements of deposit and withdrawal activities including: cash deposits they made, deposits of the returns they were supposedly earning on their investments, deposits of the interest they were supposedly earning on their funds with BOA, and withdrawals of funds by Defendants purportedly to be invested in the Projects.  Mr. and Mrs. Hoyama had access to the same information on-line. On information and belief, none of these activities actually occurred except on paper. On information and belief the representations in the statement were false.

272.     Initially, Mr. and Mrs. Hoyama were paid their principal and a return, as promised, although it took anywhere from one week to one month for transfer requests to be processed.

273.     In or about summer of 2007, Mr. Hashikura met with Mr. and Mrs. Hoyama and introduced them to Amiworld's securities. To encourage the Hoyamas to further trust in Saito and Sakagami, Mr. Hashikura showed them a large-sized advertisement for BOA in a Japanese

newspaper that had distribution in the New York area, and told him that BOA was a well-funded

big bank, which was using its funds to invest in Amiworld.

274.     In the fall of 2007, Mr. Hashikura approached Mr. and Mrs. Hoyama again and

advised them to invest in Amiworld's securities, because Amiworld shares were going to be

listed on the NASDAQ, and – according to Sakagami – once that happened, the shares would be

trading at the minimum of $10 per share – a 400% increase in price. In addition, Mr. Hashikura

made the following representations to Mr. and Mrs. Hoyama: that the Hashikuras – believing

firmly in Amiworld – had invested $500,000 in Amiworld's securities; that Saito and Sakagami

were targeting $18 for post-NASDAQ per share listing price; that Amiworld would be listed on

the NASDAQ sometime in January or February of 2008; and, that this was a dream opportunity

for someone in Mr. Hoyama's position.

275.     Mr. Hoyama asked Mr. Hashikura how – having no apparent source of income –

(as he was no longer a teacher), he could afford to invest $500,000 in securities. Mr. Hashikura

told him that he had obtained two home equity loans from two different banks and then executed

both commitment letters on the same day so the banks were not aware of the other loan.

276.     On October 31, 2007, Mr. Hashikura by email sent the following documents to

Mr. Hoyama: (i) the 2007 Amiworld Offering Memo, (ii) 2008 SPA in English and in Japanese,

(iii) Amiworld photos, and (iii) Mr. Hashikura's letter dated November 19, 2006 reporting on

Sakagami's representations regarding Amiworld's listing on the NASDAQ. These documents

were the entire file provided to Mr. Hoyama with which to analyze an investment in Amiworld.

277.     On November 26, 2007, trusting in and relying on Sakagami's and Mr.

Hashikura's representations, Mr. and Mrs. Hoyama borrowed $100,000 using the equity in his

home and purchased 50,000 shares of Amiworld stock for $100,000.

278.    Mr. and Mrs. Hoyama could not have been accredited investors – they had no experience in such investments, nor were they in possession of the requisite net worth to engage in such investments. Nevertheless, at no time prior to their acquisition of Amiworld's securities, did any representative of Amiworld make inquiries into the Hoyamas' relative experience or financial capacity to make such investments.

279.    Mr. Hashikura directed Mr. and Mrs. Hoyama to pay the fund to EBOA, which they did via wire transfer of the funds.

280.    Mr. Hashikura directed Mr. and Mrs. Hoyama to use an address in Japan for the application and the SPA, advising him that the securities are not offered to Americans, given their reputation for being litigious and difficult to control.

281.    On or about October 31, 2007, Mr. Hashikura emailed Mr. Hoyama the paperwork, including the SPA. Mr. Hoyama objected to the representation, in the SPA, which stated that he was capable of bear the risk of loss of investment. But, Mr. Hashikura assured him that such a representation was a formality that large entities had to observe and that Mr. Hoyama should not be concerned about that language. Subsequently, with the borrowed funds, Mr. Hoyama purchased 50,000 shares of Amiworld. On or about November 26, 2007, Mr. Hoyama executed the subscription agreement and sent it back to Mr. Hashikura by email and Sakagami by mail.

282.    On or about January 2008, Mr. Hashikura told Mr. Hoyama that Saito and Sakagami had postponed the listing on the NASDAQ as a strategy to achieve a $10 per share price after being listed.

283. In or about April 2008, Mr. Hoyama inquired about his stock certificates. On April 12, 2008, Mr. Hashikura advised him that Amiworld issued electronic stocks. Saito and Sakagami never provided any proof of the electronic stocks to the Hoyamas.

284. On or about March 9, 2008, Mr. Hashikura sent a webpage link to Mr. Hoyama from the OTCBB market, showing some type of trade in Amiworld's shares, but falsely representing to Mr. Hoyama that this constituted trading on the NASDAQ of Amiworld stock.

285. Sometime prior to January 21, 2009, Mr. and Mrs. Hashikura introduced the Oil Fund to Mr. Hoyama, and told Mr. Hoyama that the Oil Fund was a risk-free investment because a large Swedish bank that belonged to Saito and Sakagami guaranteed the principal and the returns were certain. Based on his experience with the VEB fund, and believing that Amiworld had been listed on the NASDAQ, Mr. and Mrs. Hoyama had no reason to doubt the genuineness of this project. Indeed, based on Mr. Hashikura's advice, Mr. and Mrs. Hoyama borrowed $130,000 from various credit card companies to invest in the Oil Fund.

286. On January 21, 2009, Mrs. Hoyama invested the proceeds of the loans from Mr. Hoyama's credit cards in the Oil Fund – $100,000 through ODIN Energy NY and $30,000 through Tsukuyomi. Based on Sakagami's and the Hashikura's representations, Mr. and Mrs. Hoyama believed that they would be able to earn the interest due on these cards, plus a profit.

287. When she expressed concern with the delay in wire transfers from BOA to his bank accounts in the U.S., Mr. and Mrs. Hashikura told her that it does not take more than three months and even then, if she needs the money faster, Mr. Hashikura will speak with Sakagami to make an exception in the Hoyamas' case.

288. EBOA Trust and EUBK Trust guaranteed the capital invested in the Oil Fund. For the funds invested through Tsukuyomi, the EBOA Trust and EUBK Trust guarantee was

extended to Tsukuyomi itself. As COO of EBOA Trust and EUBK Trust, Sakagami executed both guarantees.

289.     Throughout 2010, repeatedly, Sakagami told Mr. Hoyama that his family's investment in the Oil Fund was safe and promised that Sakagami and BOA will transfer the funds in the Hoyamas' BOA account to their local banks.

290.     Mr. and Mrs. Hoyama mailed and sent back by facsimile to Sakagami the agreements for various investments and paid the funds to EBOA by check and wire transfer of funds from their local banks including HSBC Bank USA, N.A..

291.     Mr. and Mrs. Hoyama relied on the representations made by Sakagami and Mr. and Mrs. Hashikura, borrowed money and invested in VEB, the Oil Fund and Amiworld's securities.  Mr. and Mrs. Hoyama cannot repay the loans and are facing severe financial difficulty.

292.     On or about December 24, 2010, Mr. and Mrs. Hoyama were denied access to their BOA online account and have not been able to access their online account and have not received any statements since Saito and Sakagami learned that the Hoyamas were going to join this lawsuit.

293.     To date, Mr. and Mrs. Hoyama have sustained at least $222,000 in losses.

**B.  <u>Katayamas</u>**

294.     Sometime during the winter of 2006, Mr. Katayama came to know about the VEB fund – and the fact that one of its sales agents was Termyna – through word-of-mouth. As it happened, Mr. Katayama already had a business relationship with Termyna, having purchased a life insurance policy from her in 1995 for himself and another policy for his wife in 2006, after they got married. Mr. Katayama contacted Termyna for information about VEB.

70

295.    Termyna told Mr. and Mrs. Katayama that Saito and Sakagami were sophisticated, successful and trustworthy businessmen and that any investments introduced by them were safe and sound.

296.    Mr. Katayama also met with Sakagami sometime in March 2006 at the Amiworld office at 60 East 42nd Street, New York, NY. At that meeting, Sakagami represented that the principle of any investment in the VEB fund would be guaranteed by entities Saito and Sakagami owned and that, if Mr. Katayama was in search of any other opportunities beyond the VEB fund, they were involved with numerous other investment projects. Sakagami represented that he had succeed in many other ventures including in golf and resorts, in hospitality, etc., and VEB was a risk-free investment since the principal was guaranteed by BOA which was wholly owned by Saito and Sakagami.

297.    On March 21 and March 23, 2006, Mr. and Mrs. Katayama invested in total $100,000 in the VEB project, by wiring the funds to EBOA. On Termyna's advice, Mr. Katayama borrowed $40,000 from his MetLife life insurance policy to invest.

298.    On March 30, 2006, Mr. Katayama received (a) a letter - signed by Sakagami, COO of BOA acknowledging his investment in VEB; and (b) a document - signed by Sakagami as the COO of EBOA Trust - guaranteeing his investment principle in VEB by EBOA Trust.

299.    In or about the spring of 2006, Termyna began pressuring the Katayamas to invest more money in VEB. When the Katayamas told her that they did not have any more cash, she advised them to obtain the investment funds through a home equity loan, on which they would only pay the interest portion during the term of the investment.

300.    On June 9, 2006, Mrs. Katayama invested an additional $5,388 in the VEB fund.

301.    On July 26, 2006, Mr. Katayama invested an additional $20,000 in the VEB fund.

71

302.     On August 11 and 14, 2006, as instructed by Termyna, Mr. and Mrs. Katayama

each opened separate bank accounts with BOA, for purposes of further investment in Saito and

Sakagami ventures, each putting the $1,000 initiation fee on their respective credit cards, for lack

of an alternative funding source.

303.     Mr. and Mrs.` Katayama received monthly statements of deposit and withdrawal

activities including: cash deposits they made, deposits of the returns they were supposedly

earning on their investments, deposits of the interest they were supposedly earning on their funds

with the BOA, and withdrawals of funds by Defendants purportedly to be invested in the

Projects. Mr. and Mrs. Katayama had access to the same information on line. On information and

belief, none of these activities actually occurred except on paper. On information and belief the

representations in the statement were false.

304.     On September 23, 2006, following Termyna's advice, the Katayamas took out a

home equity loan and invested $230,000 of it in the VEB fund in Mrs. Katayama's name.

305.     In or about November 2006, Termyna began soliciting the Katayamas to invest in

the Amiworld stock offering – providing them with the Amiworld Offering Memo and a 2006-

2010 Amiworld business plan. Termyna advised them that, even if they did not have the ready

funds to invest in the stock, it would still be a prudent strategy – given the tremendous gains to

be made – to finance the investment with credit cards.

306.     For further information on Amiworld, at about the same time, Mr. Katayama

consulted with Sakagami, who urged Mr. Katayama to get in on the Amiworld offering, because

the listing of Amiworld stock on the NASDAQ – which was destined to multiply the value of the

shares – was imminent. When Mr. Katayama asked why the Amiworld stock must be registered

with applicants' Japanese addresses – when both he and his wife were U.S. Green Card holders –

Sakagami replied that Amiworld preferred to sell only to Japanese nationals, since Americans were too litigious and difficult to manage.

307.     On December 5, 2006, the Katayamas purchased $20,000 worth of shares in Amiworld - i.e., 1,000 shares each for both Mr. and Mrs. Katayama at the subscription price of $10/share.  They mailed the check to EBOA at 60 East 42nd Street, New York, New York. Despite repeated requests to Termyna and Sakagami, the Katayamas did not receive their Amiworld stock certificates until June 28, 2010, when BOA, not Amiworld, finally sent PDF copies of the certificates to the Katayamas via email.

308.     Sakagami's and Termyna's verbal or written responses to Mr. Katayama's questions were always convoluted and confusing.

309.     Mr. and Mrs. Katayama were not accredited investors by any cognizable standard, nor were they in possession of the requisite net worth to engage in such investments. Nevertheless, at no time prior to purchasing Amiworld's stocks, did any of the Defendants made inquiries into the Katayamas' relative experience or financial capacity to make such investments.

310.     On March 12, 2007, the Katayamas received an official acceptance letter of their Amiworld stock subscription signed by Sakagami.

311.     In or about Spring 2007, Termyna began soliciting the Katayamas to invest in Great Voyages preferred stock. The solicitation included a dinner invitation from Sakagami and Termyna for Mr. Katayama to join them at the Don Veitia Restaurant in New York City to discuss the Great Voyages investment. At the dinner, on April 19, 2007, Sakagami – in addition to telling Mr. Katayama that he was an investor in the Don Veitia Restaurant – provided the Katayama with a copy of the Great Voyages Memo and explained that Great Voyages shared the same ownership as Amiworld and, as such, would be merged with Amiworld as a single entity as

73

soon as Amiworld was successfully listed on NASDAQ.  Sakagami said that Great Voyages –
vis-à-vis its merger with Amiworld – would soon go public and that the IPO would drive the
stock value up by a multiple of at least 5 and more likely 15 or 30. Sakagami also represented to
Mr. Katayama that a tanker ship was in the process of being built for Great Voyages.

312.    Sometime soon after Mr. Katayama met with Sakagami and Termyna, Termyna
sent a follow-up email to Mrs. Katayama attaching the Great Voyages securities application form
and telling Mrs. Katayama to call her or Sakagami with any questions about the investment. In
contrast to the Amiworld stock application, which was a formal contract, the Great Voyages
application was a simple, one-page, non-contractual form in Japanese language.

313.    On May 25, 2007, Mrs. Katayama purchased one share of Great Voyages stock
for the purportedly discount price of $43,750, where the claimed, by Sakagami and Termyna,
value of the share was $50,000. Of the total $43,750 purchase price, which she paid to EBOA,
$19,750 was paid out-of-pocket with the remaining funds coming from Mrs. Katayama's BOA
account.

314.    On June 1, 2007, EBOA sent Mrs. Katayama the certificate for her share of Great
Voyages.

315.    During the fall of 2007, both Termyna and Sakagami continued pressuring the
Katayamas to purchase more Amiworld stock.

316.    At about this time, Termyna introduced the Oil Fund project and pressured the
Katayamas to transfer their outstanding investments in the VEB venture, which were registered
on their BOA account balance statements, over to the Oil Fund. Termyna told the Katayamas
that similar to VEB, the Oil Fund was a risk-free project because the principal invested in the Oil

Fund would be guaranteed by EBOA Trust, a substantial Swedish bank wholly owned by Saito and Sakagami, and the returns were certain.

317.    On October 9, 2007, the Katayamas, following Termyna's advice, transferred their investments in VEB over to the Oil Fund through their BOA accounts.

318.    During January of 2008, Termyna kept the pressure on the Katayamas to invest more, proposing that Mrs. Katayama purchase an additional $100,000 worth of Amiworld shares – they used $82,500 from the returns deposited in their BOA account and $17,500 cash.  When Mr. Katayama informed Termyna that they only had $10,000 in available cash to invest – they would be short by $7,500, Termyna advised them that BOA accepted credit card payments and that Mrs. Katayama should put the remaining $7,500 on her credit card.

319.    On January 8, 13, and 14, 2008, Mrs. Katayama completed the down payment on the January 16 Amiworld stock purchase, by charging three separate credit card payments – totaling $7,500 – to BOA.  However, the statement for this transaction – which the Katayamas subsequently received from BOA – reveals that the payment, though addressed to BOA, had actually been re-directed, through unknown channels, to a different entity: EUBK Holdings, Inc., a New York entity with a contact number of (212) 557-0223 – the same telephone number for Amiworld's office at the same location.

320.    Termyna continuously pressured the Katayamas to invest in the Projects. On April 24, 2008, the Katayamas invested an additional $30,000 in the Oil Fund.

321.    Sometime in 2008, Mr. Katayama complained, via telephone, to Sakagami about the Katayamas' requests for the withdrawal of funds from their BOA accounts were not being honored – they were unable to get their money out. Sakagami tried to mollify Mr. Katayama by explaining that BOA's correspondent bank had purportedly gone bankrupt, but that he,

Sakagami, would devise a way to guarantee all of the investors' principal balances. Mrs. Katayama, on another occasion, lodged the same complaint with Termyna, who responded with the same set of excuses as Sakagami had to Mr. Katayama.

322.    Throughout their investment period, the Katayamas, pursuant to Termyna and/or Sakagami's instructions, had faxed their entire VEB fund, Oil Fund, Amiworld and Great Voyages stock purchase applications directly to Sakagami at: (212) 557-0073.  By the time their investments ended, in or about late 2008, the Katayamas had invested a total of $444,638, out of which $61,000 was invested in shares of Amiworld and Great Voyages and the remaining $387,388 was invested in the VEB venture and Oil Fund. Out of those investments, the Oil Fund principal was guaranteed by EBOA Trust and EUBK Trust to be returned to the Katayamas at the end of the one year term of the initial investment.

323.    Throughout their investment period, the Katayamas did not receive any notice of shareholder meetings or director decision-making, with the exception of one notice of a 2007 shareholder meeting, which, at any rate, Sakagami advised Mr. Katayama not to attend. Furthermore, during 2009 and 2010, the Katayamas continued to receive unexpected, unnoticed news and/or communications concerning Amiworld, including: (a) a notice from the EUBK Stock House – an entity with which neither of the Katayamas had ever dealt or been introduced to – instructing them, without any background explanation or rationale as to why, to open an account EUBK Stock House, and proceed with the registration of their Amiworld shares with the Panama Stock Exchange; (b) news, through word-of-mouth, about various corporate actions and/or resolutions that had been undertaken by Amiworld, without the Katayamas receiving any notice, despite, as shareholders, being entitled to such notice; and (c) more declarations from Sakagami, regarding his intention to cover investors losses through outside borrowing.

76

324.     On or about June 28, 2010 Sakagami notified certain shareholders of Great Voyages, via mail, of the company's recent stock swap with ODIN Energy, wherein each single share of Great Voyages stock was swapped for 1.5 shares of ODIN common stock.  The Katayamas were not among those who received this notice.

325.     The conversion of the stock and the dividend payment was automatic but the name of the entity for the conversion was not disclosed. On June 30, 2010, Sakagami advised Plaintiffs who had invested in Great Voyages that their preferred stock was converted to ODIN Energy's common stock which is worthless – a decision not made pursuant to any proper shareholder action and without any prior notice.

326.     In or about August 2010, Sakagami reassured Mr. Katayama, in response to Mr. Katayama's complaint about his inability to withdraw funds from his BOA account, that Amiworld would be borrowing money from a Brazilian bank in order to pay all investors' monies in place of BOA's frozen accounts.

327.     In or about September, 2010, the Katayamas learned of Amiworld's dissolution through word-of-mouth of other investors. Mr. Katayama called Sakagami to inquire into reasons for the absence of any direct shareholder notification of the dissolution from Amiworld. Sakagami explained that the law does not require majority shareholders – i.e., [Saito and Sakagami, who together] own a 60% stake in Amiworld – to provide minority shareholders with notice of company actions or to include them in corporate decision-making.

328.     Mr. and Mrs. Katayama mailed and sent back by facsimile to Sakagami the agreements for various investments and paid the funds to EBOA by check and wire transfer of funds from their local banks including PNC Bank, N.A..

329.     But for the representations made by Saito, Sakagami and Termyna, the Katayamas would not have invested their lifesavings or taken home equity loans and credit card loans to invest in any of the Projects. Mr. and Mrs. Katayama are facing severe financial difficulties.

330.     Mr. and Mrs. Katayama were denied access to their BOA online account and have not been able to access their online account and have not received any statements since Saito and Sakagami learned that the Katayamas were going to join this lawsuit.

331.     To date, Mr. and Mrs. Katayama have sustained at least $846,000 in losses.

**C. <u>Kawamoto</u>**

332.     Mr. Kawamoto and Keiji Nakamori ("Nakamori") were business acquaintances for about two years prior to Nakamori's introduction of Saito's and Sakagami's schemes.

333.     In or about summer of 2007, Nakamori introduced Messrs. Kawamoto and Hashikura to each other. Mr. Hashikura introduced the Oil Fund and Amiworld as unique investment opportunities. He told Mr. Kawamoto that the investment in the Oil Fund was risk free, since the principal was guaranteed by a sound Swedish Bank (referring to EBOA Trust) also owned by Saito and Sakagami, and the returns were certain. He further told Mr. Kawamoto that Amiworld was about to be listed on the NASDAQ because of which its value would greatly appreciate as much as 100% if not more.  Mr. Hashikura gave the two page 2007 Amiworld Offering Memo to Mr. Kawamoto.

334.     Recognizing the potential for substantial investments, Sakagami did not leave anything to chance – he also frequently called to encourage Mr. Kawamoto.

335.     Sakagami and Mr. Hashikura repeatedly contacted Mr. Kawamoto to push him to invest in the investments. Mr. Hashikura represented Saito and Sakagami as trustworthy

businessmen with expertise and resources to make the projects successful. Sakagami discussed his extensive business expertise in golf, resort and restaurant business.

336.     Mr. Hashikura frequently sent Mr. Kawamoto forecasts showing expectations that Amiworld's stocks would skyrocket after being listed.

337.     Sakagami repeatedly told Mr. Kawamoto that the investments were 100% safe. Mr. Hashikura and Sakagami knew all of these representations were false.

338.     At about the same time, summer of 2007, Mr. Kawamoto raised concern about the fact that because of common ownership, the guarantees given by the Swedish banks were risky. Sakagami told him that the funds of the Swedish banks were guaranteed by the European Union and therefore, despite ownership, Sakagami could not control the bank.

339.     At about the same time, Sakagami also advised Mr. Kawamoto that the returns were tax free.

340.     On September 3, 2007, Mr. Kawamoto invested $200,000 in the Oil Fund in the name of his son, Suguru. EBOA Trust guaranteed the principal. He opened a bank account with BOA deposit $1,000 for Coach Management – the limited liability company wholly owned by Mr. Kawamoto.

341.     In November 2007, Mr. Kawamoto was permitted to withdraw some profit from the Oil Fund. Thereafter, when Hashikura pushed him to invest in Amiworld, Mr. Kawamoto did not hesitate. On November 30, 2007, for his own account, he purchased $100,000 of Amiworld's securities. By this time, Mr. Hashikura was quite capable of convincing people to part with their life savings.

79

342.     In January 2008, Mr. Kawamoto reported his experience with the investment. He borrowed $500,000 and on January 9, 2009, he purchased additional Amiworld stocks in his own name. Mr. Hashikura told him to use an address in Japan.

343.     Mr. Hashikura and Sakagami advised Mr. Kawamoto to pay all investment funds to EBOA. Believing in the Projects, he assisted Mrs. Nakamura (also Plaintiff in this action) with her investments.

344.     On or about March 17, 2008, Mr. Hashikura sent Mr. Kawamoto a forecast – which he had posted on his Blog on March 17, 2008 – showing that Amiworld securities would be listed on the NASDAQ in the first half of May 2008 and all indications are that it will be traded at $8 to $15 range – a 400% to 800% increase.

345.     On or about April 30, 2009, in the name of his son, Suguru, Mr. Kawamoto invested $1.2 million in the Oil Fund. At the same time, on behalf of Coach Management, he invested $500,000 in the Oil Fund, $200,000 cash and $300,000 from the returns in the BOA account. EUBK Trust guaranteed the principals. Despite advertising returns of 48% for investments of $500,000 or more, Saito and Sakagami offered 35.5% return on these investments.

346.     Suguru and Coach Management were required to open bank accounts with BOA. They received monthly statements from BOA by mail as well authorization for online access to their accounts.

347.     Mr. Kawamoto discovered that Saito and Sakagami own a Japanese entity by the same name "EBOA, Ltd." This entity was created so that investors, Plaintiffs Mmes. Nakamura, Orita and Ogura included, would believe that they were dealing with one EBOA entity. On information and belief, Saito and Sakagami transfer all funds that Plaintiffs and other investors

wired to EBOA (the Canadian entity authorized to do business in New York) to this Japanese

entity's bank accounts in Japan including without limitation its account with the Bank of Tokyo-

Mitsubishi UFJ, Ltd.

348.    Mr. Kawamoto's transfer requests took longer and longer to be processed.  He

continuously complained about this situation. In or about November 2010, Mr. Hashikura

informed Mr. Kawamoto that Sakagami was arranging for a $30 million bridge loan to pay

investors without explaining why they needed a loan when they were purportedly depositing

35% returns in Plaintiffs' accounts.

349.    On December 17, 2010, via email, Sakagami, as COO of a JASB Group company,

advised Mr. Kawamoto that Sakagami and Saito would not return his investment if he

commenced litigation.

350.    Mr. Kawamoto mailed and sent back by facsimile to Sakagami the agreements for

various investments and paid the funds to EBOA by wire transfer of funds from his local bank

Union Bank, N.A..

351.    Mr. Kawamoto relied on representations from Mr. Hashikura and Sakagami in

making the substantial investments.

352.    To date, Mr. Kawamoto, Suguru and Coach Management have sustained at least

$3 million in losses.

### D.  Mochizukis

353.    Mr. and Mrs. Mochizuki came to know about Amiworld investments through

Termyna, whom they had known from about 1996 shortly after the Mochizukis had gotten

married. At that time, Mr. Mochizuki was employed as a teacher at a Japanese school that

offered insurance policies to its employees, including Mr. Mochizuki. Termyna was – and, to this day, remains – a representative for Metlife, which was one of the insurance providers with whom Mr. Mochizuki's school/employer contracted for the provision of its insurance benefits. It was through this program that Termyna contacted the Mochizukis, arranged to visit their home and, therein, solicited the Mochizukis to purchase approximately five insurance policies and four annuities through Metlife. Starting in 1996, Termyna became the Mochizukis' trusted insurance representative and, as a critical part of that role, well informed as to the state of the Mochizukis' personal finances.

354.    In or about December 2005, Termyna began soliciting the Mochizukis to invest – not in more insurance – but in various Saito and Sakagami ventures, starting with the VEB project, which she promised would be safe and produce high returns for them. Termyna told the Mochizukis that Saito and Sakagami were sophisticated, successful and trustworthy businessmen and that any investments introduced by them were safe and sound. Indeed, Termyna advised them that the guaranteed return on the VEB investment was so high that the most prudent strategy was to finance the investment principal through a home equity loan, the interest payment of which would be exceeded several times over by the VEB earnings.

355.    Given the foundation of trust that Termyna had established over the course of her years as their insurance broker, the Mochizukis followed her advice and invested in VEB, with funds raised through a home-equity loan.

356.    In or about December of 2005, the Mochizukis took out a home equity loan – under Termyna's specific directions – in the amount of $100,000.

357.    On or about December 6, 2005, Mrs. Mochizuki opened a BOA account and sent the initial start-up amount of $1,100 and the $100,000 in proceeds from the home equity loan to

EBOA for investing in VEB on a 3 to 6 month term, after which Mrs. Mochizuki was encouraged by Termyna to roll the investment over. Termyna advised them that all of the returns from VEB investment would be deposited in the Mochizukis' BOA account.

358.    As instructed by Termyna, Mr. and Mrs. Mochizuki each opened an account with BOA. Mr. and Mrs. Mochizuki received monthly statements of deposit and withdrawal activities including: cash deposits they made, deposits of the returns they were supposedly earning on their investments, deposits of the interest they were supposedly earning on their funds with the BOA, and withdrawals of funds by Defendants purportedly to be invested in the Projects. Mr. and Mrs. Mochizuki had access to the same information on line. On information and belief, none of these activities actually occurred except on paper. On information and belief the representations in the statement were false.

359.    Termyna continuously pressured the Mochizukis to increase the size of their investments in the projects. On or about April 7, 2006, the Mochizukis invested an additional $60,000 in the VEB fund.

360.    On June 12, 2006, Mr. Mochizuki gave Sakagami $8,470 in cash at Sakagami's office on 42 East 62nd Street, 12th Floor, New York, New York to be invested in the VEB fund.

361.    From June 14, 2006 to March 21, 2007, on several occasions, the Mochizukis invested an additional $260,206 in the VEB fund.

362.    At some point late 2006, Termyna had begun advising Mrs. Mochizuki to purchase shares in Amiworld, informing her that Amiworld was about to go public and that, as a result of the IPO, its share-price was guaranteed to quickly appreciate in value by several times the pre-IPO price. Termyna gave them the Amiworld Memo.

363.    On December 11 and December 13, 2006, Mrs. Mochizuki acquired $25,000 and $5,000 of Amiworld's stocks. Per Sakagami's advice, Termyna asked Mrs. Mochizuki to use an address in Japan for the stock purchase agreement.

364.    By March 21, 2007, the Mochizukis had invested a total of $458,676 in Amiworld ventures, all of which had been paid to EBOA.  During this period, they had been successful in withdrawing some amounts from their BOA accounts, via wire transfer, which fully reinforced their trust in Amiworld and in Sakagami and Saito's honesty.

365.    In or about late 2007, Mrs. Mochizuki received a proxy form in the mail from Amiworld, which contained news of a shareholder meeting, which had been held earlier in 2007 – prior to Mrs. Mochizuki's receipt of the proxy. She also received simultaneous notice of the Amiworld stock split, which had been effectuated in 2007 prior to receipt of the notice.

366.    At no point in time prior to the shareholder meeting and/or stock split did Mrs. Mochizuki receive any notice of the these meetings and/or actions taken by the directors, nor did Mrs. Mochizuki ever receive any prior notice of Sakagami and Saito's decisions to delist Amiworld stock on the OTCBB or to dissolve Amiworld itself and transfer all of its assets to separate entity in Panama.

367.    In or about February 2008, Termyna informed the Mochizukis that the VEB fund had ended and began urging them to transfer the balance in their BOA account into a new investment project, the Oil Fund. Termyna provided the Mochizukis with a copy of the Oil Fund Offering Memorandum. Termyna told the Mochizukis an investments in the Oil Fund was risk-free since Saito's and Sakagami's wholly owned bank, EBOA Trust, guaranteed the principal and the returns, similar to VEB, were certain.

368.     On or about February 11, 2008, Mrs. Mochizuki applied to transfer her entire balance in BOA into the Oil Fund.

369.     From about August 2008, Mrs. Mochizuki experienced difficulty in transferring money from her BOA account to her bank accounts in the U.S. and in Japan.

370.     In or about November 24, 2008, Termyna and BOA representatives told Mrs. Mochizuki that BOA's corresponding bank had purportedly gone bankrupt and, therefore, the prior wire transfer requests would take longer than usual.

371.     On July 27, 2009, Mrs. Mochizuki received an email from BOA representing that the reason for the failure of BOA to wire returns from investors' BOA accounts into their personal bank accounts in the U.S. and Japan was that – due to an ongoing money laundering investigation of the correspondent bank by the relevant licensing agency – the correspondent bank was short of the number of staff members licensed to deal such an investigation; moreover, the global financial crises had increased the volume of drug and/or terrorism-related international wire transfers, causing regulators to tighten enforcement – a situation that would be alleviated as the economic climate recovered.

372.     On September 9, 2009, Mrs. Mochizuki received another email from BOA representing that the reason for the continued failure of BOA to wire returns from investors' BOA accounts into their personal bank accounts in the U.S. and Japan was that – although the worst of the global financial crisis has passed and the correspondent bank has been cleared under the aforementioned money-laundering investigation – the correspondent bank was still short-staffed and overwhelmed with addressing the accumulated backlog of investor complaints, as well as servicing the needs of the numerous other offshore banks that used its services.

373.     On November 24, 2009, Mrs. Mochizuki sent another email to BOA, inquiring into the still unfulfilled wire transfer request, which she made on November 24, 2008, and about which she had inquired on September 4, 2009, at which point BOA had assured her that they were waiting for final approval on the transfer.

374.     Throughout 2009, as Mrs. Mochizuki's difficulties in attempting to withdraw money from her BOA account increased, Termyna relayed advice to Mrs. Mochizuki, which Termyna had received from Sakagami, stating that because a correspondent bank of Amiworld's had gone bankrupt, the amount of time it took to wire money from any BOA account was increasing. Termyna also blamed the delays – as she did with other frustrated Amiworld investors – on President Obama's new, more restrictive, policies towards off-shore wire transfers.

375.     Sometime in the fall of 2010, Termyna told Mrs. Mochizuki that, because – for various reasons – it is practically too difficult to withdraw funds from BOA accounts at this time, it is best for Mrs. Mochizuki to simply roll over her investments.

376.     Termyna and others aggressively solicited these investments from the Mochizukis, despite the fact that neither Mr. nor Mrs. Mochizuki had any experience in such investments, were not accredited investors by any cognizable standard, nor were they in possession of the requisite net worth to engage in such investments. Indeed, their only path to financing such investments was through home equity loans. At no time prior to the Mochizukis purchasing Amiworld stocks, did any of the Defendants make inquiries into to the Mochizukis' relative experience or financial capacity to make such investments, nor did Termyna, Sakagami or anyone at Amiworld fully explain the risks associated with investing in Amiworld ventures. In fact, the Mochizukis were told, by Termyna and others, that the securities were guaranteed to

appreciate substantially and that, therefore, borrowing against home equity to finance the investments was a safe strategy.

377.    Mr. and Mrs. Mochizuki mailed and sent back by facsimile to Sakagami the agreements for various investments and paid the funds to EBOA by check and wire transfer of funds from their local banks including PNC Bank, N.A..

378.    Mr. and Mrs. Mochizuki were denied access to their BOA online account and have not been able to access their online account and have not received any statements since Saito and Sakagami learned that the Mochizukis were going to join this lawsuit.

379.    To date, Mr. and Mrs. Mochizuki have sustained at least $876,000 in losses.

### E.  **Atsushi Mori**

380.    Mr. Mori knew the Hashikuras as neighbors for over ten years.

381.    During late 2007 and early 2008, Mr. Hashikura repeatedly solicited Mr. Mori to invest in crude oil trading and processing by contacting him directly or through Mr. Mori's wife. Mr. Hashikura gave Mr. Mori the Oil Fund Memo and photos of the oil refinery purportedly belonging to Amiworld's subsidiaries in Colombia.

382.    Mr. Hashikura represented Saito and Sakagami as experienced businessmen with a successful track record.

383.    He represented that Mr. Mori had no risk when his capital was guaranteed by a Swedish financial institution and the investment was for only one year. Mr. Hashikura talked about other satisfied investors who lived in the same community.

384.    Mr. Hashikura tried very hard to convince Mr. Mori to invest at least $100,000 in the scheme. Once he was certain that Mr. Mori was only willing to invest $50,000, Mr.

Hashikura introduced Tsukuyomi, an entity he claimed to have formed and owned, to facilitate the consolidation of smaller investment amounts, such as Mr. Mori's.

385.    After a series of solicitations from Mr. Hashikura at various occasions, including those during the home parties at Hashikura's and while picking up their children at the school, as well as discussions regarding prior investors' success-stories – and in reliance on statements made by Mr. Hashikura – Mr. Mori began investing in Saito's and Sakagami's Projects. On March 5, 2008, through Tsukuyomi, Mr. Mori paid to EBOA $51,000 – $1,000 to open a bank account with BOA and $50,000 invested in the Oil Fund.

386.    As instructed by Mr. Hashikura, Mr. Mori opened an account with BOA. Mr. Mori received monthly statements of deposit and withdrawal activities including: cash deposits he made, deposits of the returns he was supposedly earning on his investments, deposits of the interest he was supposedly earning on his funds with the BOA, and withdrawals of funds by Defendants purportedly to be invested in the Projects. Mr. Mori had access to the same information on line. On information and belief, none of these activities actually occurred except on paper. On information and belief the representations in the statement were false.

387.    On April 1, 2008, Mr. Mori invested an additional $50,000 in the Oil Fund through Tsukuyomi. He received copies of guarantees of the funds by the EBOA Trust made to Tsukuyomi.

388.    Thereafter, Mr. Hashikura repeatedly promoted the other securities offered by Saito despite the fact that Mr. Mori did not have any experience in such investments, was not accredited investors by any cognizable standard, nor was he in possession of the requisite net worth to engage in such investments. He provided the ODIN Energy Offering Memo to Mr. Mori. He represented that Saito and Sakagami would merge ODIN Energy into a company

88

already listed on the NASDAQ so Mr. Mori would in fact invest in securities that would certainly be listed on the NASDAQ.

389.    On March 9, 2009, Mr. Mori finally convinced that this was also a safe project invested $30,000 in three preferred ODIN Energy stock with 9.6% return promised.

390.    Saito and Sakagami did not pay the promised returns to Mr. Mori.

391.    On April 8, 2009, Mr. Mori paid $8,500 to EBOA to make an additional investment to the Oil Fund.

392.    Mr. Mori wired the funds to EBOA from his U.S. based Citibank and sent personal checks payable to EBOA to its address at 60 East 42nd Street, Suite 1225, New York, New York 10165.

393.    When Mr. Mori demanded a refund of his funds in July 2010, Mr. Mori was denied access to his BOA online account and has not been able to access his online account and has not received any statements since.

394.    To date, Mr. Mori has sustained at least $254,000 in losses.

### F.  Nakamura

395.    Since about October of 2005, Mrs. Nakamura and Mr. Kawamoto have been business partners and friends.

396.    Mrs. Nakamura is acquainted with Nakamori.

397.    In or about September 2007, Mr. Kawamoto discussed the information he had received from Mr. Hashikura and Nakamori about the Oil Fund with Mrs. Nakamura. He told her that he would invest in the Oil Fund and then advise her if he found Mr. Hashikura's and Sakagami's claims about the return on the investment to be true.

398.    In early January 2008, Mr. Kawamoto repeated to her Sakagami's and Mr. Hashikura's previous representation about the safety of the Projects. Mr. Kawamoto also reported that his BOA account received regular deposit of returns on the Oil Fund investment, of which he was able withdraw portions within 2 weeks or thereabouts. Mr. Kawamoto also told her about the guarantee of the principal by big Swedish banks whose funds were guaranteed by the European Union – a representation made to him by Sakagami.

399.    On this information, Mrs. Nakamura decided that it was safe to invest in the Oil Fund. She lent $500,000 to Mr. Kawamoto to invest in Amiworld's securities.

400.    On or about July 6, 2009 and again on July 16, 2009, Mrs. Nakamura invested $100,000 in the Oil Fund. On July 6 and 16, 2009, as COO of EBOA Trust, Sakagami executed the agreements guaranteeing the principal knowing that EBOA Trust was declared bankrupt.

401.    On December 14, 2009, Mrs. Nakamura invested $2 million in the Oil Fund. On December 14, 2009, again, as COO of EBOA Trust, Sakagami executed the guarantee agreement.

402.    In April and May 2010, Mrs. Nakamura invested $300,000 more in the Oil Fund.

403.    Mrs. Nakamura was required to and did open a bank account with BOA with a $1,000 deposit.

404.    Similar to other Plaintiffs, Mrs. Nakamura received some of the purported returns, but eventually she could not withdraw any funds from her BOA account. She asked Mr. Kawamoto to communicate her complaint to Sakagami and Mr. Hashikura.

405.    As her investment matured, she demanded her principal and returns back. But, of course, Saito and Sakagami did not accede to her request.

406.    Saito and Sakagami terminated her access to her BOA account.

407.    To date, Mrs. Nakamura has sustained at least $3.3 million in losses.

### G. **Ogura & Orita**

408.    Mrs. Yoko Ogura and her daughter, Kayoko Orita, came to know about, and eventually invest in, various Saito and Sakagami ventures through the Hashikuras, who were family friends of Mrs. Ogura's other daughter, Mrs. Rieko Sakuramoto. Following the most common pattern of solicitation of other investors, Mrs. Sakuramoto had been personally acquainted with the Hashikuras before any of the Amiworld investments entered the picture.

409.    Mrs. Sakuramoto knew Hashikuras through the Leonia Japanese Wives Association, where Mrs. Sakuramoto and Mrs. Hashikura had become friends. Mrs. Hashikura often arranged for her children to play with Mrs. Sakuramoto's children.

410.    Beginning sometime in October of 2007, Mrs. Hashikura invited Mrs. Sakuramoto to their home where the Hashikuras explained the investments in Amiworld and Oil Fund and gave her the Amiworld Memo and the Oil Fund Memo. Thereafter, they regularly spoke to Mrs. Sakuramoto about the very promising Oil Fund and mentioned that the Mochizukis and Mrs. Takematsu had invested in the same ventures. The Hashikuras invited Mrs. Sakuramoto to their house on several occasions, where Mr. Hashikura urged her to invest in the Oil Fund, citing the example of his own investments, as well as examples of other common acquaintances and friends of theirs from their small community who had invested in the fund. Mr. Hashikura represented Saito and Sakagami as sophisticated, successful and trustworthy businessmen and the investments projects introduced by them as safe and sound. Further, Mr. Hashikura represented that the Oil Fund was a risk-free investment since the principal invested

was guaranteed by a large Swedish institution owned by Saito and Sakagami and the returns were certain.

411.    Mrs. Sakuramoto was reassured by the news that several respected acquaintances of hers – particularly, Mrs. Mochizuki had invested – that she began to consider recommending the investments to her mother and sister.

412.    Continuing through the fall of 2007, Mrs. Sakuramoto would gather in a café with Mrs. Hashikura and other mothers after they had dropped their children off at school. At these gatherings, the Oil Fund and Amiworld's listing on NASDAQ were frequent topics of conversation, particularly the subject of the purportedly forthcoming listing of the Amiworld shares on the NASDAQ, which, Mrs. Hashikura insisted, would itself guarantee a jump in the stock value of 5 to 10  times of its purchased price. Mrs. Hashikura regularly urged the mothers to invest in the stocks as soon as possible to reap the gains of the purportedly imminent NASDAQ listing. Mrs. Sakuramoto often witnessed mothers handing checks over to Mrs. Hashikura for investment in the fund.

413.    In October 2007, having had their interest spurred by the foregoing interactions, Mrs. Ogura and Mrs. Orita resolved to begin investing in these ventures. Mr. Hashikura's repeated assurances that the investments were sound and knowing that others had invested in the same ventures caused Mrs. Orita and Mrs. Ogura to believe in Mr. Hashikura's and the ventures. Mrs. Orita and Mrs. Ogura were not accredited investors – they did not have a high net worth or experience in these types of investments. At no time did Saito, Sakagami, any of the Hashikuras or anyone else on their behalf inquired about their net worth or experience to determine their level of sophistication.

92

414.    On October 16, 2007, Mrs. Ogura wired ¥11,943,250 (about $101,000) to EBOA Ltd. to open an account with BOA and to invest $100,000 in the Oil Fund.

415.    On November 15, 2007, Mrs. Orita wired ¥11,943,250 (about $101,000) to EBOA Ltd. to open an account with BOA and to purchase 50,000 Amiworld stocks at $100,000. On November 15, 2007, Mr. Hashikura emailed Mrs. Orita (copied to Ms. Hashikura) confirming receipt of her $101,000 wire transfer to BOA - $1,000 for bank and $100,000 for purchase of Amiworld stocks; confirming that BOA would mail a confirmation and access password to Mrs. Orita, once the savings account was opened; confirming that Mrs. Orita would be able to sell the stocks within 4 months and 10 days after investing the money; asserting that – according to the BOA attorney team, the Amiworld shares would sell for $10.

416.    Although, Mrs. Orita had paid for the securities even before she submitted a subscription agreement, to ensure that Mrs. Orita would not change her mind, Mr. Hashikura emailed positive representations about the NASDAQ listing to Mrs. Orita. On November 15, 2007, Mr. Hashikura wrote that she could sell the Amiworld shares after 4 months and 10 days from November 15.

417.    As instructed by Mr. Hashikura, Mrs. Ogura and Mrs. Orita each opened an account with BOA. They received monthly statements of deposit and withdrawal activities including: cash deposits they made, deposits of the returns they were supposedly earning on their investments, deposits of the interest they were supposedly earning on their funds with the BOA, and withdrawals of funds by Defendants purportedly to be invested in the Projects. Mrs. Ogura and Mrs. Orita had access to the same information on line. On information and belief, none of these activities actually occurred except on paper. On information and belief the representations in the statement were false.

93

418.    On October 24, 2007, Mrs. Ogura wired ¥2,308,200 (about $20,000) to EBOA for investment in VEB which was later rolled over to the Palm Oil Fund.

419.    On November 16, 2007, Mr. Hashikura emailed Mrs. Orita (copying Mrs. Hashikura), attaching an offshore stock purchase agreement, in both English and Japanese, as well as all necessary material to open a BOA account.  Mr. Hashikura represented to Mrs. Orita that: (a) Amiworld had been approved as a public company by the SEC on October 5, 2007 and would be starting process of listing on the NASDAQ in 60 days time; (b) before being listed on the NASDAQ, Amiworld shares would be traded at $3, but that Amiworld's true financial status would establish an effective sales price of at least $4, once the IPO was effectuated; and (c) Amiworld had decided to issue stocks before actual listing on the NASDAQ listing, but, pursuant to SEC rules, was only authorized to issue restricted stocks during the period of preparation for the listing.

420.    On December 10, 2007, Mrs. Ogura invested $20,000 in Amiworld's securities through Tsukuyomi. She wired $6,026.13 on December 6, 2007 and $8,926.97 on December 10, 2007 from her account with a Japanese bank to EBOA and transferred $5,026.90 from her BOA account.

421.    On December 11, 2007, Chika Mukaida of Tsukuyomi emailed Mrs. Ogura and Mrs. Sakuramoto confirming receipt of Mrs. Ogura's investment amounts and represented that Tsukuyomi had successfully purchased Amiworld stock with their investment funds and that the Amiworld IPO sales would be starting in mid-December, with a scheduled listing of Amiworld stock on the NASDAQ in late January 2008. Ms. Mukaida, on behalf of Tsukuyomi, further represented that Tsukuyomi would open a EUBK Stock House account for Mrs. Ogura beginning in January 2008. But, Mrs. Ogura did not receive any evidence of this investment.

94

422.    On January 1, 2008, Mr. Hashikura emailed Mrs. Sakuramoto an update on the JASB Group that the application for listing Amiworld on the NASDAQ would be completed the middle of January and that the IPO was under way.

423.    On March 17, 2008, Mrs. Sakuramoto received an email from Mr. Hashikura regarding a posting on his website at www.adventurenewyork.com/amiworld/news-mar-17-08/nasdaq-info-mar17 that: "We got a NASDAQ listing schedule from Amiworld."

424.    On May 12, 2008, Mrs. Ogura invested $20,000 from the returns in her BOA account in the Palm Oil project.

425.    On September 12, 2008, in a mass email, to further legitimize the ventures, Mr. Hashikura notified Plaintiffs that: (a) the President of Colombia had requested a meeting with Saito and that the meeting was held on September 5; and (b) that a representative of Amiworld and the Vice President of NASDAQ had dinner together, wherein the Vice President expressed his certainty as to Amiworld's imminent listing on the NASDAQ, subject to Amiworld's discretion as to the optimal time and economic conditions for the listing.

426.    On October 10, 2008, Mr. Hashikura emailed Mrs. Sakuramoto to inform her that – as the one-year anniversary of Mrs. Ogura's October 16, 2007 investment in Oil Fund investment was approaching, Mrs. Ogura would be eligible to re-enroll (i.e. roll over) her investment in the fund for another year at a 35.536% return.

427.    On November 10, 2008, on behalf of Mrs. Ogura, Mrs. Sakuramoto requested a money transfer out of Mrs. Ogura's BOA account in the amount of $10,000. The money took more than three weeks to be transferred and was received in December 2008.

428.    Thereafter requests for transferring funds from Mrs. Ogura's BOA account to her legitimate bank accounts were not processed for months to discourage Mrs. Ogura to ask for her money back.

429.    On July 5, 2009, Mrs. Sakuramoto called Mrs. Hashikura via telephone to ask for her help in effectuating a $4,500 wire transfer request from Mrs. Ogura's BOA account, which she had submitted on February 6, 2009, which had not yet been sent to Mrs. Ogura. Thereafter, on July 8, 2009, Mr. Hashikura assured Mrs. Sakuramoto, via email, that he would again contact Mr. Sakagami by telephone to pressure him to transfer the money.

430.    On October 30, 2009, Mrs. Sakuramoto called Mr. Hashikura to inquire into the status of BOA, given all of the delays in fulfillment of wire transfer requests. Mr. Hashikura reassured her that BOA is a sound bank and she should be assured that there were no legal problems, blaming the delays in wire transfers on President Obama's new policies for combating money laundering. He recommended that Mrs. Ogura roll over her $100,000 investment, because a withdrawal request would take a long time.

431.    On December, 2009, Mrs. Sakuramoto complained in person (after dropping children off at school) to Mrs. Hashikura about the delayed wire transfers. Mrs. Hashikura re-iterated Mr. Hashikura's recommendation that Mrs. Sakuramoto simply reinvest the funds, given that there would be long delays on withdrawal requests. Mrs. Hashikura informed Mrs. Sakuramoto any amount of cancelled wire transfers would be immediately credited to Mrs. Ogura's account. Mrs. Sakuramoto called Mr. Hashikura the same day to inquire as to the same issue.  Mr. Hashikura reiterated Mrs. Hashikura's recommendation to reinvest and, further, reassured Mrs. Sakuramoto that her wire transfer amounts, as well as her principal deposits, would be fully guaranteed.

432.    On April 21, 2010, a BOA representative emailed Mrs. Sakuramoto regarding an April 16, 2010 complaint about delayed wire transfers, saying that, due to offshore banking policies, they could not answer certain questions, but they would try to help.  The representative also said the regulations on offshore money transfer were becoming less restrictive, and therefore, Mrs. Sakuramoto could should more money deposited in her account.

433.    On May 19, 2010, Sakagami called Mrs. Ogura via telephone and complained that Amiworld's delay in getting listed on the NASDAQ was due to racial discrimination, and that this delay was preventing Amiworld from completing its planned IPO. He asked her to wait for her money.  This event only increased Mmes. Sakuramoto's, Ogura's and Orita's suspicion that Saito and Sakagami's ventures were fraudulent.

434.    In June 2010, Mrs. Sakuramoto called Mr. Hashikura to inquire as to BOA wire transfer status, as well as the status of the Amiworld stock. He responded that, because of the economic crisis, it would be difficult for Amiworld to be listed on NASDAQ, but that Amiworld would be listed on Panama Stock Exchange in July 2010, then Canada and then Hong Kong and that, after the Panama listing, the sale of Amiworld stock would be possible. He said that Sakagami was working very hard and asked Mrs. Sakuramoto to wait a little longer.

435.    At no point in time did Mrs. Ogura receive any prior notice of Sakagami and Saito's decisions to delist Amiworld stock on the OTCBB and/or to dissolve Amiworld itself and transfer all of its assets to separate entity in Panama.

436.    Mrs. Ogura was denied access to her BOA online account and has not been able to access her online account and has not received any statements since they demanded the return of her money. Mrs. Orita was denied access to her BOA online account and has not been able to

access her online account and has not received any statements since they demanded the return of her money.

437.    To date, Mrs. Ogura has suffered at least $200,000, and Mrs. Orita has suffered at least $101,300, in losses.

## H. **Sandler**

438.    Prior to fall of 2007, Mr. Sandler knew Nakamori.

439.    In or about fall of 2007, Nakamori introduced Mr. Sandler to Mr. Hashikura who presented the investment opportunities in the Oil Fund and Amiworld's securities to Mr. Sandler. Mr. Hashikura represented that the returns were certain, the principal invested in the Oil Fund was guaranteed and that Amiworld's stocks would be listed on the NASDAQ within 60 days.

440.    Mr. Hashikura also told Mr. Sandler that he was licensed to sell securities.

441.    Mr. Sandler had never invested in similar projects and was not an accredited investor. At no time did Mr. Hashikura, Saito, Sakagami or anyone else at Amiworld ascertained that Mr. Sandler was an accredited investor.

442.    On January 18, 2008, Mr. Sandler executed a nominee service application with Tsukuyomi to purchase $100,000 of Amiworld's securities.

443.    Mr. Hashikura instructed Mr. Sandler to pay the subscription price before the agreement was formally accepted. Also, he directed Mr. Sandler to wire transfer $101,000 (comprising the price and bank deposit) to EBOA's account.

444.    On January 24, 2008, via mail, as CEO of Tsukuyomi, Mr. Hashikura confirmed the receipt and acceptance of the application. He advised Mr. Sandler that Tsukuyomi would purchase $100,000 of Amiworld's securities.

445.     On January 21, 2008, on behalf of Mr. Sandler, Tsukuyomi purchased 50,000 shares of Amiworld; and as with others, Sakagami signed the subscription agreement as COO of Amiworld.

446.     On January 18, 2008, Mr. Sandler opened an account with BOA depositing $1,000. Thereafter, via mail, he received confirmation of the transaction, a letter outlining BOA's services, specifically that it was a safe and reliable bank, and that the interest earned on the account was tax free. He received monthly bank statements via mail.

447.     On April 20, 2008, in a letter sent via mail, Mr. Hashikura informed Mr. Sandler that: "It is our pleasure to inform you that NASDAQ has started the review of Amiworld, Inc. from April 7[th], and listing **will start within 60 days**." (emphasis added).

448.     Among other misrepresentations, Mr. Sandler relied on Mr. Hashikura's representations that Amiworld would be listed on the NASDAQ in making his investment. But, for these representations, he would not have invested.

449.     Mr. Sandler's access to his BOA account has been terminated.

450.     To date, Mr. Sandler has suffered at least $102,000 in losses.

**I.   Setos**

451.     In or about March of 2006, Megumi Seto came to know about Amiworld ventures through her friend and acquaintance, Mrs. Mochizuki, to whom she expressed an interest in the MetLife life insurance policies in which Mrs. Mochizuki had invested (as outlined above).  In response to Mrs. Seto's query, Mrs. Mochizuki introduced her to Termyna, whom Mrs. Seto subsequently telephoned and invited to her home for an insurance primer. At the meeting, Mrs. Seto explained to Termyna that she and her husband, Mr. Seto, had saved up $100,000, which

99

they had planned to invest in life insurance policies for themselves with their son as beneficiary. Termyna advised her that, rather than investing the entire amount in life insurance, the Setos should only invest $40,000 of it in insurance and the remaining $60,000 of it in an Amiworld venture.

452.   Termyna then introduced Ms. Seto to the VEB fund and advised her to invest the $60,000 in it. Termyna represented that Saito and Sakagami were sophisticated, successful and trustworthy businessmen and the investments projects introduced by them were safe and sound.

453.   On or about April 17, 2006, the Setos, following Termyna's advice, invested $60,000 in VEB.

454.   Soon thereafter, the Setos took out a home equity loan in the amount of $150,000, under pressure from Termyna, who personally arranged for Mrs. Seto's appointment with the loan officers.

455.   Thereafter, the Setos invested the entire $150,000 loan proceeds in the VEB fund.

456.   As instructed by Termyna, Mr. and Mrs. Seto each opened an account with BOA. Mr. and Mrs. Seto received monthly statements of deposit and withdrawal activities including: cash deposits they made, deposits of the returns they were supposedly earning on their investments, deposits of the interest they were supposedly earning on their funds with the BOA, and withdrawals of funds by Defendants purportedly to be invested in the Projects. Mr. and Mrs. Seto had access to the same information on line. On information and belief, none of these activities actually occurred except on paper. On information and belief the representations in the statement were false.

457.     In or about November 2006, Termyna introduced the Setos to the Amiworld stock venture, advising them to purchase stocks in the name of multiple family members – for Mr. and Mrs. Seto, as well as for their son.

458.     In or about December 2006, the Setos purchased $20,000 worth of Amiworld stock – prior even to receipt of the Amiworld offering memorandum – including $10,000 in each of Mr. and Mrs. Seto's names.

459.     Also in or about December 2006, Termyna introduced the Setos to a Bank of America, N.A. loan officer and advised them to borrow more money for investments in VEB and Saito and Sakagami ventures.

460.     In or about January, 2007, following Termyna's advice, the Setos: took out another home equity loan for $150,000, the entire amount of which they invest in the VEB fund, and rolled over all of their previous investments in VEB fund.

461.     In or about December, 2008, Termyna informed the Setos that the VEB investment project is coming to an end and advised them, therefore, to transfer their investment balances in the VEB over to the ODIN Oil Fund. She represented that the Oil Fund was a risk-free investment since the principal invested was guaranteed by a large Swedish institution owned by Saito and Sakagami and the returns were certain.

462.     On or about February 18, 2008, the Setos, following Termyna's advice, transferred their entire VEB investment balance – up to that date, a total of $450,000 – into the Oil Fund.  The $450,000 transfer was accepted by Saito and Sakagami, despite the purported fact (as relayed to the Setos by Termyna) that the minimum qualifying Oil Fund investment was $500,000. According to Termyna, the Setos' investment was pooled with another individual's investment in order to clear the minimum $500,000 investment threshold.

463.    The Setos begin making multiple and repeated requests for fund transfers from their BOA account balances into their bank accounts in the U.S. and Japan. None of the transfers were completed, despite the Setos' repeated complaints via email and telephone to BOA, Termyna, and to Sakagami himself.

464.    During 2009, the Setos received several responses to their complaints, both from Termyna and from Sakagami.  In or about February 2009, Termyna responded to the complaints by advising Ms. Seto to limit her wire transfer requests to $9,999 so as to avoid scrutiny by the U.S. officials for money-laundering. Sakagami, on the other hand, called the Setos several times during 2009 – responding to their complaints by blaming the wire transfer delays on both the embezzlement scheme with their correspondent bank, as well as on the purported difficulties associated with President Obama's new international fund transfer regulations. At one point in September 2010, Sakagami also reassured Mr. Seto, over the telephone, that Saito and Sakagami were in the process of obtaining a bridge loan to cover all of their investors' lost moneys.

465.    In or about February, 2010, Termyna informed Mrs. Seto via telephone that – other than a sum of $50,000, which Termyna, through her special relationship with Saito and Sakagami would be able to withdraw on behalf of each of her customers, including the Setos, by year's end – all possibility of withdrawing investments from BOA accounts before 2011 had been foreclosed and, therefore, the Setos should roll over their investments in the Oil Fund for another year.

466.    Saito, Sakagami and Termyna aggressively solicited these investments from the Setos, despite the fact that neither Mr. nor Mrs. Seto had any experience in such investments, nor were they accredited investors by any cognizable standard, nor were they in possession of the requisite net worth to engage in such investments on the scale on which they were pressured to

do. Indeed, their only path to such large investments was through home equity loan financing. Nevertheless, at no time prior to the Setos' purchasing Amiworld stock, did any of the Defendants make inquiries into their relative experience or financial capacity to make such investments, nor did Termyna or anyone at Amiworld fully explain the risks associated with investing in Amiworld securities, nor did the Setos ever receive notice of any shareholder meetings that were held in connection with any of the Amiworld venture stocks of which they were in possession.

467.    Mr. and Mrs. Seto were denied access to each of their BOA online account and have not been able to access their online account and have not received any statements since Saito and Sakagami learned that Mr. and Mrs. Seto were going to join this lawsuit.

468.    To date, Mr. and Mrs. Seto have sustained at least $917,000 in losses.

**J.  Shibatas**

469.    The Shibatas and Hashikuras knew each other as neighbors. Sometime in mid-November of 2006, Mrs. Hashikura telephoned plaintiff Mrs. Shibata with a request to take a meeting at her home so that she might discuss something very important with Mrs. Shibata. At the meeting, she solicited her investment in the Amiworld stock venture and the Oil Fund. Providing her with both the Amiworld Memo and the Oil Fund Memo, she promoted the purchase of Amiworld stock as a lifetime opportunity to reap the inevitable gains of a company that was about to go public. As the Hashikuras represented it, the forthcoming IPO would guarantee a 5 to 30-fold increase in share value for those who purchased the stock pre-IPO.

470.    At this first meeting, Mrs. Shibata declined to invest in Amiworld, but did not outright discourage the Hashikuras, who continued to aggressively solicit her throughout the month of November 2006. In these continued solicitations, at meetings, which were frequent,

103

Mrs. Hashikura repeatedly spoke to Mrs. Shibata asserting that the Amiworld stocks were destined to increase in value, given that they were a sure bet to be listed on the NASDAQ very soon. Mr. and Mrs. Hashikura represented Saito and Sakagami as sophisticated, successful and trustworthy businessmen and the investments projects introduced by them as safe and sound. The Hashikuras also informed her that Mochizuki and Termyna – individuals whom Mrs. Shibata knew and trusted – had both invested in Amiworld stock.

471.    Based upon the foregoing representations – particularly the news of her acquaintances' investments – Mrs. Shibata decided to invest, despite the fact that she had no experience in such investments, was not an accredited investor by any cognizable standard (nor was her husband, Mr. Shibata), nor was she and/or her husband in possession of the requisite net worth to engage in such investments. Nevertheless, at no time during the Shibatas' involvement in the Amiworld ventures did any representative of Amiworld make inquiries into the Shibatas' relative experience or financial capacity to make such investments.

472.    On November 28, 2006, Mrs.  Shibata opened an account with BOA with a deposit of $1,000 and – through this account – subsequently, on December 14, 2006, acquired $10,000 worth of shares of Amiworld. In her Amiworld stock application, Mr. Hashikura instructed Mrs. Shibata to use her Japanese, rather than her U.S. address, since – according to Mr. Hashikura – this would make it easier for Amiworld to manage the stocks. At the time of these representations, the Shibatas were lawful residents of the United States.

473.    In early January 2007, Mrs. Hashikura introduced Mrs. Shibata to VEB and began aggressively soliciting her to invest in it. Mr. Hashikura also told her that the Hashikuras, Termyna, who was also an agent of Saito and Sakagami, and the Mochizuki family, had all invested and made profits in the VEB venture. Mr. Hashikura explained that the VEB fund

carried a guaranteed of principal, at a unit investment price of $20,000, and a 24.4% return for half a year. He told Mrs. Shibata that: "You don't have to take any risks, this is a safe investment."

474.     On January 29, 2007, Mrs. Shibata invested $40,000 in the VEB fund by mailing a check to EBOA.

475.     In February 2007, Mrs. Shibata asked Mr. Hashikura when to expect to receive an interest report from BOA for tax reporting purposes. Mr. Hashikura advised Mrs. Shibata that, because her BOA interest income was being deposited in a private offshore bank, it would not be necessary to include this income in her tax reporting, so long as she did not withdraw more than the amount of her original capital investment from her BOA account.

476.     In or about February 2007, to encourage further investments, Mr. Hashikura told Mrs. Shibata that Mrs. Takematsu – a friend of Mrs. Shibata's – had borrowed money using the equity in her home to invest in various Saito and Sakagami investment Projects.

477.     In or about May 2007, Mr. Shibata was required to open an account with BOA to invest $50,000 in VEB. At this time, the Shibatas' son, Masaomi, also invested $20,000 in VEB using Mr. Shibata's account with BOA.

478.     Mr. and Mrs. Shibata, received monthly statements of deposit and withdrawal activities including: cash deposits they made, deposits of the returns they were supposedly earning on their investments, deposits of the interest they were supposedly earning on their funds with the BOA, and withdrawals of funds by Defendants purportedly to be invested in the Projects. Mr. and Mrs. Shibata had access to the same information on line. On information and belief, none of these activities actually occurred except on paper. On information and belief the representations in the statement were false.

479. In June 2007, Mr. Hashikura solicited Mrs. Shibata to invest in Great Voyages, which was the shipping arm of Amiworld businesses with a ship being built for it and plans to buy or build additional vessels in the near future. He represented to her that Great Voyages and Amiworld were part of the same company, had the same ownership, and, pursuant to Saito's and Sakagami's plan, would be merged together after Amiworld's NASDAQ listing was accomplished. Mr. Hashikura represented that, like the Amiworld stock, the Great Voyages investment would be guaranteed to appreciate at least 5-fold (and likely much more) after the Amiworld NASDAQ listing. Each preferred stock was sold at $50,000. He offered to discount the stock and sold Mrs. Shibata one stock at $43,750. Mrs. Shibata sent the payment for this transaction to EBOA on June 30, 2007.

480. In or about summer of 2007, Mr. Hashikura solicited Mrs. Shibata to invest at least $100,000 in the Oil Fund. He represented that the Oil Fund was a risk-free investment since the principal invested was guaranteed by a large Swedish bank owned by Saito and Sakagami and the returns were certain. In addition, he represented to her that he had similarly advised Takematsu – whom Mrs. Shibata knew and trusted – to borrow $100,000 to invest in the Oil Fund, and that they had made a profit from the investment. He represented that the Oil Fund had a 42% return, and the principal, similar to the VEB venture, was guaranteed.

481. In or about September 2007, on behalf of her son, Masaomi, Mrs. Shibata invested $100,000 in the Oil Fund.

482. In November 2007, the Shibatas purchased $117,000 worth of shares of Amiworld at $2 per share. On or about November 26, 2007, Mrs. Shibata attempted to wire the money from her Citibank account to BOA. Citibank stopped the transaction and advised her that it was too dangerous to wire that much money without a correspondent bank. Mrs. Shibata called

106

BOA and explained the situation, after which, a few minutes later, Sakagami called her cell phone and gave her alternative instructions for wiring the money. The next day, Mrs. Shibata wired the $117,000 to EBOA, according to Sakagami's instructions.

483.    In fall 2008, in a telephone conversation, Sakagami told Mrs. Shibata that despite some delays due to deterioration of the U.S. economy, Sakagami would list Amiworld on the NASDAQ and at that time Mrs. Shibata should expect 1500% to 3000% increase in the price of Amiworld securities.

484.    In addition to the investments enumerated above, the Shibata family invested $700,000 in the Oil Fund.

485.    On July 14, 2009, Mr. Hashikura wrote investors, including Mrs. Shibata, as the agent of JASB Group regarding ODIN Energy's listing on the Panama Stock Exchange and referred shareholder questions to EUBK Stock House with a U.S. fax number.

486.    In or about summer of 2009, in response to Mrs. Shibata's concerns about transfer of funds from BOA to their local banks, Mrs. Hashikura stated that: "[The Hashikuras] have borrowed over $1 million to invest in various Projects. The Projects are safe and Mrs. Shibata should not be worried."

487.    From the date of her initial investment in the Amiworld ventures, through September of 2009, Mrs. Shibata had never submitted a wire withdrawal request from her BOA for any of the funds she invested in Amiworld. However, in 2009, she began hearing numerous rumors about other Amiworld investors complaining of having encountered severe obstacles to the actual fulfillment of any wire transfers that had been requested out of their BOA accounts. On a chance meeting with Mr. Hashikura in March of 2009, Mrs. Shibata inquired about these rumors.

107

488.    In or about September 2009, soon after her run-in with Mr. Hashikura, Sakagami called Mrs. Shibata and attempted to explain the rumors, stating that obstacles associated with President Obama's new money-laundering regulations, coupled with problems with the correspondent bank, had caused the delays. Sakagami declined to disclose the name of the correspondent bank to her on the grounds that the bank matter is not relevant to the investors. Further, Sakagami claimed that a large bank in Sweden had stepped in to guarantee the investors money and reassured her that everyone's money was safe with them. Sakagami asked Mrs. Shibata to convince other investors not to worry and advised her not to transfer more than $10,000 at any given time, so as to avoid money-laundering scrutiny by the U.S. government.

489.    On September 20, 2009, Mrs. Shibata replied to Mr. Hashikura's September 14 email, relaying the details of a phone conversation she had had with Sakagami, who had called Mrs. Shibata to address the wire-transfer rumors. In the conversation, Sakagami had explained that wire transfers had recently been delayed by the Obama administration's new, more rigorous policies for the review of transferred funds – a state of affairs, which was out of BOA's control. Sakagami reassured Mrs. Shibata that – notwithstanding the slowdown, which, at any rate, was liable to improve within the year – the investments were 120% guaranteed and insured and that Amiworld's business was stable and fully profitable. Further, Sakagami suggested to Mrs. Shibata that she not transfer more than $10,000 at any given time, so as to avoid scrutiny under the money laundering regulations.

490.    On November 19, 2009, via email, an agent of EBOA Trust responded to Mrs. Shibata query as to why it would only few days to make deposits to their BOA account while it took months to withdraw from their BOA accounts. EBOA Trust's agent stated that for every

deposit made by a client, an offshore member of the group – i.e. JASB Group – would make a deposit of the same sum into the BOA account of that client.

491.    On or about June 28, 2010, Sakagami sent a letter to shareholders of Great Voyages stock – among them, Mrs. Shibata – informing them that the company's shares had been swapped with ODIN Energy's stocks, which were already being traded on Panama Stock Exchange at the rate of 1 preferred Great Voyages for 1.5 common stock of ODIN Energy. Neither at that time, nor at any time since, was ODIN Energy's stock listed on the Panama Stock Exchange.  Only ODIN Energy's preferred shares are traded and they have traded at $.80 per share.

492.    On September 10, 2010, Sakagami called Mrs. Shibata and represented to her that all investments, including hers, were "120% safe".

493.    The Shibatas never received any notice of shareholder meetings for the merger, the stock split, the dissolution of Amiworld in Nevada, delisting Amiworld from the OTCBB, or any other important decision taken by the directors of Amiworld and Great Voyages. At no point in time prior to the shareholder meeting and/or stock split did Mrs. Shibata receive any notice of the these meetings and/or actions taken by the directors, nor did Mrs. Shibata ever receive any prior notice of Sakagami and Saito's decisions to delist Amiworld stock on the OTC Bulletin Board and/or to dissolve Amiworld itself and transfer all of its assets to separate entity in Panama.

494.    To date, the Shibatas have suffered approximately $1,391,000 of losses.

### K.  **Takematsu**

495.     Sometime in the fall of 2006, Mrs. Takematsu came to know about and invest in the Amiworld ventures through Mr. Hashikura, with whom they had lived on the same neighborhood block in Leonia, New Jersey for several years. At some point, Takematsu had told the Hashikuras about their recent financial difficulties and Mr. Hashikura advised to take out a home equity loan. Shortly thereafter, sometime in October of that year, Mr. Hashikura requested a visit to the Mrs. Takematsu's home to discuss investment opportunities.  At the meeting at the Mrs. Takematsu's home, Mr. Hashikura solicited their investment in the VEB project, which would provide a good investment reason for them to take out a home equity loan. He assured them that the returns on the investment were safe. Mr. and Mrs. Hashikura represented Saito and Sakagami as sophisticated, successful and trustworthy businessmen and the investments projects introduced by them as safe and sound.

496.     On or about October 26, 2006, Mrs. Takematsu took out a home equity in their loan and invested $100,000 in the VEB project, wiring the payment to EBOA for a 3 month term at a supposed 11.53% return.

497.     On December 6, 2006, Mrs. Takematsu purchased $10,000 worth of Amiworld stocks.

498.     On December 8, 2006, Mrs. Takematsu, on Mr. Hashikura's prior advice, opened a BOA account with a $1,000 opening deposit.

499.     From BOA, Mrs. Takematsu received monthly statements of deposit and withdrawal activities including: cash deposits she made, deposits of the returns she was purportedly earning on their investments, deposits of the interest she was purportedly earning on

her funds with the BOA, and withdrawals of funds by Defendants purportedly to be invested in the Projects. Mrs. Takematsu had access to the same information on line. On information and belief, none of these activities actually occurred except on paper. On information and belief the representations in the statement were false.

500.    At some point prior to July 5, 2007, Mrs. Hashikura informed Mrs. Takematsu that the VEB investment program was closing down and solicited her continued investment in another Saito and Sakagami project, the Oil Fund. She informed them that the principal investment in the VEB fund would be transferred to the Oil Fund account automatically. Mr. Hashikura represented that the Oil Fund was a risk-free investment since the principal invested was guaranteed by a large Swedish institution owned by Saito and Sakagami and the returns were certain.

501.    On or about December 10, 2007, Mr. Hashikura solicited and encouraged Mrs. Takematsu to invest in Amiworld stocks, providing her with a copy of the Amiworld Memo, an Amiworld catalog, and a one page advertisement for Amiworld, which had been published in several different media, including a Japanese newspaper (with distribution in New York City) and a Japanese telephone directory with distribution in New York and New Jersey area.

502.    On or about December 10, 2007, shortly after Mr. Hashikura's solicitation, Mrs. Takematsu purchased $40,000 worth of Amiworld stock. Mr. Hashikura and Sakagami instructed Mrs. Takematsu to use a Japanese address for her Amiworld securities application as well as for her Amiworld stock purchase agreement.

503.    On or about March 20, 2008, Mrs. Takematsu, following Mr. Hashikura's recommendation, transferred her investment in VEB to the Oil Fund.

504.     In 2007, several of Mrs. Takematsu's withdrawal requests had been successfully wired from their BOA accounts into her U.S. bank accounts in normal, relatively timely fashion. However, Mrs. Takematsu's withdrawal success-rate fell off abruptly after that.  In 2008, none of her transfer requests were processed, including even requests to transfer money to her bank accounts in Japan, where any excuses related to U.S. regulations would not have been applicable.

505.     Throughout 2008, Mrs. Takematsu complained repeatedly about these failures to Sakagami and to BOA and to the Hashikuras.

506.     In August 2008, Sakagami telephoned Mrs. Takematsu and blamed the transfer delays on a purported embezzlement scheme occurring at the corresponding bank (which Sakagami did not name).  He assured Mrs. Takematsu that Sakagami and the Oil Fund are pursuing claims against the corresponding bank and promised to reimburse those of Mrs. Takematsu's funds that were supposedly embezzled by the corresponding bank as well as refund her wire transfer fee that BOA had charged for the transfer request.

507.     On or about September 2, 2008, the refund of the supposedly embezzled amount as well as the wire transfer fee appeared on Mrs. Takematsu's BOA statement.

508.     In or about May of 2009, Mrs. Takematsu finally received what was to be the last successful transfer of funds – $10,000 – that she had requested from her BOA to her U.S. account. In the same month, she decided to terminate her investments in the Oil Fund. However, when she demanded that the Hashikuras terminate her investments and return of the principal amounts she had invested in these ventures, Mrs. Hashikura insisted that, given the Obama Administration's tighter restrictions on off-shore money transfers as well as the ongoing embezzlement matter with their corresponding bank, the more prudent strategy would be to simply roll her investments over for another term. Otherwise, she counseled, it would be years

112

before Mrs. Takematsu could get any of her money out. Finding no alternative choice, Mrs.

Takematsu followed Mrs. Hashikura's advice and rolled over her investments for another year.

509.     from Saito and Sakagami for every investor in Amiworld that they were able to

enroll.

510.     On June 22, 2010, in an email, Mrs. Takematsu once again demanded that

Hashikuras and BOA terminate all of her investments in Amiworld ventures and wire her

principal balances to her.  BOA promised them that Sakagami will call to discuss the matter, but

no call was ever received from him, nor did BOA comply with Mrs. Takematsu's termination

request.

511.     The Hashikuras, Saito and Sakagami aggressively solicited money from Mrs.

Takematsu, despite the fact that Mrs. Takematsu did not have any experience in these types of

investments, was not accredited investors by any cognizable standard, nor was she in possession

of the requisite net worth to engage in such investments – indeed, her only path to financing such

investments was through home equity loans. Nevertheless, at no time did any representative of

Amiworld make inquiries into Mrs. Takematsu's relative experience or financial capacity to

make such investments, nor did Mr. Hashikura, Saito or Sakagami or anyone at Amiworld fully

explain the risks associated with investing in Amiworld ventures. In fact, Mrs. Takematsu was

told, by the Hashikuras that the securities were guaranteed to appreciate substantially and that,

therefore, borrowing against home equity to finance the investments was a safe strategy.

512.     Mrs. Takematsu was denied access to her BOA online account and has not been

able to access her online account and has not received any statements since Saito and Sakagami

learned that she intended to file a claim against them.

513.     To date, Mrs. Takematsu has incurred approximately $205,000 in losses.

113

### L. **Yuka Tsunoda**

514.    On information and belief, sometime early in 2007,  with the assistance of Tamiko Hiramine ("Hiramine"), a real estate broker with Re/Max Realty, Sakagami gave a seminar in Dallas Texas about VEB, Amiworld securities, the Oil Fund and the Palm Oil Fund.

515.    Thereafter, on information and belief, Hiramine, claiming herself to have invested about $600,000 in these ventures, solicited investments from people within the Japanese community in Dallas including Yumi Vernon, a friend of Mrs. Tsunoda. Through her friends Mrs. Tsunoda came to know of Saito, Sakagami and was encouraged to invest in their Projects.

516.    In or about June 21, 2007, Mrs. Tsunoda entered into an agreement with Saito and Sakagami to invest in the VEB project.

517.    On June 21, 2007, Ms. Tsunoda deposited $21,000 with the EBOA, $1,000 to open an account with BOA and $20,000 to invest in the VEB project for a term of 180 days and at the return of 24.4%.

518.    Mrs. Tsunoda opened an account with BOA. Mrs. Tsunoda received monthly statements of deposit and withdrawal activities including: cash deposits she made, deposits of the returns she was purportedly earning on their investments, deposits of the interest she was purportedly earning on her funds with the BOA, and withdrawals of funds by Defendants purportedly to be invested in the Projects. Mrs. Tsunoda had access to the same information on line. On information and belief, none of these activities actually occurred except on paper. On information and belief the representations in the statement were false.

519.    Through EBOA Trust and EUBK Saito and Sakagami guaranteed the principal in the VEB project.

114

520.     At maturity, Mrs. Tsunoda reinvested her principal in VEB and did not withdraw any of the funds.

521.     On August 28, 2009, Mrs. Tsunoda invested $20,000 in the Palm Oil Fund and kept the remaining balance in her BOA account.

522.     Since September 2009, Mrs. Tsunoda has made many requests to BOA for transfer of the money she has in her BOA account to her bank in Japan.  Saito and Sakagami did not honor any of her requests.

523.     Mrs. Tsunoda relied on the representations made by Saito and Sakagami to her in the form of the guarantee of capital she invested and the representations on BOA's website.

524.     To date, Mrs. Tsunoda has sustained a loss of approximately $86,000.

## COUNT I
## FRAUD IN VIOLATION OF 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER AGAINST ALL DEFENDANTS

525.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

526.     The investment vehicles for the VEB, Amiworld and Oil Fund Projects are "securities", as defined in Section 2(1) of the Securities Act and Section 3(a)(9) of the Exchange Act.

527.     Saito and Sakagami, directly and indirectly, by use of the means or instrumentality of interstate commerce or the use of the mails, engaged in the use of manipulative and deceptive practices in connection with the sale of these securities to Plaintiffs in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

528.     The Agents, directly and indirectly, by use of the means or instrumentality of interstate commerce or the use of the mails, engaged in the use of manipulative and deceptive practices in connection with the sale of these securities to Plaintiffs in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

529.     The Corporate Defendants, directly and indirectly, by use of the means or instrumentality of interstate commerce or the use of the mails, engaged in the use of manipulative and deceptive practices in connection with the sale of these securities to plaintiffs in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

530.     Such manipulative and deceptive practices included, *inter alia*, the use of untrue statements of material fact and the omission of material facts, as alleged more particularly herein, that a reasonable investor would have considered important in making an investment decision in the securities.

531.     Defendants had actual knowledge of such false and misleading statements and omissions, or, in the alternative, recklessly disregarded the true facts concerning the Projects' business, assets and operations when making verbal and/or written representations to Plaintiffs regarding the Projects.

532.     Each Plaintiff justifiably relied on Saito and Sakagami's untrue statements and omissions of material fact regarding Amiworld in making their respective decisions to purchase the VEB, Amiworld and/or Oil Fund securities.

533.     By reason of the acts, omissions, practices, and course of conduct alleged herein, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

534.     As a direct and proximate result of Defendants' aforesaid wrongful conduct, Plaintiffs have been damaged in an amount to be proved at trial.

**COUNT II**
**VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT**
**AGAINST MAMORU SAITO AND TAKAHITO SAKAGAMI**

535.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

536.     By virtue, *inter alia*, of their position, and relationship to JASB, Amiworld, ODIN Energy Group, EBOA and all other related entities, Saito and Sakagami had the power and ability, and exercised the same, directly and indirectly, to control the operations of JASB, Amiworld, ODIN Energy Group, EBOA and all other related entities in connection with the conduct alleged herein.

537.     As such, Saito and Sakagami are "control" persons of, and are liable jointly and severally with and to the same extent to Plaintiffs as, JASB, Amiworld, ODIN Energy Group, EBOA and all other related entities, and are liable to Plaintiffs under Section 20(a) of the Securities Exchange Act, for violations by JASB, Amiworld, ODIN Energy Group, EBOA and all other related entities of Section 10(b) of the Securities Exchange Act, alleged herein.

538.     By virtue, *inter alia*, of their position, and their relationship to Tetsuya Hashikura, Hiromi Hashikura, Rumiko Termyna (the "Agents"), who were employed by them and sold VEB, Amiworld, and Oil Fund securities, Saito and Sakagami had the power and ability, and exercised the same, directly and indirectly, to control the operations of the Agent Individuals in connection with the conduct alleged herein.

539.     As such, Saito and Sakagami are "control" persons of the Agents and are liable jointly and severally with and to the same extent to Plaintiffs as, to Plaintiffs under Section 20(a)

117

of the Securities Exchange Act, for violations by the Agent Individuals of Section 10(b) of the

Securities Exchange Act, alleged herein, pursuant to which Plaintiffs were damaged.

## COUNT III
## VIOLATION OF SECTION 5 OF THE SECURITIES ACT AGAINST DEFENDANTS AND RECISSION PURSUANT TO SECTION 12 OF THE SECURITIES ACT

540.    Plaintiffs repeat and reallege each and every allegation in the preceding

paragraphs, except that in pleading this claim Plaintiffs expressly exclude any of the above

mentioned allegations insofar as they allege any defendant acted with knowledge or recklessness.

This Count is not based on and does not in any way sound in fraud.

541.    The securities offered by Defendants did not have a registration statement at all

times in effect.

542.    Defendants, directly and indirectly, made use of means or instruments of

transportation and communication in interstate commerce and of the mails to sell the Securities

through the use and medium of a prospectus, which comprised the offering documents of the

various investment Project offerings, and in so doing, violated Section 5(a)(1) of the Securities

Act.

543.    Defendants, directly and indirectly, carried and caused to be carried through the

mails and in interstate commerce, by means and instruments of transportation, the securities for

the purpose of sale and for delivery after sale, and in so doing, violated Section 5(a)(2) of the

Securities Act.

544.    The prospectuses did not meet the requirements of Section 10 of the Securities

Act.

545.    Defendants, directly and indirectly made use of means and instruments of

transportation and communication in interstate commerce and of the mails to carry and transmit

the prospectuses relating to the securities, and in so doing, violated Section 5(b)(1) of the Securities Act.

546. The securities were not accompanied or preceded by a prospectus that meets the requirements of Section 10(a) of the Securities Act.

547. Defendants, directly and indirectly carried or caused to be carried through the mails and in interstate commerce the securities for the purpose of sale and for delivery after sale, and in so doing, violated Section 5(b)(2) of the Securities Act.

548. Defendants, directly and indirectly, made use of means and instruments of transportation and communication in interstate commerce and of the mails to offer to sell the securities through the use or medium of the prospectuses and in so doing, violated Section 5(c) of the Securities Act.

549. Defendants' securities do not satisfy the requirements for exemption from Section 5 of the Securities Act.

550. By virtue of the above allegations, Defendants offered or sold a security in violation of Section 5 of the Securities Act, and in doing so are strictly liable to Plaintiffs under Section 12(a)(1) of the Securities Act, and Plaintiffs were damaged thereby.

551. Pursuant to Section 12(a) of the Securities Act, Plaintiffs who hold the Securities sue to recover the consideration paid for the securities with interest thereon, less the amount of any income received thereon, in exchange for the tender of such security.

552. Pursuant to Section 12(a) of the Securities Act, Plaintiffs who no longer own the Securities sue to recover damages caused by Defendants.

119

## COUNT IV
## VIOLATION OF RICO, SECTION 1962(a)

553.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

554.     As alleged herein, Defendants have engaged in a pattern of racketeering activity, consisting of numerous predicate acts of:

       a.      mail fraud in violation of 18 U.S.C. § 1341, as alleged in paragraphs 551 through 557 herein;

       b.      wire fraud in violation of 18 U.S.C. § 1343, as alleged in paragraphs 551 through 556 and 558 herein;

       c.      financial institution fraud in violation of 18 U.S.C. § 1344, as alleged in paragraph 559 herein;

       d.      money laundering in violation of 18 U.S.C. § 1956, as alleged in paragraphs 560 through 567herein;

       e.      engaging in monetary transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957, as alleged in paragraphs 564 through 565 herein;

       f.      use of interstate and foreign facilities in aid of racketeering in violation of 18 U.S.C. § 1952, as alleged in paragraph 566 herein;

       g.      transportation of stolen funds in violation of 18 U.S.C. § 2314, as alleged in paragraph 571 herein; and

       h.      receipt of stolen funds in violation of 18 U.S.C. § 2315, as alleged in paragraph 572 herein.

555.    Defendants made false representations of material fact to Plaintiffs, alleged in this Amended Complaint, to induce and influence Plaintiffs to (a) use their savings and borrow funds to invest in VEB, the Oil Fund and in the Palm Oil Fund, (b) agree to open account in and deposit money with BOA, and (c) agree that the returns on their investment, and principals at maturity be deposited in their BOA accounts.

556.    Defendants knew that each of the representations alleged in this Amended with respect to VEB, the Oil Fund, the Palm Oil Fund – investments offered by BOA and ODIN NY – and BOA was false at the time that the Defendants made each representation. Defendants' knowledge and fraudulent intent is evidenced by the following facts:

a.      Defendants failed to disclose to Plaintiffs that there were two judgments for fraud in similar investments outstanding against Saito and Sakagami in Japan;

b.      to induce further investments, Defendants paid some profits to Plaintiffs;

c.      to induce investments Defendants misrepresented that BOA and ODIN NY's affiliates and parent, **would be** listed on the NASDAQ;

d.      to induce investments, Defendants guaranteed the principal invested in the Oil Fund and the Palm Oil Fund by insolvent entities;

e.      Defendants misrepresented EBOA Trust and EUBK Trust as institutions with the financial strength to guarantee the principals invested in the Oil Fund and the Palm Oil Fund;

f.      Defendants misrepresented EBOA Trust as a licensed financial institution;

g.      Defendants misrepresented that EBOA Trust and EUBK Trust were regulated by the European Union;

121

h.      Defendants failed to disclose to Plaintiffs that EBOA Trust was never funded, did not have any assets and never earned revenues;

i.      Defendants failed to disclose to Plaintiffs that EBOA Trust was declared bankrupt by the Swedish government for failure to pay corporate taxes;

j.       Defendants failed to disclose that EBUK Trust had reported negative net worth to the Swedish authorities;

k.      Defendants made false representations regarding (i) BOA offering safe, stable and profit maximizing banking services in collaboration with banking institutions in Switzerland, Sweden, the U.S. and the European Union, (ii) BOA being a trustworthy bank; (iii) funds deposited with BOA being backed by secure collateral, and (iv) BOA offering access to online banking systems;

l.      Defendants made false representations about commencing the process of seeking bank licenses for BOA from the U.S. federal and state agencies when in fact the U.S. does not recognize banks licensed by the Republic of Anjouan as legitimate;

m.      Defendants misrepresented that Plaintiffs funds sent to EBOA *would be* deposited in their BOA individual accounts;

n.      Defendants misrepresented that Plaintiffs principals at maturity and returns on investments were deposited into their BOA accounts;

o.      Defendants misrepresented that they had a meeting with U.S. Senator Menendez in which the Senator approved of Defendants' banking systems;

p.      Defendants misrepresented that they had an international banking system including BOA and European Commercial that were insured by legitimate sources;

122

q.      Defendants misrepresented that Plaintiffs investments and returns were 120% safe;

r.      Defendants failed to disclose that they had no intention to return the principals invested in and the returns earned to Plaintiffs;

s.      Defendants misrepresented that returns earned on the investments were not subject to taxes in the U.S.;

t.      Defendants misrepresented that the U.S. laws and regulations on money laundering prevented the transfer of funds from BOA to Plaintiffs banks in the U.S. and in Japan;

u.      when they learned Plaintiffs have retained counsel, Defendants denied Plaintiffs access to their bank accounts with BOA;

v.      Defendants informed Plaintiffs that they will not recover their funds if they seek legal remedies against Defendants; and

w.      Defendants failed to return the principals invested in VEB, the Oil Fund and the Palm Oil Fund upon maturity.

557.    Defendants intended that each of the above misrepresentations and omissions would induce Plaintiffs to take (or to refrain from taking) one or more of the following actions:

a.      to refrain from investigating Saito's and Sakagami's background prior to investing in VEB, the Oil Fund and Palm Oil Fund;

b.      to continuously invest in the Oil Fund and Palm Oil Fund;

c.      to obtain home-equity and/or mortgage refinancing and to borrow from their insurance policies and credit card companies to raise funds to invest in VEB, the Oil Fund and Palm Oil Fund;

       d.      to agree the returns on their investments and the principal at maturity be deposited in their BOA accounts;

       e.      to refrain from reporting the returns (which were non-existent) on their tax returns; and

       f.      to refrain from seeking their remedies earlier.

558.    The collective intent of the above misrepresentations, in short, was to cause Plaintiffs to trust in Defendants' representations and to continuously invest in VEB, the Oil Fund and the Palm Oil Fund.

559.    Plaintiffs reasonably relied on Defendants' misrepresentations. Based on the misrepresentations that Defendants made to them, Plaintiffs understood and reasonably believed that: (i) their principal was guaranteed to be returned at maturity, (ii) they were earning substantial returns on their investments, and (iii) their deposits with BOA were safe and secure.

560.    As a direct and proximate result of Defendants' misrepresentations and Plaintiffs' reasonable reliance thereon, Defendants induced Plaintiffs to take (or to refrain from taking) each of the actions alleged in paragraph 553.

561.    Defendants used the United States mails to further their schemes, in violation of 18 U.S.C. § 1341, as alleged above, by placing or causing to be placed in an authorized depository for mail, or depositing or causing to be deposited with private and commercial interstate and international carriers for delivery: investment and guarantee agreements, checks for payment of principal to Defendants, application for opening bank accounts with BOA, and the monthly bank statements to Plaintiffs.

562.    Defendants also used the United States wires to further their schemes, in violation of 18 U.S.C. § 1343, as alleged above, by transmitting electronic mails to and from the United

States to Plaintiffs regarding investment in VEB, the Oil Fund and the Palm Oil Fund, transmitting, via electronic mail and facsimile, the investment applications, agreements and guaranteed, the communication regarding the investments, BOA's failure to process withdrawal of fund requests, by providing internet access to BOA system to view their BOA account, and causing to be wired substantial sums of money from Plaintiffs to Defendants.

563.    Defendants further used their misrepresentations to obtain moneys, funds, and credits owned by, or under the custody or control of, the FDIC-insured United States banks in which Plaintiffs had accounts in violation of 18 U.S.C. § 1344. Specifically, as a direct and proximate result of Plaintiffs' reliance on Defendants' misrepresentations, Defendants were able to secure from the FDIC-insured bank accounts of Plaintiffs payments of funds to be invested in the Oil Fund and the Palm Oil Fund which were sent by wire transfer to Defendants.

564.    Defendants also conducted financial transactions involving the proceeds of unlawful activity, with the intent to promote the carrying on of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Specifically, having received the proceeds of funds obtained by misappropriation, theft, and fraud from Plaintiffs, through transfers of such funds, Defendants subsequently conducted financial transactions involving these proceeds to fund additional acts of misappropriation, theft, and fraud. In particular, Defendants used the proceeds of their illegal activity to trade in restricted foreign currency and to register Amiworld with the SEC to further defraud Plaintiffs and other investors.

565.    Defendants also conducted financial transactions involving the proceeds of unlawful activity, with the intent to promote the carrying on of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) knowing that the transaction is designed in whole or in part to

conceal or disguise the nature, the location, the source, the ownership, or the control of the

proceeds of solicitation of funds obtained from Plaintiffs through theft, and fraud from Plaintiffs.

566.    Defendants also transferred funds from a place in the United States to a place

outside of the United States with the intent to promote the carrying on of unlawful activity, in

violation of 18 U.S.C. § 1956(a)(2)(A). Specifically, having obtained funds within the United

States, Defendants transferred those funds to outside of the United States with the intent to

defraud other investors.

567.    Defendants also transferred funds from a place in the United States to a place

outside the United States knowing that the funds involved in the transfer represent the proceeds

of unlawful activity and knowing that such transfer is designed in whole or in part to conceal or

disguise the nature, the location, the source, the ownership, or the control of the proceeds of

unlawful activity in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

568.    Defendants also knowingly engaged in monetary transactions in criminally

derived funds greater than $10,000.00, derived from unlawful activity, in violation of 18 U.S.C.

§ 1957. Specifically, Defendants engaged in the transactions described in paragraph 559 herein

by, through, or to financial institutions, with such transactions occurring in and affecting

interstate and foreign commerce.

569.    Defendants further committed their offenses within the United States, and their

transactions involved proceeds in excess of $10,000.00 obtained from the criminal acts of

misappropriation, fraud, and theft described in paragraph 564 herein.

570.    Additionally, Defendants used facilities in interstate and foreign commerce with

the intent to distribute the proceeds of the unlawful money laundering activity described in

paragraphs 564 through 569 herein, and thereafter did distribute the proceeds of their unlawful

126

money laundering activity, in violation of 18 U.S.C. § 1952. Specifically, Defendants used wire facilities in interstate and foreign commerce with the intent to distribute the proceeds of the activity described in paragraphs 564 through 569 herein, and thereafter did distribute the proceeds of such activity to themselves through the interstate and foreign wire facilities.

571.   Defendants also transferred in interstate and foreign commerce more than $5,000.00 in money, knowing the same to have been stolen, converted, or taken by fraud, in violation of 18 U.S.C. § 2314. Specifically, Defendants caused to be transferred in interstate and foreign commerce the proceeds of funds transferred from Plaintiffs to Defendants which Defendants knew to have been stolen, converted, or taken by fraud.

572.   Finally, Defendants received money in excess of $5,000.00 that crossed a United States boundary after having been stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken, in violation of 18 U.S.C. § 2315.

573.   All of the foregoing acts of racketeering activity were part of a single, continuous pattern of racketeering activity commencing with solicitation of investments in VEB and continuing through the solicitation of investments in the Oil Fund, and Palm Oil Fund to the present.

574.   Defendants used the proceeds derived from their pattern of racketeering activity to invest, directly or indirectly, in the acquisition of interests, establishment, or operation of enterprises, in violation of 18 U.S.C. § 1962(a).

575.   Corporate Defendants are an enterprise – the "Saito and Sakagami Enterprises". They are under the ownership and control of Defendants Saito and Sakagami, and share the common purpose with Defendants Saito, Sakagami, Mr. and Mrs. Hashikura, Termyna and Tsukuyomi of engaging in a course of conduct to take funds from Plaintiffs by inducing them to

invest their savings and borrowed funds in VEB, the Oil Fund and the Palm Oil Fund. Each defendant within the Corporate Defendants comprises a formal organization that functions as an individual continuing unit in pursuit of its purpose. Each defendant within the Corporate Defendants exists separate and apart from the pattern of racketeering activities alleged.

576.    Defendants used the proceeds derived from their pattern of racketeering activity, as described in paragraphs 550-568 herein, to invest in activities to defraud other investors.

577.    The Saito and Sakagami Enterprises are engaged in interstate and foreign commerce, and in activities that affect interstate or foreign commerce, including, among others, the following acts and omissions:

      a.  the solicitation of funds from Plaintiffs using U.S. mail and wires;

      b.  the transfer of funds from Plaintiffs' FDIC insured accounts in U.S. banks to Corporate Defendants via other FDIC insured correspondent U.S. banks;

      c.  the transfer of fund from Plaintiffs' banks in Japan to Corporate Defendants via other banks in and outside of Japan;

      d.  the guarantee of the principals invested by Plaintiffs in VEB, the Oil Fund, and the Palm Oil Fund by EBOA Trust and EUBK Trust which are Swedish entities;

      e.  providing banking services to residents of the U.S. and Japan without proper authority, oversight and being subject to any rules or regulations;

      f.  soliciting investment funds by agents who were not licensed by proper authorities;

      g.  the transmittal of the mailings described in paragraph 557 herein; and

128

        h.   the transmittal of the wires described in paragraphs 558 herein.

578.     Saito is associated with the Saito and Sakagami Enterprise as President, CEO and a member of the board of directors, of all Corporate Defendants since these companies were organized, and as a recipient of Plaintiffs' funds.

579.     Sakagami is associated with the Saito and Sakagami Enterprise as President, CEO and a member of the board of directors, of all Corporate Defendants since these companies were organized, and as a recipient of Plaintiffs' funds.

580.     Mr. Hashikura is associated with the Saito and Sakagami Enterprises as an agent directly soliciting funds from Plaintiffs and managing the relationship with Plaintiffs, and as a recipient of Plaintiffs' funds.

581.     Mrs. Hashikura is associated with the Saito and Sakagami Enterprises as an agent directly soliciting funds from Plaintiffs and managing the relationship with Plaintiffs, and as a recipient of Plaintiffs' funds.

582.     Termyna is associated with the Saito and Sakagami Enterprises as an agent directly soliciting funds from Plaintiffs and managing the relationship with Plaintiffs, and as a recipient of Plaintiffs' funds.

583.     Tsukuyomi is associated with the Saito and Sakagami Enterprises as an agent directly soliciting funds from Plaintiffs, managing the relationship with Plaintiffs and acting as conduit to facilitate investments.

584.     Corporate Defendants are associated with the Saito and Sakagami Enterprise as the recipients of Plaintiffs' funds.

585.     By the acts and omissions alleged herein, each participant in the Saito and Sakagami Enterprises knowingly and intentionally agreed to engage in, and has engaged in,

violations of criminal statutes that constitute a pattern of racketeering activity. Each Defendant has knowingly and intentionally engaged in the acts of racketeering activity alleged in paragraphs 550-568 herein.

586.    The racketeering acts set forth above are both related and continuous. Each is related to the others as part of the overall scheme to accomplish the Saito and Sakagami Enterprises' uniform purpose. The repeated nature of the conduct for more than six years makes these acts continuous.

587.    Defendants Saito, Sakagami, Mr. and Mrs. Hashikura, Termyna, each entity within the Corporate Defendants group, and Tsukuyomi are each "persons" as defined in 18 U.S.C. § 1961(3).

588.    While each of the Defendants participated in the Saito and Sakagami Enterprises, each has an identity separate and distinct from the Saito and Sakagami Enterprises as a whole.

589.    Plaintiffs have been uniquely injured as a result of Defendants' use and investment of racketeering proceeds. As a direct and proximate result of Defendants' conduct, Plaintiffs lost their funds when they were directed to invest their funds in VEB, the Oil Fund and Palm Oil Fund and to open bank accounts with BOA for the deposit of the returns and the principal. Plaintiffs have been left with guarantees from insolvent entities, accounts with a bank that is a paper entity, and in some instances with obligations to repay loans bearing high interests, while their funds have ultimately been transferred to Defendants Saito, Sakagami, Mr. and Mrs. Hashikura and Termyna. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million prior to the application of treble damages.

590.    Further necessary information regarding Defendants' racketeering activities lies solely within Defendants' control.

130

**COUNT V**
**VIOLATION OF RICO, SECTION 1962(b)**

591.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

592.    Defendants have acquired and maintained an interest in the Saito and Sakagami Enterprises through the pattern of racketeering activity described in paragraphs 550-568, in violation of 18 U.S.C. § 1962(b). Defendants Saito, Sakagami, the Hashikuras and Termyna at all relevant times, maintain an interest in, and control of the Saito and Sakagami Enterprises by holding various positions of control within, and in case of Saito and Sakagami ownership of, all the companies that are members of the Saito and Sakagami Enterprises.

593.    The Saito and Sakagami Enterprises are engaged in interstate or foreign commerce, and in activities that affect interstate or foreign commerce, as described in paragraph 566 herein.

594.    Defendants acquired and maintained their ownership interests in the Saito and Sakagami Enterprises and their assets through their pattern of wire fraud, mail fraud, financial institution fraud, interstate and foreign travel and use of interstate and foreign facilities in aid of racketeering, money laundering, engaging in monetary transactions in property derived from unlawful activity, transportation of stolen property, and sale or receipt of stolen property, as alleged in paragraphs 550-568. Defendants used their fraudulent transactions to solicit and obtain funds from Plaintiffs to transfer the same funds to Saito, Sakagami, the Hashikuras and Termyna.

595.    Plaintiffs have been uniquely injured as a result of Defendants' use and investment of racketeering proceeds. As a direct and proximate result of Defendants' conduct, Plaintiffs lost their funds when they were directed to invest their funds in VEB, the Oil Fund and

131

Palm Oil Fund and to open bank accounts with BOA for the deposit of the returns and the principal. Plaintiffs have been left with guarantees from insolvent entities, accounts with a bank that is a paper entity, and in some instances with obligations to repay loans bearing high interests, while their funds have ultimately been transferred to Defendants Saito, Sakagami, Mr. and Mrs. Hashikura and Termyna. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million prior to the application of treble damages.

### COUNT VI
### VIOLATION OF RICO, SECTION 1962(c)

596.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

597.    Saito, Sakagami, the Hashikuras and Termyna have conducted, or participated in the conduct of the affairs of the Saito and Sakagami Enterprises through the pattern of racketeering activity described in paragraphs 550-568, in violation of 18 U.S.C. § 1962(c).

598.    The Saito and Sakagami Enterprises are engaged in interstate or foreign commerce, and in activities that affect interstate or foreign commerce, as described in paragraph 566.

599.    Saito, Sakagami, the Hashikuras and Termyna exercise or exercised a managerial role in the Saito and Sakagami Enterprises. Saito and Sakagami wholly own and control the entities in the Saito and Sakagami Enterprises, and the Hashikuras and Termyna directly solicited investments in VEB, the Oil Fund and the Palm Oil Fund.

600.    Defendants have conducted, or participated in the conduct of the affairs of the Saito and Sakagami Enterprises through a pattern of racketeering activity by engaging in the acts described in paragraphs 550-568.

601.    Plaintiffs have been injured as a result of Defendants' actions in using a pattern of racketeering activity to conduct, or to participate in the conduct of the affairs of the Saito and Sakagami Enterprises. As a direct and proximate result of Defendants' conduct, Plaintiffs lost their funds when they were directed to invest their funds in VEB, the Oil Fund and Palm Oil Fund and to open bank accounts with BOA for the deposit of the returns and the principal. Plaintiffs have been left with guarantees from insolvent entities, accounts with a bank that is a paper entity, and in some instances with obligations to repay loans bearing high interests, while their funds have ultimately been transferred to Defendants Saito, Sakagami, Mr. and Mrs. Hashikura and Termyna. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million prior to the application of treble damages.

## COUNT VII
## VIOLATION OF RICO, SECTION 1962(d)

602.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

603.    Defendants agreed to join in a conspiracy whose goal was the commission of the predicate acts alleged in paragraphs 550-568.

604.    Defendants knew that the predicate acts alleged in paragraphs 550-568 were part of a pattern of racketeering activity conducted in such a way as to violate sections 1962(a), (b), and (c) of RICO.

605.    Each Defendant had a separate and specific role in the conspiracy. Defendant Saito and Sakagami formed the Corporate Defendants, with Mr. and Mrs. Hashikura and Termyna, they planned and executed the pattern of racketeering activity alleged in paragraphs 550-568.

133

606.    Plaintiffs have been injured as a result of the overt acts committed by Defendants in furtherance of the conspiracy. As a direct and proximate result of Defendants' conduct, Plaintiffs lost their funds when they were directed to invest their funds in VEB, the Oil Fund and Palm Oil Fund and to open bank accounts with BOA for the deposit of the returns and the principal. Plaintiffs have been left with guarantees from insolvent entities, accounts with a bank that is a paper entity, and in some instances with obligations to repay loans bearing high interests, while their funds have ultimately been transferred to Defendants Saito, Sakagami, Mr. and Mrs. Hashikura and Termyna. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million prior to the application of treble damages.

## COUNT VIII
## FRAUD AGAINST MAMORU SAITO AND TAKAHITO SAKAGAMI

607.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

608.    Saito and Sakagami misrepresented material facts and omitted to state material facts to Plaintiffs in connection with investment in the Projects and deposits with BOA as more particularly alleged in the preceding paragraphs.

609.    Saito and Sakagami had actual knowledge that the funds invested by Plaintiffs would not be used as represented to Plaintiffs but, in fact, would be used, *inter alia*, for purposes wholly unrelated to the proposed investments and for other improper and/or unauthorized purposes. Saito and Sakagami both knew that many, if not all, of the purported business ventures underlying the Projects they were promoting were phony and intended thereby to deceive Plaintiffs.

134

610.     Saito and Sakagami had actual knowledge that BOA was a paper company, could not receive and could not take custody of Plaintiffs deposits. Saito and Sakagami never transferred any funds – Plaintiffs sent to EBOA – from EBOA to BOA. They had actual knowledge that BOA was not licensed to provide banking services in the U.S. and in Japan.

611.     Saito and Sakagami had actual knowledge that EBOA Trust and EUBK Trust were paper companies. Saito and Sakagami knew that guarantees given by these institutions were worthless.

612.     Saito and Sakagami had actual knowledge or should have knows that Amiworld's securities would not be listed on the NASDAQ.

613.     Saito and Sakagami had actual knowledge that Great Voyages was a paper company and that they had no intention to purchase any vessels.

614.     Plaintiffs believed these representations. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, that, *inter alia*, the funds invested and deposited by them with Saito and Sakagami would not be used for their intended purpose, would be paid to Saito and Sakagami and their agents the Hashikuras and Termyna personally, would be used for purposes wholly unrelated to the proposed investments and for other improper and/or unauthorized purposes. Likewise, Plaintiffs did not know that many of the purported business ventures underlying Projects were phony.

615.     As a result of the materially false and misleading information and failures to disclose material facts, Plaintiffs reasonably relied upon Saito's and Sakagami's fraudulent representations and were induced to invest in the Projects and deposit monies with BOA unaware that the funds would not be used as represented.

616.     Such reliance of Plaintiffs was known to Saito and Sakagami.

135

617.     The representations by Saito and Sakagami (a) were material; (b) were false when made; (c) were known by Saito and Sakagami to be false, and (d) were intended to deceive Plaintiffs.

618.     By virtue of the fraudulent conduct of Saito and Sakagami, as herein alleged, including, but not limited to, the fraudulent and deceptive representations made to Plaintiffs, and the active concealment of their fraudulent conduct, Plaintiffs have been defrauded and deceived by Saito and Sakagami.

619.     Saito's and Sakagami's fraudulent conduct, as alleged herein, was undertaken willfully, wantonly, and in reckless disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to an award of punitive damages against Saito and Sakagami.

620.     As a result of the foregoing, Plaintiffs' investments in the Projects are worthless and have thereby been damaged. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million.

## COUNT IX
## FRAUD AGAINST TETSUYA HASHIKURA, HIROMI HASHIKURA, AND RUMIKO TERMYNA

621.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

622.     Mr. and Mrs. Hashikura and Termyna misrepresented material facts and omitted to state material facts to Plaintiffs in connection with investments in the Projects and deposits with BOA as more particularly alleged herein.

623.     Mr. and Mrs. Hashikura and Termyna had actual knowledge that the funds invested by Plaintiffs would not be used as represented to Plaintiffs but, in fact, would be used, *inter alia*, for purposes wholly unrelated to the proposed investments and for other improper

136

and/or unauthorized purposes. Mr. and Mrs. Hashikura and Termyna knew that many, if not all, of the purported business ventures underlying the Projects they were promoting were phony and intended thereby to deceive Plaintiffs.

624.    Mr. and Mrs. Hashikura and Termyna had actual knowledge that BOA was a paper company, could not receive and could not take custody of Plaintiffs deposits. Mr. and Mrs. Hashikura and Termyna had actual knowledge that Saito and Sakagami never transferred any funds – Plaintiffs sent to EBOA – from to BOA. They had actual knowledge or should have known that BOA was not licensed to provide banking services in the U.S. and in Japan.

625.    Mr. and Mrs. Hashikura and Termyna had actual knowledge that EBOA Trust and EUBK Trust were paper companies. Mr. and Mrs. Hashikura and Termyna knew or should have known that the guarantees given by these institutions were worthless.

626.    Mr. and Mrs. Hashikura and Termyna had actual knowledge or should have known that Amiworld's securities would not be listed on the NASDAQ.

627.    Plaintiffs believed these representations. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, that, *inter alia*, the funds invested and deposited by them with Saito and Sakagami would not be used for their intended purpose, would be paid to Saito and Sakagami and their agents the Hashikuras and Termyna personally, would be used for purposes wholly unrelated to the proposed investments and for other improper and/or unauthorized purposes. Likewise, Plaintiffs did not know that many of the purported business ventures underlying Projects were phony.

628.    As a result of the materially false and misleading information and failures to disclose material facts, Plaintiffs reasonably relied upon Mr. and Mrs. Hashikura's and

Termyna's fraudulent representations and were induced to invest in the Projects and deposit monies with BOA unaware that the funds would not be used as represented.

629.     Such reliance of Plaintiffs was known to Mr. and Mrs. Hashikura and Termyna.

630.     The representations by Mr. and Mrs. Hashikura and Termyna (a) were material; (b) were false when made; (c) were known by Mr. and Mrs. Hashikura and Termyna to be false, and (d) were intended to deceive Plaintiffs.

631.     By virtue of the fraudulent conduct of Mr. and Mrs. Hashikura and Termyna, as herein alleged, including, but not limited to, the fraudulent and deceptive representations made to Plaintiffs, and the active concealment of their fraudulent conduct, Plaintiffs have been defrauded and deceived by Mr. and Mrs. Hashikura and Termyna.

632.     Mr. and Mrs. Hashikura's and Termyna's fraudulent conduct, as alleged herein, was undertaken willfully, wantonly, and in reckless disregard for the rights of Plaintiffs. Plaintiffs are therefore entitled to an award of punitive damages against Saito and Sakagami.

633.     As a result of the foregoing, Plaintiffs' investments in the Projects are worthless and have thereby been damaged. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million.

## COUNT X
## AIDING AND ABETTING CIVIL CONSPIRACY-FRAUD
## AGAINST TETSUYA HASHIKURA, HIROMI HASHIKURA, AND RUMIKO
## TERMYNA

634.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

635.     Mr. and Mrs. Hashikura and Termyna knew of, or recklessly disregarded the circumstances surrounding the fraudulent sales of investments in the Projects and solicitation of

deposits with BOA by Saito and Sakagami to Plaintiffs, alleged in Count VIII above (the "Fraud").

636.    Mr. and Mrs. Hashikura and Termyna aided and abetted Saito and Sakagami make material misrepresentations concerning the business and operations of the Corporate Defendants to the SEC.

637.    Mr. and Mrs. Hashikura and Termyna materially misrepresented the business and operations of Amiworld, ODIN Energy, Great Voyages, ODIN NY, EBOA, BOA, EUBK Trust, EBOA Trust and other related entities; made false and misleading verbal and/or written statements that were distributed, with Saito's and Sakagami's knowledge, to Plaintiffs in furtherance of the fraud, *inter alia*, via telephone, email and/or through the distribution of offering memoranda, stock purchase agreements and other literature related to the Projects and deposits with BOA, causing Plaintiffs to reasonably understand that their investments in the Projects and deposits with BOA were guaranteed from loss, when, in fact, at all relevant times, none of the purported guarantor entities were sufficiently capitalized to satisfy or guarantee any material Plaintiffs' claims, as alleged in this Amended Complaint.

638.    On information and belief, Mr. and Mrs. Hashikura and Termyna entered into an agreement with Saito and Sakagami to sell fraudulent investments in the Projects and to obtain deposits for BOA for the overall goal of making a substantial profit to the detriment of Plaintiffs.

639.    In furtherance of the agreement with Saito and Sakagami, Defendants aggressively solicited Plaintiffs for the purpose of inducing them to invest in the Projects and make deposits with BOA and facilitated the process by which Plaintiffs ultimately invested in the Projects and made deposits with BOA.

640.     Defendants purposely and intentionally solicited Plaintiffs for the purpose of inducing them to invest in the Projects and make deposits with BOA in order to make substantial profits to Plaintiffs' detriment.

641.     As a result of the foregoing, Plaintiffs' investments in the Projects are worthless and have thereby been damaged. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million.

**COUNT XI**
**NEGLIGENT MISREPRESENTATION**
**AGAINST MAMORU SAITO AND TAKAHITO SAKAGAMI**

642.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

643.     Saito and Sakagami owed a duty of care, imposed by the federal securities laws and state fiduciary duty law, to disseminate complete, accurate and truthful information to Plaintiffs in connection with sales of securities of Amiworld. In pursuing the conduct described herein, Saito and/or Sakagami negligently omitted to disclose material facts, as alleged in this Amended Complaint, thereby breaching the duty of care owed to Plaintiffs.

644.     Saito and Sakagami were without any reasonable basis for believing that such omissions of material fact were justified.

645.     The material omissions reference herein occurred directly between Saito and/or Sakagami and Plaintiffs while Saito and/or Sakagami were acting in a fiduciary capacity as brokers and/or investment advisors to Plaintiffs. Plaintiffs were in privity with Saito and/or Sakagami and shared a relationship of trust and confidence with them.

140

646.     At the time of said material omissions, Plaintiffs were ignorant of the facts omitted and believed contrary facts to be true. In reliance upon the superior knowledge and expertise of Saito and/or Sakagami, Plaintiffs were induced to and did investment in the Projects and deposit monies with BOA. Had Plaintiffs known the truth, they would not have taken such action.

647.     As set forth above, the Defendants are liable to Plaintiffs for negligent misrepresentation because (1) Defendants had a fiduciary duty to Plaintiffs to provide pertinent and all accurate information in connection with the Projects, (2) Defendants knowingly made false representations and purposefully omitted pertinent information, (3) the information was needed by Plaintiffs to make informed decisions with respect to the investments for the Projects, (4) Plaintiffs reasonably relied on the false representations and on Defendants' disclosure of all material information to their detriment.

648.     As a result of the foregoing, Plaintiffs' investments in the Projects are worthless and have thereby been damaged. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million.

### COUNT XII
### NEGLIGENT MISREPRESENTATION AGAINST
### TETSUYA HASHIKURA, HIROMI HASHIKURA, RUMIKO TERMYNA

649.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

650.     Mr. and Mrs. Hashikura and Termyna owed a duty of care, imposed by the federal securities laws and state fiduciary duty law, to disseminate complete, accurate and truthful information to Plaintiffs in connection with sales of Amiworld securities.  In pursuing the conduct described herein, Mr. and Mrs. Hashikura and Termyna negligently omitted to disclose

material facts, as alleged in this Amended Complaint, thereby breaching the duty of care owed to Plaintiffs.

651.    Mr. and Mrs. Hashikura and Termyna were without any reasonable basis for believing that such omissions of material fact were justified.

652.    The material omissions references herein occurred directly between Mr. and Mrs. Hashikura and Termyna and Plaintiffs while they were acting in a fiduciary capacity as brokers and/or investment advisors to Plaintiffs.  Plaintiffs were in privity with Mr. and Mrs. Hashikura and Termyna and shared a relationship of trust and confidence with them.

653.    At the time of said material omissions, Plaintiffs were ignorant of the facts omitted, and believed contrary facts to be true. In reliance upon the superior knowledge and expertise of Mr. and Mrs. Hashikura and Termyna, Plaintiffs were induced to and did invest in the Projects and deposit monies with BOA. Had Plaintiffs known the truth, they would not have taken such action.

654.    As set forth above, the Defendants are liable to Plaintiffs for negligent misrepresentation because (1) Defendants had a fiduciary duty to Plaintiffs to provide pertinent and all accurate information in connection with the Projects, (2) Defendants knowingly made false representations and purposefully omitted pertinent information, (3) the information was needed by Plaintiffs to make informed decisions with respect to the investments for the Projects, (4) Plaintiffs reasonably relied on the false representations and on Defendants' disclosure of all material information to their detriment.

655.    As a result of the foregoing, Plaintiffs' investments in the Projects are worthless and have thereby been damaged. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million.

## COUNT XIII
## COMMON LAW BREACH OF FIDUCIARY DUTY
## AGAINST SAITO AND SAKAGAMI

656.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

657.    At all relevant times Plaintiffs, as investors in the various Projects, reposed trust and confidence in the Saito and/or Sakagami, who thereby gained a resulting influence over Plaintiffs by gaining control over Plaintiffs' invested funds.

658.    Saito and Sakagami built this relationship of trust and confidence by a combination of false promises, misrepresentations, and omissions. The key lie told by Saito and Sakagami was that Plaintiffs' funds would only be used as investments in the Projects and that their deposits with BOA would be safe and secured against loss. Plaintiffs entrusted their funds to Saito and Sakagami for these purposes only.

659.    Saito and Sakagami accepted control of Plaintiffs' funds subject to these conditions.

660.    Saito and Sakagami gained this relationship of confidence and trust by numerous other false promises. Saito and Sakagami held themselves out – on their various websites, SEC filings, and through other communications with Plaintiffs - as experienced, trustworthy businessmen, with an unblemished track-record of successful ventures. They also gained the trust and confidence of Plaintiffs by falsely assuring them that their investments amounts were guaranteed by reliable, sufficiently capitalized institutions.

661.    Finally, Saito and Sakagami gained the Plaintiffs' trust and confidence by promising Plaintiffs free access to withdrawals from their BOA accounts and reinforcing this

impression by providing temporary, piecemeal access to their accounts for a limited period of time after their initial investments in the projects.

662.    Thus, at all relevant times, a fiduciary relationship existed between Saito and Sakagami, as brokers and/or investment promoters, and Plaintiffs, as investors and bank account holders, with respect to the funds that Plaintiffs entrusted to Saito and Sakagami.  Saito and Sakagami owed a fiduciary duty to use the funds that Plaintiffs entrusted to them only for authorized purposes. This duty included an obligation not to intentionally use the entrusted funds to the detriment of Plaintiffs or for Saito's, Sakagami's and the other Defendants' own benefit or to misappropriate those funds for Saito's, Sakagami's and the other Defendants' own personal benefit or the benefit of others.

663.    Saito and Sakagami owed a fiduciary duty to the Plaintiffs. Saito and Sakagami knowingly breached the obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision. Saito and Sakagami breached their fiduciary duties to Plaintiffs by making false representations and promises about the Corporate Defendants' purported business activities, by withholding Plaintiffs' investment principals and returns and refusing to honor the vast majority of Plaintiffs' account withdrawal requests, by misappropriating and moving Plaintiffs' funds out of reach of any of tools for the enforcement of their rights as creditors. By all of these means, Saito and Sakagami misappropriated Plaintiffs' funds for their benefit, using them for the unauthorized purposes described above.

664.    As a result of the foregoing, Plaintiffs' investments in the Projects are worthless and have thereby been damaged. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million.

<u>COUNT XIV</u>
<u>COMMON LAW BREACH OF FIDUCIARY DUTY</u>
<u>AGAINST TETSUYA HASHIKURA, HIROMI HASHIKURA, RUMIKO TERMYNA</u>

665.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

666.    At all relevant times Plaintiffs, as investors in the various Projects, reposed trust and confidence in Mr. and Mrs. Hashikura and Termyna as the agents of Saito, Sakagami and Corporate Defendants, who thereby gained a resulting influence over Plaintiffs by gaining control over Plaintiffs' invested funds.

667.    Mr. and Mrs. Hashikura and Termyna built this relationship of trust and confidence by a combination of false promises, misrepresentations, and omissions. The key lie told by Mr. and Mrs. Hashikura and Termyna, on behalf of Saito and Sakagami, was that Plaintiffs' funds would only be used as investments in the Projects and deposit with BOA. Plaintiffs entrusted their funds to Mr. and Mrs. Hashikura and Termyna, for these purposes only.

668.    Mr. and Mrs. Hashikura and Termyna, on behalf of Saito and Sakagami, accepted control of Plaintiffs' funds subject to this condition.

669.    Mr. and Mrs. Hashikura and Termyna, on behalf of Saito and Sakagami, gained this relationship of confidence and trust by numerous other false promises. Mr. and Mrs. Hashikura and Termyna – through their communications with Plaintiffs – reinforced the image of Saito and Sakagami as experienced, trustworthy businessmen, with an unblemished track-record of successful ventures. They also gained the trust and confidence of Plaintiffs by falsely assuring them that their investments amounts were guaranteed by reliable, sufficiently capitalized institutions. Mr. and Mrs. Hashikura and Termyna, on behalf of Saito and Sakagami,

gained the Plaintiffs' trust and confidence by promising Plaintiffs free access to withdrawals from their BOA accounts and reinforcing this impression by assisting Saito and Sakagami in providing temporary, piecemeal access to their accounts for a limited period of time after their initial investments in the projects.

670.    Finally, Mr. and Mrs. Hashikura and Termyna used their prior business and personal relationships with Plaintiffs within the tight-knit Japanese immigrant community as a source of trust and confidence to exploit against Plaintiffs and lure them into investing in the projects.

671.    Thus, at all relevant times, a fiduciary relationship existed between Mr. and Mrs. Hashikura and Termyna and Plaintiffs, as investors, with respect to the funds that Plaintiffs entrusted to Mr. and Mrs. Hashikura and Termyna.  Mr. and Mrs. Hashikura and Termyna owed a fiduciary duty to ensure that the funds that Plaintiffs entrusted to them would be used only for authorized purposes. This duty included an obligation not to intentionally use the entrusted funds to the detriment of Plaintiffs or for Mr. and Mrs. Hashikura's, Termyna's, Saito's, Sakagami's or Corporate Defendants' own benefit, or to misappropriate those funds, or generate commission fees deriving from their active facilitation of others' misappropriation of those funds - for Mr. and Mrs. Hashikura's and Termyna's own personal benefit or the benefit of others.

672.    Mr. and Mrs. Hashikura and Termyna owed a fiduciary duty to the Plaintiffs. Mr. and Mrs. Hashikura and Termyna knowingly breached the obligations and fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision. Mr. and Mrs. Hashikura and Termyna breached their fiduciary duties to investors by making false representations and promises about the Corporate Defendants' purported business activities, by participating in the withholding Plaintiffs' investment principals and returns and refusing to honor the vast majority

146

of Plaintiffs' account withdrawal requests, by assisting Saito and Sakagami in misappropriating and moving Plaintiffs' funds out of reach of any of tools for the enforcement of their rights as creditors. By all of these means, Mr. and Mrs. Hashikura and Termyna assisted Saito and Sakagami in their efforts to misappropriate investor funds for their benefit, using them for the unauthorized purposes described above.

673.   As a result of the foregoing, Plaintiffs' investments in the Projects and deposits with BOA are worthless, and have thereby been damaged. The exact amount of Plaintiffs' injury is to be determined at trial, but totals substantially in excess of $11.4 million.

## COUNT XV
## UNJUST ENRICHMENT

674.   Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs.

675.   Pursuant to agreements between the parties, Plaintiffs gave their personal funds to Defendants to be specifically deposited in BOA and applied to the various investments for the Projects.  Plaintiffs had the reasonable expectation that they would receive a return of their investment plus very significant returns.

676.   The funds were not applied as agreed to by the parties and were instead applied elsewhere.  Accordingly, Plaintiffs have an immediate and superior right to the possession of their funds.

677.   Despite demand, Defendants have not returned Plaintiffs' funds.

678.   By failing to pay back the Plaintiffs' funds, Defendants have received monies at the expense of Plaintiffs and therefore have been unjustly enriched. Defendants' retention of the funds violates fundamental principles of justice, equity, and good conscience.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court:

(i)    declare, determine and find that Defendants committed the violations of the federal securities laws alleged in this Amended Complaint;

(ii)    issue a permanent injunction restraining and enjoining Defendants from violating the federal securities laws alleged in this Amended Complaint;

(iii)    issue an Order requiring Defendants to disgorge all ill-gotten profits or proceeds they received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest;

(iv)    award Plaintiffs civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d); and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

(v)    award Plaintiffs three times the damages they sustained in accordance with 18 U.S.C. § 1964(c) in an amount to be determined at trial;

(vi)    award Plaintiffs their costs, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c);

(vii)    issue an Order holding all Defendants jointly and severally liable for one another's acts in furtherance of the common scheme;

(viii)    award Plaintiffs the damages they sustained in an amount to be determined at trial;

(ix)    award Plaintiffs punitive damages in an amount to be determined at trial;

(x)    award Plaintiffs their costs, including reasonable attorneys' fees;

(xi)    award Plaintiffs pretrial interest in an amount to be determined at trial; and

(xii)     grant Plaintiffs such other and further relief as the Court deems necessary or

appropriate.

(xiii)    Plaintiffs request a trial by jury.

Dated: New York, New York

February 14, 2011

Respectfully submitted,

By: _s/Florence Rostami_____

Florence Rostami (FR-1338)
Florence Rostami Law, LLC
708 Third Avenue, 5th Floor
New York, New York 10017
(212) 209-3962
frostami@rostamilaw.com

*Attorneys for Plaintiffs*

149